**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

TRANSPERFECT GLOBAL, INC.,

                    Plaintiff,

        -vs-

LIONBRIDGE TECHNOLOGIES, INC., and
H.I.G. MIDDLE MARKET, LLC,

                  Defendants.

19-cv- _____

**COMPLAINT**

**[Demand for Jury Trial]**

---

      Plaintiff, TransPerfect Global, Inc. ("TPG" or the "Company"), as for its Complaint alleges as follows:

## INTRODUCTION

      1.     This is an action for monetary damages and injunctive relief. The Defendants caused injury when they acquired the Company's trade secrets and confidential information under false pretenses, and then used the trade secrets to unfairly compete with TPG. Defendants continue to use the misappropriated trade secrets and are irreparably harming the Company.

      2.     In August 2015, the Delaware Court of Chancery ("Chancery Court") ordered the stockholders of TPG to sell their shares at auction. Chancellor Bouchard appointed Robert Pincus ("Pincus") to serve as the Custodian of TPG for purposes of conducting the forced sale.

      3.     Pincus hired Credit Suisse to conduct the auction notwithstanding a <u>serious</u> and disabling conflict of interest. Credit Suisse was simultaneously advising Defendant H.I.G. Middle Market, LLC ("H.I.G.") on the acquisition of the Company's largest competitor – Defendant Lionbridge Technologies ("Lionbridge") – and negotiating a credit facility of $335 million to fund the purchase. Importantly, Defendants and Credit Suisse had determined that a combination of

TPG and Lionbridge would inure to their respective benefit by strengthening Lionbridge and improving the quality of the outstanding debt instruments being underwritten by Credit Suisse. To that end, Credit Suisse advised Pincus to reject a co-founder offer from Shawe which would have promptly resulted in a value-maximizing sale of the Company with minimal disruption to its business.

4.       The auction proceeded with Credit Suisse in control of the process. Despite inviting many dozens of third parties to participate in the auction, Credit Suisse convinced Pincus to exclude qualified strategic buyers from the auction so that H.I.G. was the only strategic purchaser positioned to acquire the Company. Notwithstanding this advantage, H.I.G. understood that it would be financially imprudent (and therefore was unwilling) to outbid Shawe in the auction unless it knew that Shawe would be prohibited from competition by means of a court ordered non-compete.

5.       H.I.G. never approached Shawe to negotiate and pay for a non-compete; rather, it repeatedly encouraged Pincus to seek a restrictive covenant against Shawe to make TPG a less expensive target. Shawe made it clear that he would not be the subject of a bogus, and likely unconstitutional, restrictive covenant without a court battle. He also participated in good faith in the auction. As a result, H.I.G. was priced out of the auction because the prospect of post-auction competition from Shawe meant that the Company was worth as much as $200 million less to any other buyer.

6.       As the auction progressed, H.I.G. realized that it would not prevail against Shawe because there was no viable basis for a restrictive covenant. It then changed direction in order to benefit Defendants by misappropriating trade secrets for Lionbridge to use to compete in violation of federal law. Thus, H.I.G. remained a participant in the auction in bad faith to gain access to

additional trade secrets of the Company and its affiliates and subsidiaries.  Specifically, H.I.G. submitted one or more bids and entered into a written agreement it never intended to honor so that it could gain increased access to TPG's trade secrets.

7.     During the auction, a data room was set up that entrusted bidders with access to extensive confidential business information and trade secrets regarding TPG's business operations. Credit Suisse failed to take meaningful steps to protect the Company's confidential information, and Defendants were permitted to freely interview TPG's management and downloaded TPG's top clients lists, pricing information, commission schedules, employee files, and sales strategies.

8.     H.I.G. and Lionbridge have used TPG's trade secrets and continue to use this information to compete unfairly.  Lionbridge has revamped its sales strategy, product offerings and pricing to mirror that of TPG and continues to use TPG's trade secrets to poach TPG's clients. Despite TPG's demand for the return or destruction of all confidential documents and information accessed during the auction, H.I.G. has refused to comply.

9.     TPG seeks monetary damages and injunctive relief against the Defendants to enjoin them from their ongoing use of trade secrets and confidential information.

## PARTIES

10.    Plaintiff TPG is a Nevada corporation with its nerve center and principal place of business in New York, New York.

11.    Upon information and belief, Defendant Lionbridge is a Delaware corporation with its principal place of business in Waltham, Massachusetts.  Lionbridge is one of TPG's main competitors and provides translation services worldwide.  At all times relevant to this action, Lionbridge's senior management, including its CEO John Fennelly and CFO Clemente Cohen ran

the company together from New York, New York.  At all times relevant to this action, Lionbridge and TPG were the top two language service providers in the industry, measured by revenue.

12.     Upon information and belief, Defendant H.I.G. is a Delaware limited liability company with its nerve center and principal place of business in Miami, Florida.   H.I.G. is a private equity and alternative assets investments firm.  In 2016, H.I.G. devised a strategy to acquire Lionbridge and TPG to create the world's largest language translation service provider.

### RELEVANT NON-PARTIES

13.     TPG Holdings, LLC, a New York limited liability company ("TPG Holdings"), owns 100% of the Company.

14.     Philip Shawe ("Shawe") is a co-founder of TPG and owns ninety-nine percent (99%) of the membership interests in TPG Holdings.  Shawe's mother, Shirley Shawe, owns the remaining one percent (1%) interest.

15.     Elizabeth Elting ("Elting") was a co-founder of TPG and 50% owner of TPG before Shawe, through TPG Holdings, purchased Elting's shares in May 2018.

16.     Robert B. Pincus ("Pincus" or "Custodian") was, at all relevant times, an attorney and partner in the law firm of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), in Skadden's Wilmington, Delaware office.  Pincus was the Custodian appointed by the Chancery Court to conduct the sale of TPG, and to act as a tie-breaking third director of TPG pending the sale.  As part of the Sales Purchase Agreement ("SPA"), Pincus required a broad and sweeping release of claims relating to his role in the sale process.

17.     Credit Suisse Group, including without limitation Credit Suisse Securities (USA) LLC and Credit Suisse AG's Cayman Island Branch (collectively, "Credit Suisse") was hired by the Custodian to serve as TPG's exclusive financial advisor in connection with the sale of the

Company.  As part of the SPA, Credit Suisse required a broad and sweeping release of claims relating to its role in the sale process.

18.     Houlihan Lokey, Inc. ("Houlihan") is a California corporation that was initially hired as a financial advisor to assist the Custodian in identifying and analyzing sale alternatives. That same Houlihan team later switched sides and became the financial advisor to H.I.G. as a bidder in the auction process.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over Plaintiff's claim arising under federal law under 28 U.S.C. § 1331 and 18 U.S.C. § 1836, *et seq.*, and supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.  In addition, this Court has subject matter jurisdiction over Plaintiff's state law claims under § 1332(a) as there is complete diversity of citizenship and the amount in controversy exceeds $75,000.

20.     This Court has personal jurisdiction over all Defendants and venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred here.

## FACTUAL BACKGROUND

The Proprietary Information

21.     Shawe and Elting started TPG in 1992 from a dormitory room at New York University.

22.     Using proprietary and confidential information developed through the devotion of much time, effort and financial resources, TPG has grown in the relatively short time since its founding, to become one of the world's leading providers of translation, website localization and litigation support services.  It currently employees approximately 5,000 full-time employees, with

more than 100 offices throughout the world.  The Company has a network of more than 25,000 translators, editors and proofreaders working in approximately 170 different languages.

23.     The proprietary and confidential information that has played a crucial role in fueling TPG's growth includes, but is not limited to, sales models, marketing strategies, unique cost and pricing structures, compensation models and commission schedules.  As the Company has grown, it has developed additional proprietary and confidential information including, but not limited to, many unique customer and vendor relationships based on particularized presentations and embodied in separately negotiated customer and vendor contracts.  The information referenced in this paragraph 23 is hereinafter referred to as "the Proprietary Information," as encompassing each separate category and the information *in toto*.

24.     TPG has gone, and continues to go, to great lengths to protect the confidentiality of Proprietary Information.  The steps that the Company has taken to effectuate this protection include, but are not limited to, the following:

> A.     All such information is password protected in the Company's network drive with regularly monitored access limited on a need to know basis.  For example, only the most senior marketing executives have access to marketing data; only very senior HR managers and accountants are allowed payroll access; and financial information is inaccessible to all but senior management and a very limited number of executives with the financial portfolio.

> B.     Proprietary Information is scattered to disparate parts of TPG's system, rather than concentrated even by topic, to make hacking the information more difficult.

C.      The TP system is secured by firewall, additional anti-penetration tools and infrastructure vulnerability scans and code review;

D.      Frequently, departments working with Proprietary Information are physically segregated from other parts of the Company.  For example, the domestic payroll team sits in a separate office accessible only by use of a secure pass.

E.      Multi-year Non-Disclosure Agreements ("NDAs") are entered into with all employees, clients and vendors before any Proprietary Information is disclosed, to the point where the Company has eschewed business opportunities when the putative client declines to agree to TPG's confidentiality protocol.

F.      TPG aggressively enforces its NDAs, and reinforces confidentiality obligations as part of the exit process for employees leaving the Company.

The Chancery Court Orders the Sale of the Company and Appoints the Custodian

25.     TPG has grown to become one of the world's leading providers of translation, website localization, and litigation support services.  It currently employs approximately 5,000 full-time employees, with more than 100 offices throughout the world.  The Company has a network of more than 25,000 translators, editors, and proofreaders working in approximately 170 different languages.

26.     Shawe and Elting were the co-founders and the controlling shareholders of the Company until May 2018.

27.     In April 2014, Elting filed a petition in the Chancery Court seeking the dissolution and forced sale of TPG based on alleged director and shareholder deadlock.

28.     In August 2015, the Chancery Court issued an unprecedented Order appointing a custodian and directing that TPG, a highly profitable company, be sold as a going concern. Chancellor Bouchard appointed Pincus to oversee the judicially ordered sale of the Company.  The Chancery Court ordered Pincus to "propose[] a plan to sell the Company with a view toward maintaining the business as a going concern and maximizing value for the stockholders."  *In re Shawe & Elting LLC*, 2015 WL 4874733, at *32 (Del. Ch. Aug. 13, 2015).

The Custodian Hires Houlihan and Other Advisors to Assist in the Sale

29.     On or about October 2, 2015, Pincus hired Houlihan as a financial advisor to assist the Custodian in identifying and analyzing sale alternatives.  Houlihan was permitted full access to the Company's Proprietary Information and trade secrets, including its in-depth financials, pricing models, compensation models and detailed information on TPG's clients and personnel.

30.     On or about February 8, 2016, Houlihan produced a report which recommended a "Modified Auction" approach which, according to the report, was dependent on a court-imposed competition restriction upon Shawe and Elting in order to succeed.

31.     The Modified Auction was the most expensive and risky proposal of the options considered by Houlihan.  It was likely to result in a lengthier sale process, was difficult to control, was a distraction for management, required a restrictive covenant from Shawe and Elting which did not exist, and would necessarily involve the sharing of the Proprietary Information and trade secrets with industry competitors participating in the auction.  Houlihan recognized that this plan would require "carefu[l] manage[ment]" of the "sharing of confidential information with third

parties, particularly potential competitors," but advocated for it nonetheless.[1]   Houlihan Lokey

Report to the Custodian dated February 8, 2016 at p. 44.

32.     On February 8, 2016, the Custodian submitted a proposed plan of sale (the "Sale

Report") to the Chancery Court.   The Sale Report set forth a plan for a modified auction that

permitted bids from outside parties and recommended that the court impose a non-contractual

competition restriction on Shawe.   Shawe objected to both the modified auction and an

uncompensated court-imposed non-compete.   Elting supported the Custodian's plan.

33.     On July 18, 2016, the Chancery Court issued a sale order (the "Sale Order'), based

largely on the Sale Report, which adopted the Custodian's recommendation for the Modified

Auction over Shawe's objections, but declined to impose a non-compete against Shawe.   The Court

recognized the value to a buyer if Shawe and Elting were subject to competition restrictions, but

did not take this drastic remedy, stating that "the purpose of the sale process is to maximize the

value of the Company *as it is* and not to derive a hypothetically higher value based on contractual

protections the Company may not currently possess."

H.I.G., Lionbridge, and Credit Suisse Work to Give H.I.G. an Advantage

34.     In April 2016, H.I.G. approached Lionbridge concerning a go-private acquisition

which resulted in the two parties entering into a confidentiality agreement.   Upon information and

---

[1] Upon information and belief, Houlihan was incentivized to recommend the Modified Auction.
The bases for this belief are multiple.  First, when confronted with recognized literature such as
the article entitled "Shotguns and Deadlocks" (which was published in the *Yale Journal on
Regulation* and recommends a Texas buy-sell process to maximize the risk adjusted value to the
deadlocked shareholders), Brian McDonald of Houlihan implied to Shawe that he was being
pressured to recommend the Modified Auction.  Second, it was illogical for Houlihan to endorse
a plan the success of which hinged on the Chancery Court imposing broad extra-contractual non-
compete obligations on Shawe and Elting.  Finally, upon information and belief, Houlihan
expected that it would be given the lucrative assignment of acting as the Custodian's financial
advisor for the auction (which would be a much smaller project in a Texas buy-sell process) and
in early Fall 2016, the Custodian proposed that Houlihan run the auction.

belief, H.I.G. discussed with Lionbridge that H.I.G.'s acquisition of both Lionbridge and TPG would permit Lionbridge to solidify its position as the dominant translations services provider worldwide.  Acquiring TPG would have enabled Lionbridge to diversify its customer base, achieve double digit revenue growth, and increase its margins given TPG's profitability.

35.     Upon further information and belief, H.I.G. explained to Lionbridge that its acquisition of Lionbridge had to be expeditious in order to purchase TPG at the impending sale. The bases for such beliefs are the actions taken by Defendants and statements made by Lionbridge's then-CEO with respect to Lionbridge's goal to acquire companies, and in particular, TPG.

36.     In late July 2016, four days after the Sale Order, H.I.G. submitted its initial bid to Lionbridge for $5.50 per share.  H.I.G. hired Credit Suisse as its advisor and banker for the acquisition.

37.     On November 16, 2016, Pincus hired Credit Suisse[2] to act as his financial advisor for the sale of TPG.  Pincus sidestepped the board approval process altogether and engaged Credit Suisse unilaterally on behalf of the Company.[3]

38.     With Credit Suisse positioned to influence the auction of the Company, on November 21, 2016, H.I.G. and Lionbridge entered into an exclusivity agreement for the Lionbridge go-private transaction (the "Lionbridge Acquisition").

---

[2] Credit Suisse is a significant client of Skadden Arps, where Pincus is a partner.  Skadden's website states that its banking practice has represented Credit Suisse in transactions involving an aggregate of $4.78 billion.  Skadden also recently represented Credit Suisse in an international real estate transaction involving properties worth $1 billion.

[3] In the Fall of 2016 before Credit Suisse was hired, Pincus had proposed that Houlihan be the financial advisory firm that would run the Modified Auction.  Shawe strongly opposed the proposal because of the obvious conflict; namely, Houlihan would benefit financially from the Modified Auction that it had recommended against logic and academic studies.

39.     On December 12, 2016, the Lionbridge Acquisition for $5.75 per share and valued at $360 million was publicly announced.  It was to be financed through a combination of debt and equity financing, as well as potential cash and cash equivalents on Lionbridge's balance sheet. Credit Suisse provided the financing with credit facilities totaling $335 million.

40.     Credit Suisse was incentivized to assist H.I.G. in purchasing TPG.  The acquisition of TPG for Lionbridge would result in additional assets underlying the existing Credit Suisse notes and reduce the risk of a default, making the Credit Suisse debt instruments more valuable.  In other words, the likelihood of Lionbridge repaying its loans to Credit Suisse would increase significantly with the acquisition of TPG.

41.     Within days of the announcement of the Lionbridge Acquisition, Lionbridge's then-CEO-Cowan also made it known that Lionbridge would be participating "very actively in mergers and acquisitions" and that the "best candidate in this respect is [TPG]."

42.     As the Lionbridge Acquisition was proceeding to a closing, the Modified Auction of TPG was in its infancy.

43.     Five days after the Custodian hired Credit Suisse as his financial advisor, on November 21, 2016, H.I.G. signed an exclusive agreement to acquire Lionbridge.   Upon information and belief, Credit Suisse had committed to finance the Lionbridge Acquisition before this date.

44.     On December 5, 2016, Pincus sent an email to Shawe and Elting stating that he had hired Credit Suisse to "act as my financial advisor in connection with the Sale Process."

45.     Credit Suisse was fully immersed in its client H.I.G.'s acquisition of Lionbridge but it reportedly did not disclose this potential conflict to the Custodian when it was selected to serve as his sole financial advisor.

46.     Within two weeks of the public announcement of the Lionbridge acquisition, Pincus abandoned a proposed solution which he had been negotiating with Shawe for several months.  This superior solution was an offer by Shawe directly to Elting (the "Co-Founder Offer") which would have resulted in a speedier, more economical, secure, and efficient manner of selling the Company while still permitting the Custodian to "go-shop" the company to select third-parties. Unlike the Modified Auction, which required a non-existent restrictive covenant on Shawe—and which covenant was valued at $200 million—the Co-Founder Offer worked with existing conditions and avoided the unnecessary costs, expense, uncertainty, internal disruption, disclosure of Proprietary Information to competitors, and delay of the Modified Auction.

47.     Credit Suisse succeeded in prevailing upon Pincus to move forward with the Modified Auction to benefit Defendants.

48.      The Lionbridge Acquisition was completed on February 28, 2017.   H.I.G. was confident that it would secure both entities.   As soon as the Lionbridge Acquisition was consummated, H.I.G. took control of Lionbridge and began to prepare for a combination with TPG.  It replaced Lionbridge's senior management with a New York based CEO and CFO that restricted the company's operating expenses and investment in growth while H.I.G. participated in the auction.  H.I.G. essentially put Lionbridge in a holding pattern while it attempted to land the TPG acquisition.

49.     At or about that time, the Custodian's agent Joel Molstrom stated in words or substance to TPG's CFO and a member of the accounting department that the translation business was heading for a "huge consolidation."

50.     In or about March 2017, Lionbridge poached a division president and senior manager at TPG's subsidiary, TransPerfect Translations International, Inc. ("TPT").   Upon

information and belief, this individual was hired by Lionbridge to help the Defendants strategize and plan the business combination of Lionbridge and TPT.  He was fired by Lionbridge shortly after Shawe prevailed in the TPG auction.  In connection with that termination, Lionbridge paid him a large amount of severance in exchange for a sweeping confidentiality agreement designed to prevent him from sharing the details of his employment.

51.     On May 3, 2017, Pincus provided to Shawe a redacted copy of Credit Suisse's engagement letter ("Engagement Letter") dated April 27, 2017.  By then, Pincus and Credit Suisse were well-aware of the conflict created by Credit Suisse's role as advisor to H.I.G. and lender to Lionbridge and contracted around it in the Engagement Letter.  Not only was the conflict waived, but Credit Suisse also required a separate indemnification agreement in which the Custodian agreed that TPG would indemnify Credit Suisse for any liabilities pertaining to Credit Suisse's engagement as the Custodian's exclusive financial advisor.

The Modified Auction

52.     Credit Suisse and Pincus devised a sale process with three rounds of bidding.  In Phase I, Credit Suisse invited potential bidders to participate and distributed an informational package about the Company to those potential bidders who executed a confidentiality agreement. Those who wished to advance to the next round were required to submit "an indication of interest." There was no prerequisite for first round bidders to demonstrate that they were able to finance their bids.

53.     In Phase II, Credit Suisse chose a small group of bidders who submitted indications of interest from the first round to advance.  This group was given access to an online data room and invited to meet with some of the Company's management.  At the end of this second phase, the bidders were supposed to submit their "revised offer."

13

54.     In Phase III, one "final" round of bidding was to occur, but the remaining parties were permitted to submit an informal fourth round "final" bid.  For both Phase II and Phase III, the potential bidders were explicitly advised that resolution of any pending litigation and restrictive covenants on competition could not be a closing condition.

Phase I– Credit Suisse Limits the Competition
and Includes its Client H.I.G. as the Frontrunning Strategic Buyer

55.     During Phase I of the sale process, Elting and Shawe declared themselves potential buyers of the Company and were allowed to communicate with selected third parties to assist them in making a bid for the Company.

56.     At the same time, Credit Suisse solicited indications of interest from third-party buyers.  Credit Suisse identified 92 potential participants.  Credit Suisse began immediately to narrow the competition to H.I.G.'s advantage.

57.     Credit Suisse failed to invite obvious strategic buyers capable of purchasing TPG to bid in the auction.  For example, it did not invite TPG's competitor RWS Group ("RWS"), which was consistently reported as the most valuable competitor in the industry, had the wherewithal to purchase TPG, and was known as an active participant in acquisitions.  Any auction which was serious about maximizing shareholder value and conducting a fair and open auction process that included strategic buyers would have included RWS.  Other prominent candidates included content aggregators active in the translation space such as Google and Amazon.  Upon information and belief, these entities were not invited by Credit Suisse because it would have been a formidable competitor that would have likely outbid H.I.G.

58.     At or about this time, Credit Suisse contacted potential debt funding sources to gauge interest on H.I.G.'s behalf for the purchase TPG.

59.     Credit Suisse then provided an informational package which contained an overview of the Company, its clients, services, financial performance and audited financial statements to those who executed the confidentiality agreements.

60.     H.I.G. signed its confidentiality agreement on June 2, 2017 ("H.I.G. Confidentiality Agreement").

61.     Upon information and belief, prior to entering into the H.I.G. Confidentiality Agreement, Pincus negotiated and agreed with H.I.G. that its status as a competitor made it a strategic buyer subject to certain limitations on access to the Company's Proprietary Information and trade secrets, including the use of a "clean room" and use of third parties to summarize and vet certain information.   That is, H.I.G. agreed that it would not have direct access to the Proprietary Information, trade secrets and other sensitive information of competitive value.   The bases for that belief are many.    First, Houlihan warned in its report, which recommended the Modified Auction, that the Company had to take special precaution with respect to the disclosure of the Proprietary Information to strategic buyers.  Second, Shawe raised the issue in the Chancery Court and Pincus assured the Court that "the Custodian can regulate the level of access to diligence materials depending on the stage of the bidding process and the identity of the bidder, with any competitively sensitive information provided to a competitor only after it has been selected as the winning bidder or provided only to a third-party consultant."   Third, Credit Suisse repeatedly claimed in its report submitted to support the sale to Shawe that it had taken precautions in the dissemination of information "at the direction of the Custodian."   Fourth, H.I.G. admitted in its objection to the SPA (which was submitted through Elting's objection to the SPA), that it knew from the outset that it would have limited access to certain information by virtue of its ownership of TPG's direct competitor Lionbridge.  And finally, H.I.G. and the Custodian memorialized their

15

understanding of H.I.G.'s restrictions in accessing Proprietary Information in the so-called "Clean Room Agreement" (*see infra* ¶¶ 82-86).

62.     On July 13, 2017, H.I.G., Shawe, and Elting, and other financial institutions submitted indications of interest for TPG.

63.     H.I.G.'s initial headline bid was $750 million.

<u>Pincus and Credit Suisse Give H.I.G. an Advantage Over Other Third-Party Bidders</u>

64.     With conflicted Credit Suisse advising Pincus, H.I.G. was quickly given a competitive advantage by another pivotal shift.  Houlihan entered the scene once again—the same team led by Brian McDonald—this time on behalf of H.I.G.  This questionable engagement allowed Houlihan to further monetize its recommendation of the Modified Auction despite losing the opportunity to run the auction itself.

65.     With no shortage of institutions in New York that could provide the necessary financial advisory services, H.I.G. and Lionbridge purposefully and strategically hired the one firm that had extensive insider information on TPG.  Upon information and belief, Credit Suisse convinced Pincus to waive the conflict.

66.     Houlihan switched places with Credit Suisse and became H.I.G.'s advisor.

<u>Phase II – Defendants Shift Their Focus to Unfair Competition</u>

67.     On August 7, 2017, Credit Suisse provided ten bidders, who were selected from the first round, with access to a data room and invited them to meet with certain members of senior management.  Shawe, Blackstone (in partnership with Elting), and H.I.G. were among the 10 bidders chosen.

68.     That same day, Shawe offered to buy or sell the Company to Elting (her choice) for $350 million – an implied valuation of $700 million – partially because he was concerned that H.I.G. would gain access to the Proprietary Information and trade secrets.

69.     On August 21, 2017, Credit Suisse and the Custodian invited the 10 bidders by letter to bid in Phase II.  As part of the second phase, the potential buyers had to provide an updated written offer by September 7, 2017, which included information such as closing conditions and tax matters.  The invitation letter explicitly stated that the transaction could not be conditioned on either the existence of a restrictive covenant on competition or resolution of any litigation involving TPG or the Custodian.

70.     Upon learning that a non-compete would not be imposed on Shawe as part of the sale of the Company, H.I.G. understood that it would not be prudently able to outbid Shawe in the Modified Auction, and that it therefore would not do so, because the value of the Company to a third party (including H.I.G.) was hundreds of millions of dollars less if Shawe were able to compete – a discount that Shawe would not have to apply in his bid.  The absence of a restrictive covenant posed an unsurmountable obstacle for H.I.G. and caused Defendants to switch gears.

71.     Defendants shifted their goal from acquiring TPG to obtaining a competitive advantage for Lionbridge in bad faith.  Upon information and belief, H.I.G. thereafter remained in the auction for the sole purpose of unfair competition, including the misappropriation and later use of Proprietary Information and trade secrets.

72.     Notwithstanding the existing auction plan, Credit Suisse mysteriously removed the requirement that bidders prove committed financing in the Phase II bidding.  The removal of this condition permitted H.I.G. to remain in the auction without having to incur the expense of obtaining committed financing.

73.     Despite the Custodian and Credit Suisse's agreement with H.I.G. that the documents it was permitted to access in the data room would be redacted and curated to prevent the disclosure of TPG's Proprietary Information and trade secrets, Defendants took advantage of Credit Suisse's apparent incompetence in setting security protocols for the data room.  H.I.G. and Lionbridge employees knowingly accessed the Proprietary Information, including thousands of confidential and competitively sensitive documents in the data room from approximately August 8, 2017 until November 22, 2017— several days _after_ the SPA with Shawe concluding the auction was executed.

74.     H.I.G. and Lionbridge directed droves of their employees and consultants into the data room and into interviews to access TPG's Proprietary Information and trade secrets. Defendants recognized that the security features on the data room set up by Credit Suisse were well below industry standards.  Specifically, they knew that the audit trail did not differentiate between documents that were viewed or downloaded, and the restrictions which were supposed to be put in place to screen Proprietary Information from direct competitors of TPG (_i.e._, H.I.G.) were wholly inadequate.

75.     Despite its understanding that it was prohibited from viewing and accessing Proprietary Information such as "customer names or pricing, cost or other similar competitively sensitive information," upon information and belief, H.I.G. ignored its obligation and proceeded to view and download documents which it knew did not belong in the data room.  Based on the plain names of the documents alone (_e.g._, Top 20 Clients by FY 2016 Revenue, Per Word External Cost Analysis by Pairing), Defendants knew or should have known that accessing certain documents was prohibited because they contained Proprietary Information.

H.I.G. Continues to Bid to Gain Access and
Misappropriate Proprietary Information and Trade Secrets

76.     On September 7, 2017, H.I.G. submitted its Phase II "revised" bid of $750 million. The "revised" bid remained the same as the Phase I indication of interest, but H.I.G. did not disclose its intended disqualifying closing conditions (*e.g.*, non-compete against Shawe) because it knew that it could not advance if such disclosures were made.

77.     That same day, without knowing that Credit Suisse was accepting bids with prohibited conditions, Shawe submitted his Phase II bid of $765 million which he was led to believe was necessary.

78.     Shawe's higher bid prompted Credit Suisse to alert H.I.G. that it needed to increase its bid to remain in the auction.  Upon information and belief, H.I.G. disingenuously raised its bid to $900 million—approximately $350 million more than Blackstone[4]—without any additional information and without disclosing material conditions that it would later use to reduce the real value of its bid.  The basis for this belief is the subsequent bidding history of H.I.G. and the documents filed by the Custodian and H.I.G. in the Chancery Court challenging approval of the sale.

79.     With this new H.I.G. "bid" in hand, Credit Suisse convinced the Custodian to permit H.I.G. to remain in the auction.  Upon information and belief, H.I.G. knew that its bid was disingenuous but made it to remain in the auction to gain continued access to its competitor's data room which was replete with Proprietary Information and trade secrets, and to obtain other Proprietary Information through interviews of senior management.  Such confidential information

---

[4] The Chancery Court recognized that Blackstone and Elting were never in contention to win the auction based on their significantly lower bids and their refusal to remove a non-compete against Shawe as a closing condition.

was crucial to H.I.G., as made apparent by its admission that "TPG's business execution was in many ways superior to that of Lionbridge." Declaration of Matthew Lozow in Support of Elizabeth Elting's Objection to Definitive Sale Agreement, dated December 21, 2017 at p. 4.

80.     H.I.G., with the help of Credit Suisse, was sophisticated in masking its true motivation for staying in the auction after it knew that it could not purchase the Company. In bad faith, H.I.G. created the illusion for Pincus that it was a real bidder. H.I.G. also knowingly forced up Shawe's bid which had the intended effect of burdening the Company with tens of millions of dollars in additional debt. The Chancery Court found that "'Shawe's participation as a bidder (a widely known event) likely resulted in one of the bidders increasing its bid significantly and, in turn, causing Mr. Shawe to raise his bid.'" *In re TransPerfect Global, Inc.*, 2018 WL 904160, \*17 (Del. Ch. Feb. 15, 2018); *aff'd sub nom. Elting v. Shawe*, 185 A.3d 694 (Del. 2018).

Phase III – H.I.G. and Lionbridge Misappropriate More TPG Trade Secrets

81.     On September 21, 2017, Credit Suisse and Pincus invited four bidders (Blackstone with Elting, Cerberus, H.I.G., and Shawe) to provide a markup of a Form Sale Agreement by October 30, 2017, and to submit a final bid by November 8, 2017.

82.     Cerberus resigned from the auction citing that it could not proceed given the reality that the Company would not be sold with a non-compete on the co-founders.

83.     Blackstone refused to continue in the process unless certain of its fees were reimbursed by Pincus. Credit Suisse convinced Pincus to agree to pay Blackstone's fees to induce Blackstone to remain in the process.

84.     H.I.G. understood that the undisclosed conditions it intended to attach to its final bid would render its offer unsuccessful and escalated Defendants' feigned "due diligence" to collect information it would later use to unfairly compete with TPG. To that end, Defendants

disregarded the auction process rules and engaged in a range of prohibited conduct, without the fear that a legitimate bidder would have of being ousted from the bidding process.

85.    On October 3, 2017, Defendants met with selected members of TPG's management team at Skadden's offices (as opposed to Credit Suisse's) because, according to Credit Suisse, the bank was under "intense scrutiny."  During the meeting, Lionbridge CEO Fennelly announced in words or substance (after having access to TPG's trade secrets and confidential information) that "Lionbridge is going to be a dramatically different company regardless of whether they do TPG or not."  Fennelly continued that he thought "TPG's sales model was pretty cool" and recognized that the "compensation model was part of the secret sauce."  Lionbridge CFO Clemente Cohen agreed, commenting that he "loves seeing commission plans go up and up."

86.    On October 7, 2017, Fennelly contacted Elting to circumvent the bidding process in direct violation of the auction rules.  Such a blatant violation would normally result in H.I.G. being excluded from the auction.  When TPG's anti-theft system flagged the Lionbridge email, Shawe immediately alerted Credit Suisse of this breach.  Credit Suisse remained silent for two weeks and then responded with platitudes that the matter would be taken "seriously," but neither acknowledged the violation nor detailed any responsive action, and, upon information and belief, no action was taken against H.I.G. or Lionbridge.

87.    When Shawe finally understood the extent of Credit Suisse's conflict and was concerned it was affecting the auction process, on or about October 9, 2017, he filed a motion for expedited discovery on the selection of Credit Suisse as Pincus' financial advisor (the "CS Conflict Motion").  In conjunction with the CS Conflict Motion, Shawe sought documents and information concerning Credit Suisse's engagement and facts surrounding its conflicts and waivers.

88.     Two weeks after the CS Conflict Motion was filed (and nearly three months after H.I.G. first accessed Proprietary Information in TPG's data room), on or about October 26, 2017, the Custodian and H.I.G. entered into a so-called "Clean Room Agreement."

89.     Pursuant to this "Clean Room Agreement," certain advisors for H.I.G. agreed to review the information in the Clean Room and to provide a written summary (called the "Clean Room Memo") to Defendants, which did not include customer names, pricing, cost or other similar Proprietary Information.   The Clean Room Memo was purportedly approved in advance by H.I.G.'s antitrust legal advisor before being distributed.

90.     H.I.G. entered into this "Clean Room Agreement" in bad faith because it knew it had already been (and would continue to be) in violation of its terms.

91.     Before and after this "Clean Room Agreement," Defendants and their agents accessed thousands of documents they should never have been able to view.  Prior to execution of the Clean Room Agreement, Defendants should have known, based on detailed file names, that certain documents contained TPG's Proprietary Information and trade secrets.   Nevertheless, Defendants repeatedly viewed and downloaded such documents.   After the Clean Room Agreement, Defendants should not have had access to the documents placed in the Clean Room (or should have been able to view only redacted versions of such documents, in order to give any significance to the purpose of the Clean Room Agreement), yet Defendants continued having access to, and continued downloading, those documents.

92.     The Clean Room itself was superfluous because duplicate versions of all 90 documents in the Clean Room also existed in the data room.  Both prior and subsequent to the execution of the Clean Room Agreement, H.I.G., its attorneys, Houlihan, and Lionbridge accessed unredacted duplicate versions of more than half of the documents in the Clean Room.

93.     The Chancery Court denied the CS Conflict Motion on October 31, 2017 on the basis that such motion was premature.  Notwithstanding the Chancery Court's denial of the motion, it remained clear that Credit Suisse would have to tread lightly because its actions would be scrutinized in light of its conflict.

Phase III – More Shill Bidding and Misconduct

94.     With no penalty imposed on H.I.G. for Lionbridge's misconduct in trying to work around the auction process with Elting, the bidding ensued.  H.I.G. submitted a Phase III headline bid of $900 million, with many conditions that made the real value of its bid no better than the $750 million bid on September 7, 2017 which Credit Suisse had advised was too low.  Those conditions included terms which affected the net proceeds after taxes, a $100 million payment in the form of an unsecured note which violated the bidding procedures, large litigation reserves, and extensive closing conditions.

95.     The economic terms of Shawe's offer were superior and had been artificially forced up by H.I.G.'s fake bidding.  The Custodian later admitted that H.I.G. was out as a real bidder no later than November 8, 2017, when H.I.G.'s counsel informed him that H.I.G. was "at or near the top end of its price range and was unlikely to agree to a meaningful increase in its offer price."  In fact, H.I.G. was out much earlier.

96.     The Custodian valued the three competing offers of H.I.G., Blackstone and Shawe based on the estimated net proceeds, after tax, to be received at closing by the stockholders.  As of November 8, 2017, Shawe's offer provided greater after-tax net proceeds to stockholders at closing than the others.  Even though Shawe's final offer was admittedly superior to the remaining two bidders both in economic and non-economic terms, Credit Suisse recommended an additional "final revised bid" by November 15, 2017.

97.     Pincus permitted the three remaining parties to submit a "final revised bid" by November 15, 2017 and H.I.G.'s previous shill bids caused Shawe to increase his bid and accede to the conditions or eliminate and improve certain conditions altogether, which he was misled to believe was necessary in order to win the auction.

98.     H.I.G. increased its headline bid to $925 million by increasing the amount of the impermissible note to $125 million and did not remove any of its proposed deductions and conditionality.  H.I.G. failed to eliminate the pre-closing covenants that it added to the draft SPA and the condition relating to resolution of a litigation over technology that TPG used.

99.     Shawe submitted a near execution-ready bid, addressing all the terms in the Custodian's draft SPA, with no material changes, and decreased the conditionalities by eliminating any post-closing indemnity for breaches of TPG's representations and warranties.  As discussed in detail below, Shawe's final revised bid of $770 million and terms were the most favorable, and on November 19, 2017, the SPA was executed with Shawe's company, PRS Capital LLC, as the purchaser.

100.     Shawe's victory did not dissuade H.I.G.'s efforts to further damage TPG.  Although knowing that Pincus was prohibited post-execution from speaking to H.I.G. or considering any untimely bids, H.I.G. flouted the rules once again and submitted its sixth bid on November 22, 2017 to further damage TPG and prolong the auction process.  This motivation is evidenced by the fact that the offer itself was not delivered signed and still contained terms to be negotiated which offered no finality.

101.     H.I.G. acted with malice in intentionally prolonging the auction because it knew that time was of the essence and any delay in the closing would create additional injury.  In October

2017, Lionbridge CEO Fennelly specifically acknowledge to TPG managers that such a delay was harmful.

102.    The terms of H.I.G.'s unauthorized bid, which H.I.G. knew the Custodian was contractually forbidden from considering, made it clear that its goal was not to win the auction. Even this untimely and prohibited proposal would have been more difficult to close than the SPA and "would not provide the same level of finality as the Sale Agreement with respect to the disputes between Ms. Elting and Shawe, and . . . could adversely affect the Company's ability to continue as a going concern (consistent with its current state), particularly given that [H.I.G.] owns the Company's largest competitor." *In re TransPerfect Global, Inc.,* 2018 WL at *13.

103.    H.I.G.'s unauthorized bid was not considered, and on December 1, 2017, the Custodian issued his report and recommendation to the Chancery Court that Shawe's purchase of the Company be approved.

104.    For H.I.G., losing the auction was not a defeat because it was able to accomplish its refocused goal to gain an unfair competitive advantage over TPG.  Upon information and belief, H.I.G. further delayed the closing of the TPG sale, took advantage of the disruption caused by the sale, utilized the information it had secured to unfairly compete and caused uncertainty among clients and employees.

105.    Notwithstanding the fact that H.I.G. as a non-party had no standing to object to the SPA under the Sale Order which expressly limited objections to the "parties," H.I.G. forged ahead and sought to intervene in the Delaware action contending that it was disadvantaged during the auction because senior employees refused to meet with it and that it was not provided with sufficient information and documents to make improved bids.  This claim was false inasmuch as records show that H.I.G. had more access than other bidders to certain Company representatives.

However, the fact that H.I.G. continued to put in bids, with purported limited access to employees and insufficient information, in and of itself underscores the fact that it was placing shill bids.

106.    H.I.G. also complained that Shawe's bid was inferior to H.I.G.'s bid and that it did not contain a "fiduciary out" provision.  The fact that H.I.G. knew the details and terms of the SPA (which was filed under seal) in violation of the auction rules further confirmed that H.I.G. was, and had been, privy to prohibited materials from inception.

107.    The Chancery Court denied the motion to intervene because H.I.G. lacked standing as a non-party to the underlying action and had waived any potential claims pursuant to the H.I.G. Confidentiality Agreement.

108.    H.I.G. next broke the auction rules by contacting Elting, who was extremely displeased with Shawe's win, and offered to help her object to the sale.

109.    On December 21, 2017, Elting filed her objections to the Custodian's report and recommendation to the Chancery Court with the help of H.I.G., including affidavits from an H.I.G. partner and an attorney for H.I.G.  Although H.I.G. was prohibited from communicating with Elting pursuant to the auction rules, H.I.G. chose to disregard them to further damage TPG.

110.    H.I.G.'s attempt to intervene and Elting's H.I.G.-assisted objections also confirmed that H.I.G. knew early on that it would not purchase TPG without a restrictive covenant on Shawe. In the papers it filed in court, H.I.G. admitted that throughout the process it urged Pincus to seek to have the court impose a non-compete restriction against Shawe.  Despite repeated notice that no such restrictive covenant would be forthcoming, H.I.G. stayed in the auction to disrupt TPG with continued uncertainty and allowed Lionbridge to take affirmative steps to unfairly compete with the Company.

111.    During the auction, Lionbridge took advantage of the extended sales process to undercut TPG.   Lionbridge sales people falsely told TPG's customers that Lionbridge was purchasing TPG and that they should contract with Lionbridge directly before the sale.   They also contacted TPG's existing and prospective clients, and both misrepresented the nature of the underlying litigation and introduced doubt regarding the stability of the Company in bad faith for the purpose of damaging TPG and advantaging Lionbridge.

Defendants Use Trade Secrets and Confidential Information

112.    After Shawe prevailed in the auction, the openly expressed mantra at Lionbridge became "beat TPG."  H.I.G. and Lionbridge set out to misuse the information they gained through access to TPG's Proprietary Information and trade secrets in the data room and to key employees to compete unfairly.   Specifically, Lionbridge used Proprietary Information and trade secrets regarding TPG's highest revenue producing clients, staffing, commission schedules and pricing to replicate TPG's business model.   CEO John Fennelly recently gloated to his employees that Lionbridge has "a bunch of surprises for TPG."

113.    Slator.com, which is a leading news source regarding the translation and language technology markets, reported that Lionbridge quickly announced that it was "going to be a very different company."   *Lionbridge Will Be a 'Very Different Company,' Says CEO John Fennelly* (January 23, 2018), *available at* https://slator.com/ma-and-funding/lionbridge-will-different-company-says-ceo-john-fennelly/.

114.    Lionbridge began to rebrand and restructure its business model to mirror TPG's. Before the auction, Lionbridge's main business model emphasized a horizontal sales strategy whereby Lionbridge offered services to clients in many industries.   Historically, Lionbridge cast its net wide in the automotive, industrial manufacturing, travel and hospitality and retail sectors.

After accessing TPG's Proprietary Information and trade secrets regarding TPG's proprietary sales approach, Lionbridge changed its business model to replicate TPG's by focusing on certain products with market outreach to specific industries.

115.    Lionbridge's website no longer casts a wide net to service the automotive, industrial manufacturing, travel and hospitality and retail sectors; rather, the cite has been refocused on particular industries[5] it learned were the largest revenue generators for TPG.

116.    Having learned that many of TPG's most prolific clients are companies in one particular industry, Lionbridge set its sights on tapping into this same area by targeting the top clients with the unfair advantage of knowing TPG's proprietary pricing information.  Its website now heralds that this sector is at the forefront of its purported specialties.  Lionbridge newly contends that it is offering an array of services within this specific industry.  These services (which TPG had and continues to offer) were not prominently offered and marketed by Lionbridge until after H.I.G. and Lionbridge accessed the data room and interviewed TPG management.

117.    Lionbridge is also revamping its sales force and strategy to better match TPG's proprietary methodology.   It has held meetings with its sales team to discuss changes based on TPG's compensation structure, top clients, and the pricing information for those clients. Lionbridge's management encouraged their employees to focus their efforts on TPG's top clients and to offer better terms and pricing based on TPG's pricing information which had been accessed by Lionbridge and H.I.G. from the data room.  The Lionbridge sales force is using that information today to compete unfairly with TPG.   Lionbridge is so confident that its misuse of TPG's

---

[5] To protect the confidentiality of trade secrets, this information has been purposefully omitted in the Complaint.

Proprietary Information and trade secrets will be successful that it has set an unprecedented growth goal of more than $100,000,000 for 2019.

118.     To implement its unfair price competition, Lionbridge has created a deal desk (the "Deal Desk") comprised of at least some individuals who participated in the TPG auction and accessed the Proprietary Information in the data room, including Lionbridge's CEO and CFO. When pricing a potential project valued at more than $200,000, Lionbridge salespeople present the pricing proposal to the Deal Desk.   The Deal Desk then reviews the proposal and advises on whether to raise or lower the pricing "to be competitive."   Using the pricing information that it downloaded, viewed and discussed with management during the TPG auction, the Deal Desk structures the company's pricing to be competitive with TPG's proposals.   The direct involvement of Lionbridge's CEO in reviewing the pricing of deals as small as $200,000 is unusual in a company with $600 million in annual revenue but is consistent with Fennelly's direct access to the pricing information contained in documents he downloaded from the data room and discussed with TPG managers.

119.     Lionbridge is also attempting to replicate TPG's sales force model by changing the way the sales personnel is staffed and commissioned.

120.     Historically, Lionbridge's sales force was leanly staffed, and each sales person was required to fulfill many roles for a large geographic territory.   Lionbridge's sales force is now being restructured to mirror TPG's.   Accordingly, the Lionbridge sales team is now divided into different groups comprised of new business generators, service sales people and persons designated to develop more business from existing clients.   Teams of these different types of sales persons are assigned to cover newly defined smaller geographic territories.

121.    Lionbridge also learned from TPG management that TPG hires sales people and other employees who have experience and expertise in its targeted industries and leverages the sophistication of its staff to successfully market TPG services to clients in these industries who recognize it as value added to the relationship.   To compete with TPG, Lionbridge is now hiring sales personnel organized on the basis of industry verticals.

122.    Lionbridge also misused client-specific information learned from TPG management to unfairly compete.  By way of example, Lionbridge learned from interviewing TPG employees that one of the reasons that TPG successfully captured work from one major pharmaceutical account was because the client valued the benefit it received for conducting business with a business particularly structured like TPG.[6]  Using this confidential information, Lionbridge structured its sales effort to work through a small translation company which was similar in structure to TPG, and had the partner pitch its business to the pharmaceutical client.  By these unfair means, Lionbridge succeeded in winning a superior position to TPG on the Company's second largest client.

Defendants Disregard TPG's Demand to Return
And Destroy Confidential Documents and Information

123.    As part of the H.I.G. Confidentiality Agreement, H.I.G. and its partners, affiliates, subsidiaries, and others were required to return or to destroy all documents obtained from TPG during the auction process within five business days of a written demand.  On October 30, 2018, TPG served a demand letter on H.I.G. requiring a response from the company no later than November 6, 2018.  Despite its clear obligation to do so, H.I.G. has failed to disclose whether any of TPG's documents were shared or released to third-parties (and to identify such third-parties)

---

[6] To protect the confidentiality of trade secrets, this information has been purposefully omitted in the Complaint.

and has failed to deliver or otherwise to disclose whether it has destroyed all such confidential information and materials.

## COUNT I

Misappropriation of Trade Secrets Under the Defend Trade Secrets Act ("DTSA")
(Acquisition of Trade Secrets by Improper Means)
18 U.S.C. § 1836, *et seq.*

124.    TPG repeats and realleges the allegations contained in Paragraphs 1 – 123 above, as if fully set forth herein.

125.    TPG operates its business in interstate commerce across the United States.  The trade secrets misappropriated by H.I.G. and Lionbridge are related to, and intended for use in, interstate commerce.

126.    As set forth above, H.I.G. and Lionbridge improperly acquired, accessed, viewed and downloaded TPG's trade secrets and confidential information, thereby misappropriating TPG's trade secrets pursuant to 18 U.S.C. § 1839(5)(A).  The trade secrets misappropriated by Defendants include information regarding TPG's business, operations, services, clients (including annual revenue from particular clients, and client preferences), pricing, sales and marketing strategies, and other Proprietary Information and/or financial information that was secret, valuable in the industry, and had not been disclosed to anyone outside TPG.

127.    Defendants' actions constitute misappropriation pursuant to the DTSA. Defendants acquired TPG's Proprietary Information and trade secrets while knowing or having reason to know that the trade secrets were acquired by improper means – through misrepresentation and/or breach of duty to maintain secrecy.

128.    Defendants have improperly acquired, accessed, downloaded, and retained TPG's trade secrets and Proprietary Information to compete with TPG and is in fact doing so utilizing that very same information.

31

129.    The aforementioned documents qualify as "trade secrets" under the DTSA, as defined in 18 U.S.C. § 1839(3).  The misappropriated documents concerned TPG's operations, services, clients (including annual revenue from particular clients, and client preferences), pricing, sales and marketing strategies, including financial, business, and economic information, plans, methods, techniques, procedures, formulas and processes.

130.    Furthermore, TPG has taken reasonable measures to keep such information secret by, among other things, requiring an executed confidentiality agreement prior to access to the data room and, further limiting highly sensitive information to the few individuals permitted under the Clean Room Amendment, and who signed the Clean Room Agreement.

131.    The trade secrets misappropriated by Defendants include highly confidential and Proprietary Information which required substantial resources, time and investment by TPG to create and/or develop, and derive independent economic value from not being generally known to, or readily ascertainably by, those who can obtain economic value from use of this information, such as TPG's competitors.

132.    Defendants' misappropriation of TPG's trade secrets has caused TPG to suffer harm, including but not limited to the loss of clients, loss of reputation and customer goodwill, and loss of the confidentiality of, and investment in, its trade secrets.  Furthermore, Defendants have altered their business strategies based on the misappropriated trade secrets, thereby gaining new clients and increased market share in profitable industries, among other advantages, to the detriment of Plaintiff.

133.    H.I.G. and Lionbridge's actions constitute willful and malicious misappropriation of TPG's trade secrets pursuant to the DTSA.  Therefore, TPG is entitled to exemplary damages

under 18 U.S.C. §1836(b)(3)(D) in an amount up to two times the damages awarded under 18 U.S.C. §1836(b)(3)(B).

134.    TPG is entitled to full compensatory and consequential damages, including damages pursuant to 18 U.S.C. §1836(b)(3)(B) for actual loss and any unjust enrichment caused by the misappropriation, as well as attorneys' fees, costs, and expenses, and such other relief as the Court deems just and proper.

135.    Accordingly, TPG demands judgment against Lionbridge and H.I.G. for compensatory and exemplary damages, prejudgment interest, an award of Plaintiff's reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1836(b)(3), and such other relief as the Court deems just and proper.

<u>COUNT II</u>
Misappropriation of Trade Secrets Under the Defend Trade Secrets Act ("DTSA")
(Unauthorized Disclosure of Trade Secret)
18 U.S.C. § 1836, *et seq.*

136.    TPG repeats and realleges the allegations contained in Paragraphs 1 – 135 above, as if fully set forth herein.

137.    TPG operates its business in interstate commerce across the United States.  The trade secrets misappropriated by H.I.G. and Lionbridge are related to, and intended for use in, interstate commerce.

138.    As set forth above, H.I.G. and Lionbridge improperly disclosed and/or used TPG's trade secrets and Proprietary Information, thereby misappropriating TPG's trade secrets pursuant to 18 U.S.C. § 1839(5)(B).  This includes information regarding TPG's business, operations, services, clients (including annual revenue from particular clients, and client preferences), pricing, sales and marketing strategies, and other confidential business and/or financial information that was secret, valuable in the industry, and had not been disclosed to anyone outside TPG.

139.    Defendants disclosed or used TPG's trade secrets without TPG's consent, and Defendants knew or had reason to know that the information was derived from or through a person who had used improper means to acquire the trade secret – through misrepresentation and/or breach of duty to maintain secrecy – and/or under circumstances giving rise to a duty to maintain the secrecy of the trade secret (*i.e.*, having signed a confidentiality agreement).

140.    H.I.G. has disclosed to Lionbridge the trade secrets and Proprietary Information that H.I.G., as alleged above, wrongfully acquired.

141.    The aforementioned documents qualify as "trade secrets" under the DTSA, as defined in 18 U.S.C. § 1839(3).   The misappropriated documents concerned TPG's operations, services, clients (including annual revenue from particular clients, and client preferences), pricing, sales and marketing strategies, including financial, business, and economic information, plans, methods, techniques, procedures, formulas and processes.

142.    Furthermore, TPG has taken reasonable measures to keep such information secret by, among other things, requiring an executed confidentiality agreement prior to access to the data room and, further limiting highly sensitive information to the few individuals permitted under the Clean Room Amendment, and who signed the Clean Room Agreement.

143.    The trade secrets misappropriated by Defendants include highly confidential and proprietary business information which required substantial resources, time and investment by TPG to create and/or develop, and derive independent economic value from not being generally known to, or readily ascertainably by, those who can obtain economic value from use of this information, such as TPG's competitors.

144.     Defendants' misappropriation of TPG's trade secrets Proprietary Information has caused TPG to suffer harm, including but not limited to the loss of clients, loss of reputation and customer goodwill, and loss of the confidentiality of, and investment in, its trade secrets.

145.     H.I.G. and Lionbridge's actions constitute willful and malicious misappropriation of TPG's trade secrets pursuant to the DTSA.  TPG therefore is entitled to exemplary damages under 18 U.S.C. §1836(b)(3)(D) in an amount up to two times the damages awarded under 18 U.S.C. §1836(b)(3)(B).

146.     TPG is entitled to full compensatory and consequential damages, including damages pursuant to 18 U.S.C. §1836(b)(3)(B) for actual loss and any unjust enrichment caused by the misappropriation, as well as attorneys' fees, costs, and expenses, and such other relief as the Court deems just and proper.

147.     Accordingly, TPG demands judgment against Lionbridge and H.I.G. for compensatory and exemplary damages, prejudgment interest, an award of Plaintiff's reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1836(b)(3), and such other relief as the Court deems just and proper.

COUNT III
Injunctive Relief Under the DTSA
18 U.S.C. § 1836, *et seq.*

148.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 – 147 above, as if fully set forth herein.

149.     TPG operates its business in interstate commerce across the United States.  The trade secrets and Proprietary Information misappropriated by H.I.G. and Lionbridge are related to, and intended for use in, interstate commerce.

150.    As set forth above, H.I.G. and Lionbridge improperly acquired, accessed, viewed, downloaded, and disclosed TPG's trade secrets and Proprietary Information, including information regarding TPG's business, operations, services, clients (including annual revenue from particular clients, and client preferences), pricing, sales and marketing strategies, and other confidential business and/or financial information that was secret, valuable in the industry, and had not been disclosed to anyone outside TPG.

151.    The aforementioned documents qualify as "trade secrets" under the DTSA, as defined in 18 U.S.C. § 1839(3).  The misappropriated documents concerned TPG's operations, services, clients (including annual revenue from particular clients, and client preferences), pricing, sales and marketing strategies, including financial, business, and economic information, plans, methods, techniques, procedures, formulas and processes.

152.    Furthermore, TPG has taken reasonable measures to keep such information secret by, among other things, requiring an executed confidentiality agreement prior to access to the data room and, further limiting highly sensitive information to the few individuals permitted under the Clean Room Amendment, and who signed the Clean Room Agreement.

153.    The trade secrets misappropriated by Defendants include the Proprietary Information which required substantial resources, time and investment by TPG to create and/or develop, and derive independent economic value from not being generally known to, or readily ascertainably by, those who can obtain economic value from use of this information, such as TPG's competitors.

154.    Defendants' misappropriation of TPG's trade secrets and Proprietary Information has caused TPG to suffer harm, including but not limited to the loss of clients, loss of reputation and customer goodwill, and loss of the confidentiality of, and investment in, its trade secrets.  This

harm cannot be adequately remedied at law and requires permanent injunctive relief.  Plaintiff will suffer irreparable and imminent harm in the absence of a permanent injunction; Defendants' continued misappropriation of Plaintiff's Proprietary Information and trade secrets and failure to return Plaintiff's documents containing trade secrets and confidential information, including TPG's most profitable industry segments and top revenue clients, will cause TPG further loss of clients, customers, accounts and/or market share.  This imminent injury is neither remote nor speculative, because TPG has already been harmed in precisely this manner by Defendants' misappropriation and use thereof, and will continue to be irreparably harmed in the absence of a permanent injunction.

155.    Defendants will not suffer harm from the rightful return of TPG's Proprietary Information and trade secrets, and will not be prevented from conducting its ordinary business. Defendants will merely be prevented from continuing to gain an unfair and unlawful advantage at Plaintiff's expense.

156.    This harm cannot be adequately remedied at law and requires permanent injunctive relief.

157.    The public interest would not be disserved by the issuance of an injunction preventing Defendants from misappropriating Plaintiff's trade secrets.

158.    Accordingly, TPG is entitled to an injunction, pursuant to 18 U.S.C. 1836(b)(3)(A), enjoining Defendants from continuing to use TPG's trade secrets, in order to prevent continued actual and threatened misappropriation of TPG's Proprietary Information and trade secrets, and requiring Defendants to return and/or destroy the confidential information and trade secrets improperly accessed and retained by Defendants, pursuant to 18 U.S.C. 1836(b)(3)(A)(ii).

COUNT IV
Misappropriation of Trade Secrets
under New York State Common Law

159.   Plaintiff repeats and realleges the allegations contained in Paragraphs 1 – 158 above, as if fully set forth herein.

160.    The documents and information uploaded to the data room, and subject to the Clean Room Agreement, qualify as trade secrets under New York law because they contained the Proprietary Information regarding TPG's business, operations, services, clients (including annual revenue from particular clients, and client preferences), pricing, sales and marketing strategies, and other confidential business and/or financial information that was secret, valuable in the language service provider industry, and had not been disclosed to anyone outside TPG.

161.   TPG took reasonable steps to protect the confidentiality of these documents and information.   TPG's trade secrets were not accessible to anyone outside the Company and obtaining access to documents containing trade secrets and Proprietary Information during the auction process required an executed confidentiality agreement.

162.   TPG invested significant time and money in the development and protection of its trade secrets and Proprietary Information, which is valuable to, and cannot be easily acquired or duplicated by its competitors.

163.   H.I.G. initially executed a confidentiality agreement to gain access to the Proprietary Information and trade secrets, and later executed a "Clean Room Agreement" intended to provide even greater protection to TPG's secrets.

164.   Before and after the execution of the "Clean Room Agreement," Defendants were able to, and did, view and download thousands of TPG documents containing customer names, pricing, cost, and similar competitive, Proprietary Information and trade secrets.

165.   Defendants' actions constitute willful misappropriation of trade secrets and Proprietary Information under New York law.   By using the documents they viewed and downloaded containing TPG's trade secrets and Proprietary Information to compete with TPG, Defendants breached the confidential relationship and duty imposed on them by the confidentiality agreements permitting them access to the confidential data room and TPG's management.

166.   Defendants have improperly retained documents and information containing TPG's trade secrets and Proprietary Information in violation of their confidentiality agreements, the Clean Room Agreement and the Clean Team Amendment, and the confidential relationship and duty resulting from the grant of access to the data room.

167.   Defendants also have used the misappropriated Proprietary Information and trade secrets to unfairly compete with TPG.   Lionbridge has reorganized its business model to focus on a vertical sales strategy like TPG.   It has begun reorganizing its sales force and compensation structure to replicate the TPG model.   Using sensitive pricing and client information, Defendants are concentrating Lionbridge's sales and marketing efforts on TPG's top clients in two specific industries.

168.   Defendants' misappropriation of TPG's trade secrets and Proprietary Information has caused TPG to suffer harm, including but not limited to the loss of client revenue, loss of reputation and customer goodwill, and loss of the confidentiality of, and investment in, its trade secrets.

169.   Defendants' actions are especially gross, wanton and egregious given the calculated nature of the misappropriation and the great lengths to which Defendants went to hide their actions, including their refusal to return and account for all documents and information that Defendants

accessed during the auction, and, accordingly, TPG is entitled to recover punitive damages in an amount to be determined by a trier of fact.

170.    TPG is entitled to full compensatory and consequential damages, a full accounting of Defendants' profits, punitive damages, as well as attorneys' fees, costs, and expenses.

171.    Accordingly, TPG demands judgment against Lionbridge and H.I.G. for compensatory damages, punitive damages, prejudgment interest, an award of reasonable attorneys' fees and costs pursuant to New York law, and such other relief as the Court deems just and proper.

COUNT V<br>Unjust Enrichment

172.    TPG repeats and realleges the allegations contained in Paragraphs 1 – 171 above as if fully set forth herein.

173.    As described above, Defendants have taken unfair advantage of their restricted access to TPG's data room and management by, among other things, wrongfully disclosing, stealing, and utilizing TPG's confidential Proprietary Information and trade secrets for their own financial gain and to TPG's detriment.  Specifically, Defendants have misappropriated and used TPG's client lists, client agreements, client pricing information, commission schedules, sales and marketing strategies, confidential employee information and organization structures to generate income to the exclusion of TPG.

174.    It is unconscionable for Defendants to retain the financial benefits resulting from their wrongful conduct.  Defendants therefore should be required to make full and complete restitution to TPG.

175.    Accordingly, under principles of equity and good conscience, TPG is entitled to judgment against H.I.G. and Lionbridge in an amount to be determined at trial, plus all interest and costs as allowed by law.

<u>COUNT VI</u>
Fraud
(Against H.I.G.)

176.    TPG repeats and realleges the allegations contained in Paragraphs 1 – 175 above as if fully set forth herein.

177.    H.I.G. made misrepresentations and omissions of material facts to TPG by continuing to present bids into, and past, the second phase of the bidding process.  The Custodian's invitation to participate in the second round of bidding, dated August 21, 2017, informed potential buyers that the transaction would not be conditioned on the existence of any non-competition obligations of the stockholders.  Accordingly, by August 21, 2017, H.I.G. knew that a non-compete would not be imposed on Shawe as part of the sale of TPG, and that therefore H.I.G. would not be able to purchase TPG because the Company's value to third parties without a non-compete was hundreds of millions of dollars lower than if the Company was in Shawe's control.

178.    The representations made in H.I.G.'s "revised" bid submitted on September 7, 2017, its second "revised" bid, its final bid submitted on November 8, 2017, its final revised bid submitted on November 15, 2017, and its execution of the Clean Room Amendment, were materially false in fact and by omission, and were intended to, and did, deceive TPG and induce it to provide H.I.G. with access to confidential Proprietary Information and trade secrets to which H.I.G. was not otherwise entitled.

179.    Had TPG known H.I.G.'s true intentions, it would have immediately taken appropriate measures to prevent H.I.G. from continuing its participation in the bidding process under false pretenses, and from thereby obtaining access to TPG's trade secrets and Proprietary Information.

180.    H.I.G.'s representations to TPG regarding its intent to purchase TPG, after learning that a non-compete would not be imposed on Shawe, were false, and intended to induce TPG to allow H.I.G. to access TPG's Proprietary Information and trade secrets.    H.I.G. knew its representations were false when it made them, and H.I.G. intended that TPG rely on its misrepresentations. The conduct of H.I.G. was therefore fraudulent.

181.    At the time they were made, TPG had no knowledge of the falsity of H.I.G.'s representations and omissions of relevant facts.    TPG reasonably and justifiably relied upon H.I.G.'s representations and omissions of relevant facts in allowing H.I.G. to continue in the bidding process, to continue accessing TPG's Proprietary Information and documents in the data room, and for H.I.G.'s representatives to continue accessing the Clean Room.

182.    TPG has been injured as a direct and proximate result of the foregoing fraud in an amount to be proven at trial.    H.I.G. committed these acts of material misrepresentation and omission of relevant facts willfully and wantonly, and TPG therefore is entitled to recover punitive damages in an amount to be determined by a trier of fact.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, TPG respectfully demands that judgment be made and entered in its favor against the Defendants as follows:

a.    Require H.I.G. and Lionbridge to make restitution to TPG, and award TPG judgment against H.I.G. and Lionbridge in an amount to be determined at trial but now believed to be in excess of $100,000,000, plus all interest and costs as allowed by law, for H.I.G. and Lionbridge's unjust enrichment at TPG's expense;

b.    Require H.I.G. and Lionbridge to account to TPG for all revenues and profits derived from their misappropriation of TPG's trade secrets and Proprietary Information;

c. Award TPG actual, liquidated, and/or compensatory damages in an amount to be determined at trial but now believed to be in excess of $100,000,000 against H.IG. and Lionbridge for their misappropriation of TPG's trade secrets and Proprietary Information;

d. Award TPG exemplary and/or punitive damages of $200,000,000 pursuant to (i) the DTSA and (ii) the New York state common law due to H.I.G. and Lionbridge's willful and malicious misappropriation of TPG's trade secrets and Proprietary Information;

e. Enter a permanent injunction enjoining H.IG. and Lionbridge from further violating their Confidentiality Agreements, and H.I.G. from violating the Clean Room Amendment, intended, in part, to protect TPG's trade secrets, and require H.I.G. and Lionbridge to account for and to return to TPG any documents obtained from TPG in their possession;

f. Enter a permanent injunction enjoining Lionbridge from soliciting TPG's highest revenue generating clients for two years;

g. Enter a permanent injunction enjoining Lionbridge from soliciting TPG's sales people and managers for two years;

h. Award TPG actual, liquidated and/or compensatory damages as well as punitive damages in an amount to be determined at trial but now believed to be in excess of $300,000,000 against H.I.G. and Lionbridge for their fraudulent actions;

i. Award TPG prejudgment interest against Defendants for the claims asserted against them herein;

j. Award TPG all costs and attorneys' fees it incurs in the prosecution of this lawsuit pursuant to relevant New York law; and

k. Award TPG such other and further relief as this Court deems just and proper.

<u>JURY TRIAL DEMANDED</u>

TPG hereby demands a jury trial.


Dated:  New York, New York
        April 11, 2019

                                Respectfully submitted,

                                GARVEY SCHUBERT BARER, P.C.

                                By:
                                    Andrew J. Goodman, Esq.
                                100 Wall Street, 20th Floor
                                New York, New York 10005
                                Tel:  (212) 965-4534
                                Fax: (212) 334-1278


                                KRUZHKOV RUSSO PLLC

                                By: s/  Martin P. Russo
                                        Martin P. Russo
                                        Sarah Y. Khurana
                                350 Fifth Avenue
                                Suite 7230
                                New York, New York 10118
                                Tel: (212) 363-2000
                                Fax: (347) 507-2378


                                *Attorneys for Plaintiff TransPerfect Global, Inc.*