**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TRANSPERFECT GLOBAL, INC.,

                                        Plaintiff,

          -vs-

LIONBRIDGE TECHNOLOGIES, INC., and
H.I.G. MIDDLE MARKET, LLC,

                                        Defendants.

19-cv- 03283

**FIRST AMENDED COMPLAINT**

**[Demand for Jury Trial]**

          Plaintiff, TransPerfect Global, Inc. ("TPG" or the "Company"), as for its Complaint alleges as follows:

<u>**INTRODUCTION**</u>

          1.        This is an action for monetary damages and injunctive relief.  The Defendants caused injury when they acquired the Company's trade secrets and confidential information under false pretenses, and then used the trade secrets to unfairly compete with TPG.  Defendants continue to use the misappropriated trade secrets and are irreparably harming the Company.

          2.        In August 2015, the Delaware Court of Chancery ("Chancery Court") ordered the stockholders of TPG to sell their shares at auction.  Chancellor Bouchard appointed Robert Pincus ("Pincus") to serve as the Custodian of TPG for purposes of conducting the forced sale.

          3.        Pincus hired Credit Suisse, by and through its New York City office, to conduct the auction notwithstanding a <u>serious</u> and disabling conflict of interest.  Credit Suisse was simultaneously advising Defendant H.I.G. Middle Market, LLC ("H.I.G.") on the acquisition of the Company's largest competitor – Defendant Lionbridge Technologies ("Lionbridge") – and negotiating a credit facility of $335 million to fund the purchase.  Importantly, Defendants and

Credit Suisse had determined that a combination of TPG and Lionbridge would inure to their respective benefit by strengthening Lionbridge and improving the quality of the outstanding debt instruments being underwritten by Credit Suisse.  To that end, Credit Suisse advised Pincus to reject a co-founder offer from Shawe which would have promptly resulted in a value-maximizing sale of the Company with minimal disruption to its business.

4.     In fact, Lionbridge tried to wring competitive advantage from the Delaware Chancery litigation from the very outset.  As Chancellor Bouchard wrote in an August 13, 2015 decision:

> The strife within the Company has not been lost on its competition. The Company's primary competitor, Lionbridge, has portrayed the Shawe/Elting conflicts and resulting lawsuits as calling into question the ability of the Company "to deliver on client contractual obligations, as well as basic financial obligations to employees." The record reflects that, in June 2014, Lionbridge solicited Avis Budget Group, Bank of America, and Morgan Stanley in this manner.

5.     The auction proceeded with Credit Suisse in control of the process in New York. Despite inviting many dozens of third parties to participate in the auction, Credit Suisse convinced Pincus to exclude qualified strategic buyers from the auction so that H.I.G. was the only strategic purchaser positioned to acquire the Company.  Notwithstanding this advantage, H.I.G. understood that it would be financially imprudent (and therefore was unwilling) to outbid Shawe in the auction unless it knew that Shawe would be prohibited from competition by means of a court ordered non-compete.

6.     H.I.G. never approached Shawe to negotiate and pay for a non-compete; rather, it repeatedly encouraged Pincus to seek a restrictive covenant against Shawe to make TPG a less expensive target.  Shawe made it clear that he would not be the subject of a bogus, and likely unconstitutional, restrictive covenant without a court battle.  He also participated in good faith in

the auction.  As a result, H.I.G. was priced out of the auction because the prospect of post-auction competition from Shawe meant that the Company was worth as much as $200 million less to any other buyer.

7.      As the auction progressed, H.I.G. realized that it would not prevail against Shawe because there was no viable basis for a restrictive covenant.  It then changed direction in order to benefit Defendants by misappropriating trade secrets for Lionbridge to use to compete in violation of federal law.  Thus, H.I.G. remained a participant in the auction in bad faith to gain access to additional trade secrets of the Company and its affiliates and subsidiaries.  Specifically, H.I.G. submitted one or more bids and entered into a written agreement it never intended to honor so that it could gain increased access to TPG's trade secrets.

8.      During the auction, a data room was set up that entrusted bidders with access to extensive confidential business information and trade secrets regarding TPG's business operations. Credit Suisse failed to take meaningful steps to protect the Company's confidential information, and Defendants were permitted to freely interview TPG's management and download TPG's top clients lists, pricing information, commission schedules, employee files, and sales strategies.

9.      H.I.G. and Lionbridge have used TPG's trade secrets and continue to use this information to compete unfairly.  Lionbridge has revamped its sales strategy, product offerings and pricing to mirror that of TPG and continues to use TPG's trade secrets to poach TPG's clients. Despite TPG's demand for the return or destruction of all confidential documents and information accessed during the auction, H.I.G. has refused to comply.

10.      TPG seeks monetary damages and injunctive relief against the Defendants to enjoin them from their ongoing use of trade secrets and confidential information.

## PARTIES

11.     Plaintiff TPG is a Nevada corporation with its nerve center and principal place of business in New York, New York.

12.     Upon information and belief, Defendant Lionbridge is a Delaware corporation with its principal place of business in Waltham, Massachusetts.  Lionbridge is one of TPG's main competitors and provides translation services worldwide.  At all times relevant to this action, Lionbridge's senior management, including its CEO John Fennelly and CFO Clemente Cohen, ran the company together from New York, New York.  At all times relevant to this action, Lionbridge and TPG were the top two language service providers in the industry, measured by revenue.

13.     Upon information and belief, Defendant H.I.G. is a Delaware limited liability company with its nerve center and principal place of business in Miami, Florida.   H.I.G. is a private equity and alternative assets investments firm.  In 2016, H.I.G. devised a strategy to acquire Lionbridge and TPG to create the world's largest language translation service provider.

## RELEVANT NON-PARTIES

14.     TPG Holdings, LLC, a New York limited liability company ("TPG Holdings"), owns 100% of the Company.

15.     Philip Shawe ("Shawe"), was at all relevant times a resident of the City, County and State of New York, and is a co-founder of TPG, owning ninety-nine percent (99%) of the membership interests in TPG Holdings.  Shawe's mother, Shirley Shawe, owns the remaining one percent (1%) interest.

16.     Elizabeth Elting ("Elting") was a co-founder of TPG and 50% owner of TPG before Shawe, through TPG Holdings, purchased Elting's shares in May 2018.

4

17.     Robert B. Pincus ("Pincus" or "Custodian") was, at all relevant times, an attorney and partner in the law firm of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), in Skadden's Wilmington, Delaware office.  Pincus was the Custodian appointed by the Chancery Court to conduct the sale of TPG, and to act as a tie-breaking third director of TPG pending the sale.  As part of the Sales Purchase Agreement ("SPA"), Pincus required a broad and sweeping release of claims relating to his role in the sale process.

18.     Credit Suisse Group, including without limitation Credit Suisse Securities (USA) LLC and Credit Suisse AG's Cayman Island Branch (collectively, "Credit Suisse") was hired by the Custodian to serve, by and through its New York City office, as TPG's exclusive financial advisor in connection with the sale of the Company.  As part of the SPA, Credit Suisse required a broad and sweeping release of claims relating to its role in the sale process.

19.     Houlihan Lokey, Inc. ("Houlihan") is a California corporation that was initially hired as a financial advisor to assist the Custodian in identifying and analyzing sale alternatives. That same Houlihan team later switched sides and became the financial advisor to H.I.G. as a bidder in the auction process.

**JURISDICTION AND VENUE**

20.     This Court has subject matter jurisdiction over Plaintiff's claim arising under federal law pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836, *et seq*., and supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.  In addition, this Court has subject matter jurisdiction over Plaintiff's state law claims under § 1332(a) as there is complete diversity of citizenship and the amount in controversy exceeds $75,000.

21.    This Court has personal jurisdiction over all Defendants and venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred here.

## FACTUAL BACKGROUND

The Proprietary Information

22.    Shawe and Elting started TPG in 1992 from a dormitory room at New York University.

23.    Using proprietary and confidential information developed through the devotion of much time, effort and financial resources, TPG has grown in the relatively short time since its founding to become one of the world's leading providers of translation, website localization and litigation support services.  It currently employs approximately 5,000 full-time employees, with more than 100 offices throughout the world.  The Company has a network of more than 25,000 translators, editors and proofreaders working in approximately 170 different languages.

24.    The proprietary and confidential information that has played a crucial role in fueling TPG's growth includes, but is not limited to, sales models, marketing strategies, unique cost and pricing structures, compensation models and commission schedules.  As the Company has grown, it has developed additional proprietary and confidential information including, but not limited to, many unique customer and vendor relationships based on particularized presentations and embodied in separately negotiated customer and vendor contracts.  The information referenced in this paragraph 24 is hereinafter referred to as "the Proprietary Information," as encompassing each separate category and the information *in toto*.

25.     The trade secrets to which Defendants had access through Credit Suisse included, but were not limited to:

A.     A list of, and confidential contracts within, TPG's clients and customers, which included annual revenue by client going back to 2012, as well as client-specific word rates by language class and turnaround time;

B.     A list of TPG's top 20 clients by revenue for 2016, along with the revenue received from each client;

C.     A January 2016 memorandum detailing TPG's pricing methodology for each service within every TPG product suite, stating for example, which services were billed by word, or hourly, or time based charges, flat fees and/or a combination of some or all of the foregoing;

D.     TPG's external per word cost analysis by pairing for fiscal years 2014-2016;

E.     TPG's price lists;

F.     TPG's revenue by industry;

G.     TPG's mark-up by industry for fiscal years 2014-2016;

H.     TPG's revenue by product for 2010-2016;

I.     TPG's revenue by service for 2010-2016;

J.     TPG's revenue by license for 2010-2016;

K.     Revenue by country;

L.     A description of the available functionality for each suite of TPG's proprietary technology solutions;

M.     TPG's internal quality control manual; and

N.   TPG's entire management structure and the identity of each individual occupying each management position.

O.   Rates paid by TPG to its translators, whose talents are sought after by TPG's competitors, and whose billing rates impact what TPG can charge its customers; and

P.   Details of internal resignations from TPG, identifying confidential departures of talent attractive to TPG's competitors.

Collectively hereinafter referred to as the "Trade Secrets."

26.   TPG developed its pricing system through many years of experience, data collection and analysis of historic trends to determine, on a customer-by-customer basis, which pricing tools work most effectively in which circumstances.  Through decades of refinement, TPG has developed pricing models for each of its clients, based on each client's needs, preferences and spending history.  A typical pricing model includes a variable schedule of client-specific rates, in which TPG's charges depend on the languages used, the frequency of certain words, and the turnaround time allowed for the project.  Each of these rates is adjusted on a client-by-client basis, based on TPG's analysis of the client's preferences and spending history.

27.   This data and the methodologies developed for analyzing it allow TPG to retain clients and competitively bid for projects, while maximizing TPG's margins.  The depth of TPG's client intelligence gives TPG a significant competitive advantage, precisely because this information is not known to TPG's competitors.  As a result, TPG has been extremely successful in the marketplace, and zealously guards the confidentiality of its pricing system and customer charges.  As far as TPG is aware, prior to the auction, TPG's pricing systems and actual customer charges were not known outside of TPG at any time.  It would have taken Lionbridge years of trial,

error, and experience working with the same client base, to duplicate the Trade Secrets independently.

28.     In conjunction with the auction process, Pincus commissioned an independent third-party valuation of TPG, including all intangible assets and the Trade Secrets.  Based upon this valuation, TPG estimates the value of the Trade Secrets to be no less than $100,000,000.  Moreover, the Trade Secrets are integral to the retention and preservation of TPG's client relationships, which were appraised at a value of $340,000,000.

29.     Notwithstanding the sensitivity and value of the Trade Secrets, Credit Suisse failed to implement appropriate, industry standard controls in the data room (including the "Clean Room" established for especially sensitive documents), such that all accessed documents were automatically downloaded to the reviewing entity.  This failure effectively permitted unchecked downloading of Proprietary Information, including Trade Secrets, without any controls on document sharing or exfiltration, or any audit trail that might show who had received and viewed downloaded files.

30.     Defendants' representatives reviewed the data on numerous occasions, thereby obtaining multiple copies of, *inter alia,* all such crucial, secret proprietary client and pricing information thereby enabling Defendants continued unfettered use of this key client and pricing information to their ongoing unfair competitive advantage at the expense of TPG.  Additionally, Defendants have completely ignored and stonewalled all requests to advise whether they still possess any such privileged and proprietary documents and information, thereby failing and refusing to identify and return all such information they continue to retain.  All other participants in the auction process have complied with these requests.

31.     Consequently, Lionbridge knows how much TPG charges each customer, and of equal significance can compute on an ongoing basis precisely the price TPG will quote for each project on which TPG bids.  As a result, Lionbridge can consistently and regularly underbid TPG on every project.

32.     In fact, on information and belief, Lionbridge has created a procedure by which it regularly requires that its bids be analyzed against TPG's pricing system and methodology so that Lionbridge can consistently underbid TPG.  *See* ¶¶ 133-34, *infra*.  The Trade Secrets thereby provide very substantial marketplace value to Lionbridge.

33.     TPG has gone, and continues to go, to great lengths to protect the confidentiality of Trade Secrets and indeed all Proprietary Information.  The steps that the Company has taken to effectuate this protection include, but are not limited to, the following:

> A.     All Trade Secrets are password protected in the Company's network drive with regularly monitored access limited on a need to know basis.  For example, only the most senior marketing executives have access to marketing and pricing data (¶ 25A, D, E and G); only very senior HR managers and accountants are allowed payroll access (¶25N-P); and financial information (¶25F-K) is inaccessible to all but senior management and a very limited number of executives with the financial portfolio.  If TPG employees without the requisite clearance wish to view access-restricted materials, they must obtain prior approval directly from TPG's CEO.

B.     Trade Secrets, and Proprietary Information generally, are scattered to disparate parts of TPG's system, rather than concentrated by topic, to make exfiltration and misappropriation more difficult (applicable to the Trade Secrets identified at ¶ 25A, B, E-K, N and O).

C.     The TPG system is secured by firewall, additional anti-penetration tools and infrastructure vulnerability scans and code review (applicable to all Trade Secrets).

D.     Frequently, departments working with Trade Secrets and Proprietary Information are physically segregated from other parts of the Company in separate offices accessible only by use of a secure pass (applicable to the Trade Secrets identified at ¶ 25A, B, E-K and M-O).

E.     Multi-year Non-Disclosure Agreements ("NDAs") are entered into with all employees, clients and vendors before any Trade Secret and/or Proprietary Information is disclosed, to the point where the Company has eschewed business opportunities when the putative client declines to agree to TPG's confidentiality protocol (applicable to all Trade Secrets).

F.     TPG aggressively enforces its NDAs, and reinforces confidentiality obligations as part of the exit process for employees leaving the Company. TPG pursues litigation to enforce such agreements, including as non-exhaustive examples, a pending action in New York County Supreme Court in which TPG successfully obtained an injunction against a former

employee,[1] and pending litigation in the Los Angeles Superior Court.[2]  In addition, TPG routinely enforces its confidentiality agreements though extrajudicial methods such as cease-and-desist letters.

<u>The Chancery Court Orders the Sale of the Company and Appoints the Custodian</u>

34.     TPG has grown to become one of the world's leading providers of translation, website localization, and litigation support services.  It currently employs approximately 5,000 full-time employees, with more than 100 offices throughout the world.  The Company has a network of more than 25,000 translators, editors, and proofreaders working in approximately 170 different languages.

35.     Shawe and Elting were the co-founders and the controlling shareholders of the Company until May 2018.

36.     In April 2014, Elting filed a petition in the Chancery Court seeking the dissolution and forced sale of TPG based on alleged director and shareholder deadlock.

37.     In August 2015, the Chancery Court issued an unprecedented Order appointing a custodian and directing that TPG, a highly profitable company, be sold as a going concern. Chancellor Bouchard appointed Pincus to oversee the judicially ordered sale of the Company.  The Chancery Court ordered Pincus to "propose[] a plan to sell the Company with a view toward maintaining the business as a going concern and maximizing value for the stockholders."  *In re Shawe & Elting LLC*, 2015 WL 4874733, at *32 (Del. Ch. Aug. 13, 2015).

---

[1] *See TransPerfect Translations v. Hengels*, Index No. 656381/2017 (N.Y. Cnty. Sup. Ct., 2017).

[2] *See Koumaris v. TransPerfect Translations Inc.*, Case No. BC658106 (L.A. Cnty., Sup. Ct., 2017).

The Custodian Hires Houlihan and Other Advisors to Assist in the Sale

38.     On or about October 2, 2015, Pincus hired Houlihan as a financial advisor to assist the Custodian in identifying and analyzing sale alternatives.  Houlihan was permitted full access to the Company's Proprietary Information and Trade Secrets, including its in-depth financials, pricing models, compensation models and detailed information on TPG's clients and personnel.

39.     On or about February 8, 2016, Houlihan produced a report which recommended a "Modified Auction" approach which, according to the report, was dependent on a court-imposed competition restriction upon Shawe and Elting in order to succeed.

40.     The Modified Auction was the most expensive and risky proposal of the options considered by Houlihan.  It was likely to result in a lengthier sale process, was difficult to control, was a distraction for management, required a restrictive covenant from Shawe and Elting which did not exist, and would necessarily involve the sharing of the Proprietary Information and Trade Secrets with industry competitors participating in the auction.  Houlihan recognized that this plan would require "carefu[l] manage[ment]" of the "sharing of confidential information with third parties, particularly potential competitors," but advocated for it nonetheless.[3]  Houlihan Lokey Report to the Custodian dated February 8, 2016 at p. 44.

---

[3] Upon information and belief, Houlihan was incentivized to recommend the Modified Auction. The bases for this belief are multiple.  First, when confronted with recognized literature such as the article entitled "Shotguns and Deadlocks" (which was published in the *Yale Journal on Regulation* and recommends a Texas buy-sell process to maximize the risk adjusted value to the deadlocked shareholders), Brian McDonald of Houlihan implied to Shawe that he was being pressured to recommend the Modified Auction.  Second, it was illogical for Houlihan to endorse a plan the success of which hinged on the Chancery Court imposing broad extra-contractual non-compete obligations on Shawe and Elting.  Finally, upon information and belief, Houlihan expected that it would be given the lucrative assignment of acting as the Custodian's financial advisor for the auction (which would be a much smaller project in a Texas buy-sell process) and in early Fall 2016, the Custodian proposed that Houlihan run the auction.

41.     On February 8, 2016, the Custodian submitted a proposed plan of sale (the "Sale Report") to the Chancery Court.  The Sale Report set forth a plan for a Modified Auction that permitted bids from outside parties and recommended that the court impose a non-contractual competition restriction on Shawe.  Shawe objected to both the Modified Auction and an uncompensated court-imposed non-compete.  Elting supported the Custodian's plan.

42.     On July 18, 2016, the Chancery Court issued a sale order (the "Sale Order'), based largely on the Sale Report, which adopted the Custodian's recommendation for the Modified Auction over Shawe's objections, but declined to impose a non-compete against Shawe.  The Court recognized the value to a buyer if Shawe and Elting were subject to competition restrictions, but did not take this drastic remedy, stating that "the purpose of the sale process is to maximize the value of the Company *as it is* and not to derive a hypothetically higher value based on contractual protections the Company may not currently possess."

43.     Defendants ultimately participated in the auction process despite the Chancery Court's clear rejection of Houlihan's proposed non-compete provisions, submitting bids that were conditioned on the inclusion of exactly such a provision.  Defendants' representatives have stated that they included these defiant conditions because Pincus had represented to them that the Court was likely to impose further covenants and restrictions on Shawe, notwithstanding the Sale Order.

H.I.G., Lionbridge, and Credit Suisse Work to Give H.I.G. an Advantage

44.     In April 2016, H.I.G. approached Lionbridge concerning a go-private acquisition which resulted in the two parties entering into a confidentiality agreement.  Upon information and belief, H.I.G. discussed with Lionbridge that H.I.G.'s acquisition of both Lionbridge and TPG would permit Lionbridge to solidify its position as the dominant translations services provider

worldwide.  Acquiring TPG would have enabled Lionbridge to diversify its customer base, achieve double digit revenue growth, and increase its margins given TPG's profitability.

45.     Upon information and belief based on publicly available data, Lionbridge's revenues were declining in 2016.

46.     Upon further information and belief, H.I.G. explained to Lionbridge that its acquisition of Lionbridge had to be expeditious in order to purchase TPG at the impending sale. The bases for such beliefs are the actions taken by Defendants and statements made by Lionbridge's then-CEO with respect to Lionbridge's goal to acquire companies, and in particular, TPG.

47.     In late July 2016, four days after the Sale Order, H.I.G. submitted its initial bid to Lionbridge for $5.50 per share.  H.I.G. hired Credit Suisse as its advisor and banker for the acquisition.

48.     On November 16, 2016, Pincus hired Credit Suisse[4] to act as his financial advisor for the sale of TPG.  Pincus sidestepped the board approval process altogether and engaged Credit Suisse unilaterally on behalf of the Company.[5]

---

[4] Credit Suisse is a significant client of Skadden Arps, where Pincus is a partner.  Skadden's website states that its banking practice has represented Credit Suisse in transactions involving an aggregate of $4.78 billion.  Skadden also recently represented Credit Suisse in an international real estate transaction involving properties worth $1 billion.  Based on publicly available information, H.I.G. is also a client of Skadden.

[5] In the Fall of 2016 before Credit Suisse was hired, Pincus had proposed that Houlihan be the financial advisory firm that would run the Modified Auction.  Shawe strongly opposed the proposal because of the obvious conflict; namely, Houlihan would benefit financially from the Modified Auction that it had recommended against logic and academic studies.

49. With Credit Suisse positioned to influence the auction of the Company, on November 21, 2016, H.I.G. and Lionbridge entered into an exclusivity agreement for the Lionbridge go-private transaction (the "Lionbridge Acquisition").

50. On December 12, 2016, the Lionbridge Acquisition, for $5.75 per share and valued at $360 million, was publicly announced.  It was to be financed through a combination of debt and equity financing, as well as potential cash and cash equivalents on Lionbridge's balance sheet. Credit Suisse provided the financing with credit facilities totaling $335 million.

51. Credit Suisse was incentivized to assist H.I.G. in purchasing TPG.  The acquisition of TPG for Lionbridge would result in additional assets underlying the existing Credit Suisse notes and reduce the risk of a default, making the Credit Suisse debt instruments more valuable.  In other words, the likelihood of Lionbridge repaying its loans to Credit Suisse would increase significantly with the acquisition of TPG.

52. Within days of the announcement of the Lionbridge Acquisition, Lionbridge's then-CEO-Cowan also made it known that Lionbridge would be participating "very actively in mergers and acquisitions" and that the "best candidate in this respect is [TPG]."

53. As the Lionbridge Acquisition was proceeding to a closing, the Modified Auction of TPG was in its infancy.

54. Five days after the Custodian hired Credit Suisse as his financial advisor, on November 21, 2016, H.I.G. signed an exclusive agreement to acquire Lionbridge.  Upon information and belief, Credit Suisse had committed to finance the Lionbridge Acquisition before this date.

55. On December 5, 2016, Pincus sent an email to Shawe and Elting stating that he had hired Credit Suisse to "act as my financial advisor in connection with the Sale Process."

16

56.     Credit Suisse was fully immersed in its client H.I.G.'s acquisition of Lionbridge but it reportedly did not disclose this potential conflict to the Custodian when it was selected to serve as his sole financial advisor.

57.     Within two weeks of the public announcement of the Lionbridge acquisition, Pincus abandoned a proposed solution which he had been negotiating with Shawe for several months.  This superior solution was an offer by Shawe directly to Elting (the "Co-Founder Offer") which would have resulted in a speedier, more economical, secure, and efficient manner of selling the Company while still permitting the Custodian to "go-shop" the company to select third-parties. Unlike the Modified Auction, which would have required a non-existent restrictive covenant on Shawe to succeed—and which covenant was valued at $200 million—the Co-Founder Offer worked with existing conditions and avoided the unnecessary costs, expense, uncertainty, internal disruption, disclosure of Proprietary Information to competitors, and delay of the Modified Auction.

58.     Credit Suisse succeeded in prevailing upon Pincus to move forward with the Modified Auction to benefit Defendants.

59.      The Lionbridge Acquisition was completed on February 28, 2017.   H.I.G. was confident that it would secure both entities.   As soon as the Lionbridge Acquisition was consummated, H.I.G. took control of Lionbridge and began to prepare for a combination with TPG.  It replaced Lionbridge's senior management with a New York based CEO and CFO that restricted the company's operating expenses and investment in growth while H.I.G. participated in the auction.  H.I.G. essentially put Lionbridge in a holding pattern while it attempted to land the TPG acquisition.

60.     At or about that time, while in TPG's offices in the City, County and State of New York, where his services were being rendered, the Custodian's agent Joel Molstrom stated in words or substance to TPG's CFO and a member of the accounting department that the translation business was heading for a "huge consolidation."

61.     In or about March 2017, Lionbridge poached a division president and senior manager at TPG's subsidiary, TransPerfect Translations International, Inc. ("TPT").   Upon information and belief, this individual was hired by Lionbridge to help the Defendants strategize and plan the business combination of Lionbridge and TPT.   He was fired by Lionbridge shortly after Shawe prevailed in the TPG auction.   In connection with that termination, Lionbridge paid him a large amount of severance in exchange for a sweeping confidentiality agreement designed to prevent him from sharing the details of his employment.

62.     On May 3, 2017, Pincus provided to Shawe a redacted copy of Credit Suisse's engagement letter ("Engagement Letter") dated April 27, 2017.   By then, Pincus and Credit Suisse were well aware of the conflict created by Credit Suisse's role as advisor to H.I.G. and lender to Lionbridge and contracted around it in the Engagement Letter.   Not only was the conflict waived, but Credit Suisse also required a separate indemnification agreement in which the Custodian agreed that TPG would indemnify Credit Suisse for any liabilities pertaining to Credit Suisse's engagement as the Custodian's exclusive financial advisor.

The Modified Auction

63.     Credit Suisse and Pincus devised a sale process with three rounds of bidding.   In Phase I, Credit Suisse invited potential bidders to participate and distributed an informational package about the Company to those potential bidders who executed a confidentiality agreement. Those who wished to advance to the next round were required to submit "an indication of interest."

There was no prerequisite for first round bidders to demonstrate that they were able to finance their bids.

64.     In Phase II, Credit Suisse chose a small group of bidders who submitted indications of interest from the first round to advance.  This group was given access to an online data room and invited to meet with some of the Company's management.  At the end of this second phase, the bidders were supposed to submit their "revised offer."

65.     In Phase III, one "final" round of bidding was to occur, but the remaining parties were permitted to submit an informal fourth round "final" bid.  For both Phase II and Phase III, the potential bidders were explicitly advised that resolution of any pending litigation and restrictive covenants on competition could not be a closing condition.

66.     For each subsequent Phase of the Modified Auction, additional and more detailed Proprietary Information and Trade Secrets were loaded into the data room for the remaining bidders.  Defendants were incentivized to advance to successive bidding rounds, because doing so granted them access to increasingly sensitive materials.  From the outset, Credit Suisse's invitations to bid indicated that additional due diligence would be provided to bidders who advanced to later bidding rounds.  Credit Suisse advised bidders that those who advanced to later rounds would be permitted to conduct in-depth interviews with senior TPG management.

67.     These interviews took place throughout the auction process, starting in or before early August, 2017 and running through late October or early November, 2017.  In preparation for the management interviews, Defendants prepared a detailed list of questions covering a range of competitively sensitive subjects, including but not limited to TPG's competitive intelligence in specific industry verticals, TPG's staffing models by industry vertical, TPG's revenue and pricing strategies by industry vertical, typical pricing models by industry vertical, and growth projections

by industry vertical.  Defendants' questionnaires for these interviews confirm that Defendants expected to, and indeed did, inquire about TPG's competitive advantages, Proprietary Information and Trade Secrets at management interviews that continued throughout the Modified Auction. Defendants interviewed certain TPG executives multiple times.

68.     Defendants' Phase III questionnaires were vastly more detailed and granular than those of other finalist bidders like Blackstone and Cerberus.  Defendants' questionnaires revealed that Defendants had developed detailed intelligence on, and profiles of, TPG's largest client accounts in many of TPG's largest industry verticals.  Defendants used the management interviews to gather additional information on these client accounts, including highly sensitive competitive information concerning how specific client accounts were staffed, serviced and priced, why TPG had retained or lost major client accounts, how TPG's talent base was distributed across TPG's various geographic offices, why certain TPG regional production centers performed better or worse than others, and even why specific TPG executives performed better or worse than their counterparts.  Defendants' Phase III questionnaires sought details regarding TPG's closely guarded algorithms for computing client-specific rate markups, which Defendants knew or should have known were crucial trade secrets.   In light of the generality of questions asked by other sophisticated bidders and investors, these detailed questions were not necessary for Defendants to conduct a thorough enterprise valuation of TPG.  Defendants sought this level of detail not as a prospective purchaser, but as a direct competitor.

69.     In addition to these interviews, TPG continued to upload new and updated information to the data room and the Clean Room through the last days of the auction process. The longer Defendants remained in contention as bidders in the auction, the more they were

rewarded with access to Proprietary Information, Trade Secrets and opportunities for additional management interviews.

Phase I– Credit Suisse Limits the Competition
and Includes its Client H.I.G. as the Frontrunning Strategic Buyer

70.     During Phase I of the sale process, Elting and Shawe declared themselves potential buyers of the Company and were allowed to communicate with selected third parties to assist them in making a bid for the Company.

71.     At the same time, Credit Suisse solicited indications of interest from third-party buyers.  Credit Suisse identified 92 potential participants.  Credit Suisse began immediately to narrow the competition to H.I.G.'s advantage.

72.     Credit Suisse failed to invite obvious strategic buyers capable of purchasing TPG to bid in the auction.  For example, it did not invite TPG's competitor RWS Group ("RWS"), which was consistently reported as the most valuable competitor in the industry, had the wherewithal to purchase TPG, and was known as an active participant in acquisitions.  Any auction which was serious about maximizing shareholder value and conducting a fair and open auction process that included strategic buyers would have included RWS.  Other prominent candidates included content aggregators active in the translation space such as Google and Amazon.  Upon information and belief, these entities were not invited by Credit Suisse because they would have been formidable competitors that would have likely outbid H.I.G.

73.     At or about this time, Credit Suisse contacted potential debt funding sources to gauge interest on H.I.G.'s behalf for the purchase TPG.

74.     Credit Suisse then provided an informational package which contained an overview of the Company, its clients, services, financial performance and audited financial statements to those who executed the confidentiality agreements.

75. H.I.G. signed a confidentiality agreement on June 2, 2017 ("H.I.G. Confidentiality Agreement").

76. Upon information and belief, prior to entering into the H.I.G. Confidentiality Agreement, Pincus negotiated and agreed with H.I.G. that its status as a competitor made it a strategic buyer subject to certain limitations on access to the Company's Proprietary Information and Trade Secrets, including the use of a "clean room" and use of third parties to summarize and vet certain information. That is, H.I.G. agreed that it would not have direct access to the Proprietary Information, trade secrets and other sensitive information of competitive value. The bases for that belief are many. First, Houlihan warned in its report recommending the Modified Auction that the Company had to take special precaution with respect to the disclosure of the Proprietary Information to strategic buyers. Second, Shawe raised the issue in the Chancery Court and Pincus assured the Court that "the Custodian can regulate the level of access to diligence materials depending on the stage of the bidding process and the identity of the bidder, with any competitively sensitive information provided to a competitor only after it has been selected as the winning bidder or provided only to a third-party consultant." Third, Credit Suisse repeatedly claimed in its report submitted to support the sale to Shawe that it had taken precautions in the dissemination of information "at the direction of the Custodian." Fourth, H.I.G. admitted in its objection to the SPA (which was submitted through Elting's objection to the SPA), that it knew from the outset that it would have limited access to certain information by virtue of its ownership of TPG's direct competitor Lionbridge. The H.I.G. Confidentiality Agreement itself acknowledged that the Proprietary Information being shared with H.I.G. would include certain trade secrets that would remain protected under applicable trade secret law, even after expiration of that agreement. And H.I.G. and the Custodian ultimately memorialized their understanding of

H.I.G.'s restrictions in accessing Proprietary Information in a so-called "Clean Room Agreement" (*see infra* ¶¶ 102-106).

77.     Consequently, H.I.G. was not authorized to access TPG's Trade Secrets including, among other things, client and customer lists, revenues per customer and pricing.

78.     On July 13, 2017, H.I.G., Shawe, and Elting, and other financial institutions submitted indications of interest for TPG.

79.     H.I.G.'s initial headline bid was $750 million.

Pincus and Credit Suisse Give H.I.G. an Advantage Over Other Third-Party Bidders

80.     With conflicted Credit Suisse advising Pincus, H.I.G. was quickly given a competitive advantage by another pivotal shift.  Houlihan entered the scene once again—the same team led by Brian McDonald—this time on behalf of H.I.G.  This questionable engagement allowed Houlihan to further monetize its recommendation of the Modified Auction despite losing the opportunity to run the auction itself.

81.     With no shortage of institutions in New York that could provide the necessary financial advisory services, H.I.G. and Lionbridge purposefully and strategically hired the one firm that had extensive insider information on TPG.  Upon information and belief, Credit Suisse convinced Pincus to waive the conflict.

82.     Houlihan switched places with Credit Suisse and became H.I.G.'s advisor.

 Phase II – Defendants Shift Their Focus to Unfair Competition

83.     On August 7, 2017, Credit Suisse provided ten bidders, who were selected from the first round, with access to a supplemental and more detailed data room and invited them to meet with certain members of senior management.  Shawe, Blackstone (in partnership with Elting), and H.I.G. were among the 10 bidders chosen.

84.     That same day, Shawe offered to buy or sell the Company to Elting (her choice) for $350 million – an implied valuation of $700 million – partially because he was concerned that H.I.G. would gain access to the Proprietary Information and Trade Secrets.

85.     On August 21, 2017, Credit Suisse and the Custodian invited the 10 bidders by letter to bid in Phase II.  As part of the second phase, the potential buyers had to provide an updated written offer by September 7, 2017, which included information such as closing conditions and tax matters.  The invitation letter explicitly stated that the transaction could not be conditioned on either the existence of a restrictive covenant on competition or resolution of any litigation involving TPG or the Custodian.  The disclosures in this invitation letter contradicted Pincus' assurances to Defendants that, in spite of the Sale Order, the Chancery Court would likely impose restrictive covenants against Shawe to encourage bidding.

86.     Upon learning that a non-compete would not be imposed on Shawe as part of the sale of the Company, H.I.G. understood that it would not be prudently able to outbid Shawe in the Modified Auction, and that it therefore would not do so, because the value of the Company to a third party (including H.I.G.) was hundreds of millions of dollars less if Shawe were able to compete – a discount that Shawe would not have to apply in his bid.  The absence of a restrictive covenant posed an insurmountable obstacle for H.I.G. and caused Defendants to switch gears.

87.     Defendants shifted their goal from acquiring TPG to obtaining a competitive advantage for Lionbridge in bad faith.  Upon information and belief, H.I.G. thereafter remained in the auction for the sole purpose of unfair competition, including the misappropriation and later use of Proprietary Information and Trade Secrets.

88.     Notwithstanding the existing auction plan, Credit Suisse removed the requirement that bidders prove committed financing in the Phase II bidding.  The removal of this condition permitted H.I.G. to remain in the auction without having to incur the expense of obtaining committed financing.

89.     Despite the Custodian and Credit Suisse's agreement with H.I.G. that the documents it was permitted to access in the data room would be redacted and curated to prevent the disclosure of TPG's Proprietary Information and Trade Secrets, Defendants took advantage of Credit Suisse's apparent incompetence in setting security protocols for the data room.  This was particularly damaging given that additional and more detailed Proprietary Information and Trade Secrets were available to Phase II bidders in the data room.  H.I.G. and Lionbridge employees and agents knowingly accessed the Proprietary Information and Trade Secrets, including thousands of confidential and competitively sensitive documents in the data room, from approximately August 8, 2017 until November 22, 2017— several days after the SPA with Shawe concluding the auction was executed.

90.     H.I.G. and Lionbridge directed droves of their employees and consultants into the data room and into interviews in TPG's offices in New York to access TPG's Proprietary Information and Trade Secrets.  Defendants recognized that the security features on the data room set up by Credit Suisse were well below industry standards.  Specifically, they knew that the audit trail did not differentiate between documents that were viewed or downloaded, and the restrictions which were supposed to be put in place to screen Proprietary Information and Trade Secrets from direct competitors of TPG (*i.e.*, H.I.G.) were wholly inadequate, thereby enabling Defendants to exceed authorized access.

91.     Specifically, despite its understanding that it was prohibited from viewing and accessing Proprietary Information and Trade Secrets such as "customer names or pricing, cost or other similar competitively sensitive information," upon information and belief, H.I.G. ignored its obligation and proceeded to view and download documents which it knew it was unauthorized to access.  Based on the plain names of the documents alone (*e.g.*, Top 20 Clients by FY 2016 Revenue, Per Word External Cost Analysis by Pairing), Defendants knew or should have known that accessing certain documents was prohibited because they contained Proprietary Information and Trade Secrets.

H.I.G. Continues to Bid to Gain Unauthorized Access and
Misappropriate Proprietary Information and Trade Secrets

92.     On September 7, 2017, H.I.G. submitted its Phase II "revised" bid of $750 million. The "revised" bid remained the same as the Phase I indication of interest, but H.I.G. did not disclose its intended disqualifying closing conditions (*e.g.*, non-compete against Shawe) because it knew that it could not advance if such disclosures were made.

93.     That same day, without knowing that Credit Suisse was accepting bids with prohibited conditions, Shawe submitted his Phase II bid of $765 million which he was led to believe was necessary in order to advance to the next round.

94.     Shawe's higher bid prompted Credit Suisse to alert H.I.G. that it needed to increase its bid to remain in the auction.  Upon information and belief, H.I.G. disingenuously raised its bid to $900 million—approximately $350 million more than Blackstone[6]—without disclosing material conditions that it would later use to reduce the real value of its bid.  The basis for this belief is the

---

[6] The Chancery Court recognized that Blackstone and Elting were never in contention to win the auction based on their significantly lower bids and their refusal to remove a non-compete against Shawe as a closing condition.

subsequent bidding history of H.I.G. and the documents filed by the Custodian and H.I.G. in the Chancery Court challenging approval of the sale.

95.     With this new H.I.G. "bid" in hand, Credit Suisse convinced the Custodian to permit H.I.G. to remain in the auction.  Upon information and belief, H.I.G. knew that its bid was disingenuous but made it to remain in the auction for Phase III to gain continued access to its competitor's data room, to which Proprietary Information and Trade Secrets were being loaded, and to obtain other Proprietary Information and Trade Secrets through ongoing interviews of senior management.  Such confidential information was crucial to H.I.G., as made apparent by its admission that "TPG's business execution was in many ways superior to that of Lionbridge." Declaration of Matthew Lozow in Support of Elizabeth Elting's Objection to Definitive Sale Agreement, dated December 21, 2017 at p. 4.

96.     H.I.G., with the help of Credit Suisse, was sophisticated in masking its true motivation for staying in the auction after it knew that it could not purchase the Company.  In bad faith, H.I.G. created the illusion for Pincus that it was a real bidder.  H.I.G. also knowingly forced up Shawe's bid which had the intended effect of burdening the Company with tens of millions of dollars in additional debt.  The Chancery Court found that "'Shawe's participation as a bidder (a widely known event) likely resulted in one of the bidders increasing its bid significantly and, in turn, causing Mr. Shawe to raise his bid.'"  *In re TransPerfect Global, Inc.*, 2018 WL 904160, *17 (Del. Ch. Feb. 15, 2018); *aff'd sub nom. Elting v. Shawe*, 185 A.3d 694 (Del. 2018).

Phase III – H.I.G. and Lionbridge Misappropriate More TPG Trade Secrets

97.    On September 21, 2017, Credit Suisse and Pincus invited four bidders (Blackstone with Elting, Cerberus, H.I.G., and Shawe) to provide a markup of a Form Sale Agreement by October 30, 2017, and to submit a final bid by November 8, 2017.

98.    Cerberus resigned from the auction, claiming that it could not proceed given the reality that the Company would not be sold with a non-compete on the co-founders.

99.    Blackstone refused to continue in the process unless certain of its fees were reimbursed by Pincus.  Credit Suisse convinced Pincus to agree to pay Blackstone's fees to induce Blackstone to remain in the process.

100.    H.I.G. understood that the undisclosed conditions it intended to attach to its final bid would render its offer unsuccessful and escalated Defendants' feigned "due diligence" to Proprietary Information and Trade Secretes it would later use to unfairly compete with TPG.  To that end, Defendants disregarded the auction process rules and engaged in a range of prohibited conduct, without the fear that a legitimate bidder would have of being ousted from the bidding process.

101.    On October 3, 2017, Defendants met with selected members of TPG's management team at Skadden's New York offices (as opposed to Credit Suisse's) because, according to Credit Suisse, the bank was under "intense scrutiny."  During the meeting, Lionbridge CEO Fennelly announced in words or substance (after having access to TPG's Trade Secrets and Proprietary Information) that "Lionbridge is going to be a dramatically different company regardless of whether they do TPG or not."  Fennelly continued that he thought "TPG's sales model was pretty cool" and recognized that the "compensation model was part of the secret sauce."  Lionbridge CFO Clemente Cohen agreed, commenting that he "loves seeing commission plans go up and up."

102.    On October 7, 2017, Fennelly contacted Elting to circumvent the bidding process in direct violation of the auction rules.  Such a blatant violation would normally result in H.I.G. being excluded from the auction.  When TPG's anti-theft system flagged the Lionbridge email, Shawe immediately alerted Credit Suisse of this breach.  Credit Suisse remained silent for two weeks and then responded with platitudes that the matter would be taken "seriously," but neither acknowledged the violation nor detailed any responsive action, and, upon information and belief, no action was taken against H.I.G. or Lionbridge.

103.    When Shawe finally understood the extent of Credit Suisse's conflict and was concerned it was affecting the auction process, on or about October 9, 2017, he filed a motion for expedited discovery on the selection of Credit Suisse as Pincus' financial advisor (the "CS Conflict Motion").  In conjunction with the CS Conflict Motion, Shawe sought documents and information concerning Credit Suisse's engagement and facts surrounding its conflicts and waivers.

104.    Two weeks after the CS Conflict Motion was filed (and nearly three months after H.I.G. first accessed Trade Secrets and Proprietary Information in TPG's data room), on or about October 26, 2017, the Custodian and H.I.G. entered into a so-called "Clean Room Agreement."

105.    Pursuant to this "Clean Room Agreement," certain advisors for H.I.G. (including its attorneys) agreed to review the information in the Clean Room and to provide a written summary (called the "Clean Room Memo") to Defendants, which did not include customer names, pricing, cost or other similar Trade Secrets and Proprietary Information.  The Clean Room Memo was purportedly approved in advance by H.I.G.'s antitrust legal advisor before being distributed.

106.    H.I.G. entered into this Clean Room Agreement in bad faith because it knew it had already been (and would continue to be) in violation of its terms.

107.    Before and after this Clean Room Agreement, Defendants and their agents accessed thousands of documents they should never have been able to view.  Prior to execution of the Clean Room Agreement, Defendants should have known, based on detailed file names, that certain documents contained TPG's Proprietary Information and Trade Secrets.  Nevertheless, Defendants repeatedly viewed and downloaded such documents.  After the Clean Room Agreement, Defendants should not have had access to the documents placed in the Clean Room (or should have been able to view only redacted versions of such documents, in order to give any significance to the purpose of the Clean Room Agreement), yet Defendants continued having access to, and continued downloading, those documents.

108.    The Clean Room itself was superfluous because duplicate versions of all 90 documents in the Clean Room also existed in the data room.  Both prior and subsequent to the execution of the Clean Room Agreement, H.I.G., its attorneys, Houlihan, and Lionbridge accessed through the data room unredacted duplicate versions of more than half of the documents in the Clean Room.

109.    The Chancery Court denied the CS Conflict Motion on October 31, 2017 on the basis that such motion was premature, among other reasons.  Notwithstanding the Chancery Court's denial of the motion, it remained clear that Credit Suisse would have to tread lightly because its actions would be scrutinized in light of its conflict.

Phase III – More Shill Bidding and Misconduct

110.    With no penalty imposed on H.I.G. for Lionbridge's misconduct in trying to work around the auction process with Elting, the bidding ensued.  H.I.G. submitted a Phase III headline bid of $900 million, with many conditions that made the real value of its bid no better than the $750 million bid on September 7, 2017 that Credit Suisse had advised was too low.  Those

conditions included terms which affected the net proceeds after taxes, a $100 million payment in the form of an unsecured note which violated the bidding procedures, large litigation reserves, and extensive closing conditions.

111.    The economic terms of Shawe's offer were superior and had been artificially forced up by H.I.G.'s fake bidding.  The Custodian later admitted that H.I.G. was out as a real bidder no later than November 8, 2017, when H.I.G.'s counsel informed him that H.I.G. was "at or near the top end of its price range and was unlikely to agree to a meaningful increase in its offer price."  In truth, H.I.G. was really out much earlier.  Even though H.I.G. had been disqualified as an earnest bidder, it continued to download voluminous documents from the data room and the Clean Room after November 8, 2017, and even after submitting what was supposed to be its final bid one week later.

112.    The Custodian valued the three competing offers of H.I.G., Blackstone and Shawe based on the estimated net proceeds, after tax, to be received at closing by the stockholders.  As of November 8, 2017, Shawe's offer provided greater after-tax net proceeds to stockholders at closing than the others.  Even though Shawe's final offer was admittedly superior to the remaining two bidders both in economic and non-economic terms, Credit Suisse recommended an additional "final revised bid" by November 14, 2017.

113.    Pincus permitted the three remaining parties to submit a "final revised bid" by November 14, 2017 and H.I.G.'s previous shill bids caused Shawe to increase his bid and accede to the conditions or eliminate and improve certain conditions altogether, which he was misled to believe was necessary in order to win the auction.

114.    H.I.G. increased its headline bid to $925 million by increasing the amount of the impermissible note to $125 million and did not remove any of its proposed deductions and

conditionalities.  H.I.G. failed to eliminate the pre-closing covenants that it added to the draft SPA and the condition relating to resolution of a litigation over technology that TPG used.

115.    Shawe submitted a near execution-ready bid, addressing all the terms in the Custodian's draft SPA, with no material changes, and decreased the conditionalities by eliminating any post-closing indemnity for breaches of TPG's representations and warranties.  As discussed in detail below, Shawe's final revised bid of $770 million and terms were the most favorable, and on November 19, 2017, the SPA was executed with Shawe's company, PRS Capital LLC, as the purchaser.

116.    Shawe's victory did not dissuade H.I.G.'s efforts to further damage TPG.  Although knowing that Pincus was prohibited post-execution from speaking to H.I.G. or considering any untimely bids, H.I.G. flouted the rules once again and submitted its sixth bid on November 22, 2017 to further damage TPG and prolong the auction process.  This motivation is evidenced by the fact that the offer itself was not delivered signed and still contained terms to be negotiated which offered no finality.

117.    H.I.G. acted with malice in intentionally prolonging the auction because it knew that time was of the essence and any delay in the closing would create additional injury.  In October 2017, Lionbridge CEO Fennelly specifically acknowledged to TPG managers that such a delay was harmful.

118.    The terms of H.I.G.'s unauthorized bid, which H.I.G. knew the Custodian was contractually forbidden from considering, made it clear that its goal was not to win the auction.  Even H.I.G.'s untimely and prohibited proposal would have been more difficult to close than the SPA and "would not provide the same level of finality as the Sale Agreement with respect to the disputes between Ms. Elting and Shawe, and . . . could adversely affect the Company's ability to

continue as a going concern (consistent with its current state), particularly given that [H.I.G.] owns the Company's largest competitor." *In re TransPerfect Global, Inc.,* 2018 WL at *13.

119. H.I.G.'s unauthorized bid was not considered, and on December 1, 2017, the Custodian issued his report and recommendation to the Chancery Court that Shawe's purchase of the Company be approved.

120. For H.I.G., losing the auction was not a defeat because it was able to accomplish its refocused goal to gain an unfair competitive advantage over TPG. Upon information and belief, H.I.G. further delayed the closing of the TPG sale, took advantage of the disruption caused by the sale, utilized the information it had secured to unfairly compete and caused uncertainty among clients and employees.

121. Notwithstanding the fact that H.I.G. as a non-party had no standing to object to the SPA under the Sale Order which expressly limited objections to the "parties," H.I.G. forged ahead and sought to intervene in the Delaware action, contending that it was disadvantaged during the auction because senior employees refused to meet with it and that it was not provided with sufficient information and documents to make improved bids. This claim was false inasmuch as records show that H.I.G. had more access than other bidders to certain Company representatives. By this point even neutral parties like Pincus had recognized that H.I.G. had fallen out of the running as an earnest bidder weeks if not months prior. H.I.G.'s objection to the auction process was a transparent and belated ploy to obtain even greater access to TPG's Proprietary Information and Trade Secrets than it had already been granted. Moreover, the fact that H.I.G. continued to put in bids, when it claimed it lacked sufficient access to TPG employees and information, underscores that it was placing shill bids in efforts, *inter alia*, to obtain even more TPG Proprietary Information and Trade Secrets.

122.    H.I.G. also complained that Shawe's bid was inferior to H.I.G.'s bid and that it did not contain a "fiduciary out" provision.  The fact that H.I.G. knew the details and terms of the SPA (which was filed under seal) in violation of the auction rules further confirmed that H.I.G. was, and had been, privy to prohibited materials from inception.

123.    The Chancery Court denied the motion to intervene because H.I.G. lacked standing as a non-party to the underlying action and had waived any potential claims pursuant to the H.I.G. Confidentiality Agreement.

124.    H.I.G. next broke the auction rules by contacting Elting, who was extremely displeased with Shawe's win, and offered to help her object to the sale.

125.    On December 21, 2017, Elting filed her objections to the Custodian's report and recommendation to the Chancery Court with the help of H.I.G., including affidavits from an H.I.G. partner and an attorney for H.I.G.   Although H.I.G. was prohibited from communicating with Elting pursuant to the auction rules, H.I.G. chose to disregard them to further damage TPG.

126.    H.I.G.'s attempt to intervene and Elting's H.I.G.-assisted objections also confirmed that H.I.G. knew early on that it would not purchase TPG without a restrictive covenant on Shawe. In the papers it filed in court, H.I.G. admitted that throughout the process it urged Pincus to seek to have the court impose a non-compete restriction against Shawe.  Despite repeated notice that no such restrictive covenant would be forthcoming, H.I.G. stayed in the auction to disrupt TPG with continued uncertainty and allowed Lionbridge to take affirmative steps to unfairly compete with the Company, including accumulating additional and more detailed TPG Proprietary Information and Trade Secrets.

127.    During the auction, Lionbridge took advantage of the extended sales process to undercut TPG.  Lionbridge sales people falsely told TPG's customers that Lionbridge was purchasing TPG and that they should contract with Lionbridge directly before the sale.  They also contacted TPG's existing and prospective clients, and both misrepresented the nature of the underlying litigation and introduced doubt regarding the stability of TPG in bad faith for the purpose of damaging TPG and advantaging Lionbridge.

Defendants Use Trade Secrets and Confidential Information

128.    After Shawe prevailed in the auction, the openly expressed mantra at Lionbridge became "beat TPG."  H.I.G. and Lionbridge set out to misuse the information they gained through access to TPG's Proprietary Information and Trade Secrets in the data room and to key employees to compete unfairly.  Specifically, Lionbridge used Proprietary Information and Trade Secrets regarding TPG's highest revenue producing clients, staffing, commission schedules and pricing to solicit TPG's customers (armed with TPG's pricing information) and to replicate TPG's business model.  CEO John Fennelly recently gloated to his employees that Lionbridge has "a bunch of surprises for TPG."

129.    Slator.com, which is a leading news source regarding the translation and language technology markets, reported that Lionbridge quickly announced that it was "going to be a very different company."  *Lionbridge Will Be a 'Very Different Company,' Says CEO John Fennelly* (January 23, 2018), *available at* https://slator.com/ma-and-funding/lionbridge-will-different-company-says-ceo-john-fennelly/.

130.    Lionbridge began to rebrand and restructure its business model to mirror TPG's.  Before the auction, Lionbridge's main business model emphasized a horizontal sales strategy whereby Lionbridge offered services to clients in many industries.  Historically, Lionbridge cast

its net wide in the automotive, industrial manufacturing, travel and hospitality and retail sectors. After accessing TPG's Proprietary Information and Trade Secrets regarding TPG's proprietary sales approach, Lionbridge changed its business model to replicate TPG's by focusing on certain products with market outreach to specific industries.

131.    Lionbridge's website no longer casts a wide net to service the automotive, industrial manufacturing, travel and hospitality and retail sectors; rather, the website has been refocused on particular industries[7] it learned were the largest revenue generators for TPG.

132.    Having learned that many of TPG's most prolific clients are companies in one particular industry, Lionbridge set its sights on tapping into this same area by targeting the top clients with the unfair advantage of knowing TPG's proprietary pricing information and methodology.  Its website now heralds that this sector is at the forefront of its purported specialties. Lionbridge newly contends that it is offering an array of services within this specific industry. These services (which TPG had and continues to offer) were not prominently offered and marketed by Lionbridge until after H.I.G. and Lionbridge accessed the data room and interviewed TPG management.

133.    Lionbridge is also revamping its sales force and strategy to better match TPG's proprietary methodology.   It has held meetings with its sales team to discuss changes based on TPG's compensation structure, top clients, and the pricing information for those clients. Lionbridge's management encouraged their employees to focus their efforts on TPG's top clients and to offer better terms and pricing based on TPG's pricing information which had been accessed

---

[7] To protect the confidentiality of Trade Secrets, this information has been purposefully omitted in the Complaint.

by Lionbridge and H.I.G. from the data room.  The Lionbridge sales force is using that information today to compete unfairly with TPG.

134.    Upon information and belief based on publicly available information, Lionbridge's revenues decreased from 2015 to 2016, after flagging or remaining flat for more than two decades. Suddenly in 2017 (its first year with access to TPG's Proprietary Information and Trade Secrets), its revenues increased by $50,000,000 over the prior year, and then by another $50,000,000 in 2018.  By the end of 2018, its revenues were $100,000,000 greater than in 2016, its last year operating without TPG's Proprietary Information and Trade Secrets.  Lionbridge is apparently so confident that its misuse of TPG's Proprietary Information and Trade Secrets will be successful that it has set an unprecedented growth goal of more than $100,000,000 for 2019.

135.    To implement its unfair price competition, Lionbridge has created a deal desk (the "Deal Desk") comprised of at least some individuals who participated in the TPG auction and accessed the Proprietary Information and Trade Secrets in the data room, including Lionbridge's CEO and CFO.  When pricing a potential project valued at more than $200,000, Lionbridge salespeople present the pricing proposal to the Deal Desk.  The Deal Desk then reviews the proposal and advises on whether to raise or lower the pricing "to be competitive."  Using the pricing information that it downloaded, viewed and discussed with management during the TPG auction, the Deal Desk structures the company's pricing to be competitive with TPG's proposals. The direct involvement of Lionbridge's CEO in reviewing the pricing of deals as small as $200,000 is unusual in a company with $600 million in annual revenue but is consistent with Fennelly's direct access to the pricing information contained in documents he downloaded from the data room and discussed with TPG managers.

136.    Lionbridge misused client-specific information learned from TPG management to unfairly compete.  By way of example, Lionbridge obtained pricing information regarding a major international pharmaceutical account which was TPG's second largest customer as the primary translating service provider to that company.[8]  Shielded by an intermediary, a small translation company, Lionbridge pitched to the pharmaceutical client.  By these unfair means, Lionbridge succeeded in winning a superior position to TPG with that company.

137.    Lionbridge is also attempting to replicate TPG's sales force model by changing the way the sales personnel is staffed and commissioned.

138.    Historically, Lionbridge's sales force was leanly staffed, and each sales person was required to fulfill many roles for a large geographic territory.  Lionbridge's sales force is now being restructured to mirror TPG's.  Accordingly, the Lionbridge sales team is now divided into different groups comprised of new business generators, service sales people and persons designated to develop more business from existing clients.  Teams of these different types of sales persons are assigned to cover newly defined smaller geographic territories.

139.    Lionbridge also learned from TPG management that TPG hires sales people and other employees who have experience and expertise in its targeted industries and leverages the sophistication of its staff to successfully market TPG services to clients in these industries who recognize it as value added to the relationship.   To compete with TPG, Lionbridge is now hiring sales personnel organized on the basis of industry verticals.

---

[8] To protect the confidentiality of Trade Secrets, this information has been purposefully omitted in the Complaint.

Defendants Disregard TPG's Demand to Return
And Destroy Confidential Documents and Information

140.    As part of the H.I.G. Confidentiality Agreement, H.I.G. and its partners, affiliates,

subsidiaries, and others were required to return or to destroy all documents obtained from TPG

during the auction process within five business days of a written demand.  On October 30, 2018,

TPG served a demand letter on H.I.G. requiring a response from the company no later than

November 6, 2018.  Despite its clear obligation to do so, H.I.G. has failed to disclose whether any

of TPG's documents were shared or released to third-parties (and to identify such third-parties)

and has failed to deliver or otherwise to disclose whether it has destroyed all such confidential

information and materials.

COUNT I
Misappropriation of Trade Secrets Under the Defend Trade Secrets Act ("DTSA")
(Acquisition of Trade Secrets by Improper Means)
18 U.S.C. § 1836, *et seq.*

141.    TPG repeats and realleges the allegations contained in Paragraphs 1 – 140 above,

as if fully set forth herein.

142.    TPG operates its business in interstate commerce across the United States.  The

Trade Secrets misappropriated by H.I.G. and Lionbridge are related to, and intended for use in,

interstate commerce.

143.    As set forth above, H.I.G. and Lionbridge improperly acquired, accessed, viewed

and downloaded TPG's Trade Secrets, thereby misappropriating TPG's trade secrets pursuant to

18 U.S.C. § 1839(5)(A).  The Trade Secrets misappropriated by Defendants include information

regarding TPG's business, operations, services, clients (including annual revenue from particular

clients, and client preferences), pricing, sales and marketing strategies, and other Proprietary

Information and/or financial information that was secret, valuable in the industry, and had not been disclosed to anyone outside TPG.

144.    Defendants' actions constitute misappropriation pursuant to the DTSA. Defendants acquired TPG's Trade Secrets while knowing or having reason to know that the Trade Secrets were acquired by improper means – through misrepresentation and/or breach of duty to maintain secrecy.

145.    Defendants have improperly acquired, accessed, downloaded, and retained TPG's Trade Secrets to compete with TPG and are in fact doing so utilizing that very same information.

146.    The aforementioned documents qualify as "Trade Secrets" under the DTSA, as defined in 18 U.S.C. § 1839(3).  The misappropriated documents concerned TPG's operations, services, clients (including annual revenue from particular clients, and client preferences), pricing, sales and marketing strategies, including financial, business, and economic information, plans, methods, techniques, procedures, formulas and processes.

147.    Furthermore, TPG has taken reasonable measures to keep such information secret by, among other things, requiring an executed confidentiality agreement prior to access to the data room and, further limiting highly sensitive information to the few individuals permitted under the Clean Room Amendment, and who signed the Clean Room Agreement.

148.    The Trade Secrets misappropriated by Defendants include highly confidential and Proprietary Information which required substantial resources, time and investment by TPG to create and/or develop, and derive independent economic value from not being generally known to, or readily ascertainably by, those who can obtain economic value from use of this information, such as TPG's competitors.

149.    Defendants' misappropriation of TPG's Trade Secrets has caused TPG to suffer harm, including but not limited to the loss of clients, loss of reputation and customer goodwill, and loss of the confidentiality of, and investment in, its Trade Secrets.  Furthermore, Defendants have altered their business strategies based on the misappropriated Trade Secrets, thereby gaining new clients and increased market share in profitable industries, among other advantages, to the detriment of Plaintiff.

150.    H.I.G. and Lionbridge's actions constitute willful and malicious misappropriation of TPG's Trade Secrets pursuant to the DTSA.  Therefore, TPG is entitled to exemplary damages under 18 U.S.C. §1836(b)(3)(D) in an amount up to two times the damages awarded under 18 U.S.C. §1836(b)(3)(B).

151.    TPG is entitled to full compensatory and consequential damages, including damages pursuant to 18 U.S.C. §1836(b)(3)(B) for actual loss and any unjust enrichment caused by the misappropriation, as well as attorneys' fees, costs, and expenses, and such other relief as the Court deems just and proper.

152.    Accordingly, TPG demands judgment against Lionbridge and H.I.G. for compensatory and exemplary damages, prejudgment interest, an award of Plaintiff's reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1836(b)(3), and such other relief as the Court deems just and proper.

COUNT II

Misappropriation of Trade Secrets Under the Defend Trade Secrets Act ("DTSA")
(Unauthorized Disclosure of Trade Secret)
18 U.S.C. § 1836, *et seq*.

153.    TPG repeats and realleges the allegations contained in Paragraphs 1 – 152 above, as if fully set forth herein.

154.    TPG operates its business in interstate commerce across the United States.  The Trade Secrets misappropriated by H.I.G. and Lionbridge are related to, and intended for use in, interstate commerce.

155.    As set forth above, H.I.G. and Lionbridge improperly disclosed and/or used TPG's Trade Secrets, thereby misappropriating TPG's Trade Secrets pursuant to 18 U.S.C. § 1839(5)(B).  This includes information regarding TPG's business, operations, services, clients (including annual revenue from particular clients, and client preferences), pricing, sales and marketing strategies, and other confidential business and/or financial information that was secret, valuable in the industry, and had not been disclosed to anyone outside TPG.

156.    Defendants disclosed or used TPG's Trade Secrets without TPG's consent, and Defendants knew or had reason to know that the information was derived from or through a person who had used improper means to acquire the Trade Secrets – through misrepresentation and/or breach of duty to maintain secrecy – and/or under circumstances giving rise to a duty to maintain the secrecy of the Trade Secret (*i.e.*, having signed a confidentiality agreement).

157.    H.I.G. has disclosed to Lionbridge the Trade Secrets that H.I.G., as alleged above, wrongfully acquired.

158.    The aforementioned documents qualify as "Trade Secrets" under the DTSA, as defined in 18 U.S.C. § 1839(3).  The misappropriated documents concerned TPG's operations, services, clients (including annual revenue from particular clients, and client preferences), pricing, sales and marketing strategies, including financial, business, and economic information, plans, methods, techniques, procedures, formulas and processes.

159.    Furthermore, TPG has taken reasonable measures to keep such information secret by, among other things, requiring an executed confidentiality agreement prior to access to the data

room and, further limiting highly sensitive information to the few individuals permitted under the Clean Room Amendment, and who signed the Clean Room Agreement.

160.    The Trade Secrets misappropriated by Defendants include highly confidential and proprietary business information which required substantial resources, time and investment by TPG to create and/or develop, and derive independent economic value from not being generally known to, or readily ascertainably by, those who can obtain economic value from use of this information, such as TPG's competitors.

161.    Defendants' misappropriation of TPG's Trade Secrets has caused TPG to suffer harm, including but not limited to the loss of clients, loss of reputation and customer goodwill, and loss of the confidentiality of, and investment in, its Trade Secrets.

162.    H.I.G. and Lionbridge's actions constitute willful and malicious misappropriation of TPG's Trade Secrets pursuant to the DTSA.  TPG therefore is entitled to exemplary damages under 18 U.S.C. §1836(b)(3)(D) in an amount up to two times the damages awarded under 18 U.S.C. §1836(b)(3)(B).

163.    TPG is entitled to full compensatory and consequential damages, including damages pursuant to 18 U.S.C. §1836(b)(3)(B) for actual loss and any unjust enrichment caused by the misappropriation, as well as attorneys' fees, costs, and expenses, and such other relief as the Court deems just and proper.

164.    Accordingly, TPG demands judgment against Lionbridge and H.I.G. for compensatory and exemplary damages, prejudgment interest, an award of Plaintiff's reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1836(b)(3), and such other relief as the Court deems just and proper.

<u>COUNT III</u>
Injunctive Relief Under the DTSA
18 U.S.C. § 1836, *et seq.*

165.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 – 164 above, as if fully set forth herein.

166.    TPG operates its business in interstate commerce across the United States.  The Trade Secrets misappropriated by H.I.G. and Lionbridge are related to, and intended for use in, interstate commerce.

167.    As set forth above, H.I.G. and Lionbridge improperly acquired, accessed, viewed, downloaded, and disclosed TPG's Trade Secrets, including information regarding TPG's business, operations, services, clients (including annual revenue from particular clients, and client preferences), pricing, sales and marketing strategies, and other confidential business and/or financial information that was secret, valuable in the industry, and had not been disclosed to anyone outside TPG.

168.    The aforementioned documents qualify as "Trade Secrets" under the DTSA, as defined in 18 U.S.C. § 1839(3).  The misappropriated documents concerned TPG's operations, services, clients (including annual revenue from particular clients, and client preferences), pricing, sales and marketing strategies, including financial, business, and economic information, plans, methods, techniques, procedures, formulas and processes.

169.    Furthermore, TPG has taken reasonable measures to keep such information secret by, among other things, requiring an executed confidentiality agreement prior to access to the data room and, further limiting highly sensitive information to the few individuals permitted under the Clean Room Amendment, and who signed the Clean Room Agreement.

170.    The trade secrets misappropriated by Defendants include the Trade Secrets which required substantial resources, time and investment by TPG to create and/or develop, and derive independent economic value from not being generally known to, or readily ascertainably by, those who can obtain economic value from use of this information, such as TPG's competitors.

171.    Defendants' misappropriation of TPG's Trade Secrets has caused TPG to suffer harm, including but not limited to the loss of clients, loss of reputation and customer goodwill, and loss of the confidentiality of, and investment in, its Trade Secrets.  This harm cannot be adequately remedied at law and requires permanent injunctive relief.  Plaintiff will suffer irreparable and imminent harm in the absence of a permanent injunction; Defendants' continued misappropriation of Plaintiff's Trade Secrets and failure to return Plaintiff's documents containing Trade Secrets, including TPG's most profitable industry segments and top revenue clients, despite demand therefor, will cause TPG further loss of clients, customers, accounts and/or market share.  This imminent injury is neither remote nor speculative, because TPG has already been harmed in precisely this manner by Defendants' misappropriation and use thereof, and will continue to be irreparably harmed in the absence of a permanent injunction.

172.    Defendants will not suffer harm from the rightful return of TPG's Proprietary Information and Trade Secrets, and will not be prevented from conducting their ordinary business. Defendants will merely be prevented from continuing to gain an unfair and unlawful advantage at Plaintiff's expense.

173.    The ongoing, continuing and future harm to TPG cannot be adequately remedied at law and requires permanent injunctive relief.

174.    The public interest would not be disserved by the issuance of an injunction preventing Defendants from misappropriating Plaintiff's Trade Secrets.

175.    Accordingly, TPG is entitled to an injunction, pursuant to 18 U.S.C. 1836(b)(3)(A), enjoining Defendants from continuing to use TPG's Trade Secrets, in order to prevent continued actual and threatened misappropriation of TPG's Trade Secrets, and requiring Defendants to return and/or destroy the Trade Secrets improperly accessed and retained by Defendants, pursuant to 18 U.S.C. 1836(b)(3)(A)(ii).

COUNT IV
Computer Fraud and Abuse Act ("CFAA")
(Exceeding Authorized Access)
18 U.S.C. §1030(g)

176.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 – 175 as if fully set forth herein.

177.    The Proprietary Information and Trade Secrets were maintained in a data storage and communications facility directly related to and operating in conjunction with an electronic, high speed data processing device which is used in and affects interstate and foreign commerce and communication ("the Protected Computer").

178.    Defendants knew, or recklessly did not know, that they were not allowed access to TPG's Trade Secrets and Proprietary Information (including, but not limited to, client lists, pricing information and revenue per client) maintained in, and available through, the Protected Computer.

179.    In accessing and retaining copies of TPG's Trade Secrets and Proprietary Information, Defendants knowingly or recklessly exceeded their authorized authority to the information stored on the Protected Computer, and did so for the purpose of their own commercial advantage and private financial gain.

180.    Defendants' conduct as aforesaid caused actual economic damage to TPG as prayed below.

181.    Accordingly, TPG demands judgment against Lionbridge and H.I.G. for compensatory damages and pre-judgment interest, pursuant to 18 U.S.C. §1030(g), and such other relief as the Court deems just and proper.

COUNT V
Injunctive Relief Under the CFAA
18 U.S.C. §1030(g)

182.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 – 181 as if fully set forth herein.

183.    Defendants continue to this day in using TPG's Proprietary Information and Trade Secrets in soliciting TPG's customers identified on the Protected Computer, and in structuring their business, in direct and ongoing competition with TPG in interstate and international trade and commerce.

184.    TPG's ongoing, continuing and future damages cannot be adequately compensated at law.

185.    Accordingly, TPG is entitled to an injunction, pursuant to 18 U.S.C. 1030(g) enjoining and restraining Defendants from continuing to use TPG's Trade Secrets and Proprietary Information accessed and obtained by Defendants from the Protected Computer in excess of Defendants authority.

COUNT VI
Misappropriation of Trade Secrets
under State Law

186.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 – 185 above, as if fully set forth herein.

187.    The documents and information uploaded to the data room, and subject to the Clean Room Agreement, qualify as Trade Secrets under all applicable state laws because they

contained information regarding TPG's business, operations, services, clients (including annual revenue from particular clients, and client preferences), pricing, sales and marketing strategies, and other confidential business and/or financial information that was secret, valuable in the language service provider industry, and had not been disclosed to anyone outside TPG.

188.    TPG took reasonable steps to protect the confidentiality of these documents and information.  TPG's Trade Secrets were not accessible to anyone outside the Company and obtaining access to documents containing Trade Secrets and Proprietary Information during the auction process required an executed confidentiality agreement.

189.    TPG invested significant time and money in the development and protection of its Trade Secrets, which are valuable to, and cannot be easily acquired or duplicated by its competitors.

190.    H.I.G. initially executed a confidentiality agreement to gain access to the Proprietary Information and Trade Secrets, and later executed a Clean Room Agreement intended to provide even greater protection to TPG's secrets.

191.    Before and after the execution of the Clean Room Agreement, Defendants were able to, and did, view and download thousands of TPG documents containing customer names, pricing, cost, and similar competitive Trade Secrets.

192.    Defendants' actions constitute willful misappropriation of Trade Secrets and Proprietary Information under any applicable state law.  By using the documents they viewed and downloaded containing TPG's Trade Secrets and Proprietary Information to compete with TPG, Defendants breached a confidential relationship and duty imposed on them by contract and at law, permitting them access to the confidential data room and TPG's management.

193.    Defendants have improperly retained documents and information containing TPG's Trade Secrets and Proprietary Information in violation of their obligations at law, and the confidential relationship and duty resulting from the grant of access to the data room.

194.     Defendants' misappropriation of TPG's Trade Secrets and Proprietary Information has caused TPG to suffer harm, including but not limited to the loss of client revenue, loss of reputation and customer goodwill, and loss of the confidentiality of, and investment in, its Trade Secrets.

195.    Defendants' actions are especially gross, wanton and egregious given the calculated nature of the misappropriation and the great lengths to which Defendants went to hide their actions, including their refusal to return and account for all documents and information that Defendants accessed during the auction, and, accordingly, TPG is entitled to recover punitive damages in an amount to be determined by a trier of fact.

196.    TPG is entitled to full compensatory and consequential damages, a full accounting of Defendants' profits, punitive damages, as well as attorneys' fees, costs, and expenses.

197.    Accordingly, TPG demands judgment jointly and severally against Lionbridge and H.I.G. for compensatory damages, punitive damages, prejudgment interest, an award of reasonable attorneys' fees and costs.

COUNT VII
Unfair Competition and Trade Secrets
Under State Law

198.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 – 197 as if fully set forth herein.

199.    Upon information and belief, at all times since unlawfully and improperly obtaining TPG's Trade Secrets and Proprietary Information, Defendants have used TPG's Trade Secrets and

Proprietary Information to solicit TPG's clients, structuring such solicitations with knowledge of and reference to TPG's Trade Secrets and Proprietary Information, including pricing as well as the needs and preferences of such clients, improperly obtained and retained by Defendants.

200.    Additionally, Lionbridge has reorganized its business model to focus on a vertical sales strategy like TPG.  It has begun reorganizing its sales force and compensation structure to replicate the TPG model.  Using Trade Secrets, including, pricing and client information, Defendants are concentrating Lionbridge's sales and marketing efforts on TPG's top clients in two specific industries.

201.    By reason of the foregoing, Defendants have intentionally, maliciously and willfully unfairly competed, and continue to unfairly compete TPG, causing TPG damages as prayed below for, among other things, loss of client revenue, loss of reputation and customer goodwill, and loss of the confidentiality of, and investment in, its Trade Secrets and Proprietary information.

202.    Accordingly, TPG demands judgment jointly and severally against Lionbridge and H.I.G. for compensatory damages, punitive damages, prejudgment interest, an award of reasonable attorneys' fees and costs.

<u>COUNT VIII</u>
Unjust Enrichment
(Against Lionbridge)

203.    TPG repeats and realleges the allegations contained in Paragraphs 1 – 202 above as if fully set forth herein.

204.    As described above, Lionbridge has taken unfair advantage of its access to TPG's data room and management by, among other things, wrongfully disclosing, stealing, and utilizing TPG's confidential Proprietary Information and Trade Secrets for its own financial gain and to

TPG's detriment.  Specifically, Lionbridge has misappropriated and used TPG's client lists, client agreements, client pricing information, commission schedules, sales and marketing strategies, confidential employee information and organization structures to generate income to the exclusion of, and ongoing damage to, TPG.

205.    It is unconscionable for Lionbridge to retain the financial benefits resulting from its wrongful conduct.  Lionbridge therefore should be required to make full and complete restitution to TPG.

206.    Accordingly, under principles of equity and good conscience, TPG is entitled to judgment against Lionbridge in an amount to be determined at trial, plus all interest and costs as allowed by law.

COUNT IX
Breach of Contract[9]
(Against H.I.G.)

207.    TPG repeats and realleges the allegations contained in Paragraphs 1 – 206 above as if fully set forth herein.

208.    By reason of the foregoing, H.I.G. has breached the H.I.G. Confidentiality Agreement and the Clean Room Amendment.

209.    Specifically, the H.I.G. Confidentiality Agreement states that H.I.G. shall not use the Proprietary Information it acquires through the auction process "either directly or indirectly, for any purpose other than in connection with evaluating a potential Transaction" to acquire TPG. H.I.G. has breached this provision by using TPG's Trade Secrets and Proprietary Information to unfairly compete with TPG.

---

[9] In its motion to dismiss the initial complaint, H.I.G. waived the Delaware forum selection clause in the H.I.G. Confidentiality Agreement.

210.    The H.I.G. Confidentiality Agreement forbids disclosure of any such Proprietary Information except to H.I.G. "[r]epresentatives who need access to such information for the sole purpose of assisting in your evaluation of a potential Transaction."   H.I.G. has breached this provision by disclosing TPG's Trade Secrets and Proprietary Information to sales and marketing personnel, and other employees and agents not directly involved in the auction process, for purposes of unfairly competing with TPG.

211.    The H.I.G. Confidentiality Agreement forbids H.I.G. from disclosing its participation in the auction process or its potential acquisition of TPG.  Based on statements made by Lionbridge employees concerning the company's impending acquisition of TPG, TPG has reason to believe that H.I.G. breached this provision and disclosed to Lionbridge employees that the company would be acquiring TPG.

212.    The H.I.G. Confidentiality Agreement forbids H.I.G. from contacting "any customer, supplier, lender, agent, independent contractor, or other third party that you know conducts business with [TPG]" concerning any Proprietary Information or H.I.G.'s participation in the auction, without the express consent of Credit Suisse or TPG.  H.I.G. breached this provision by contacting TPG's clients during and after the pendency of the auction, and using TPG's Proprietary Information to poach these relationships.

213.    The H.I.G. Confidentiality Agreement requires H.I.G. to destroy all Proprietary Information acquired from TPG through the auction process upon demand.  H.I.G. has breached this provision by refusing to respond to TPG's destruction notice, and to inquiries regarding H.I.G.'s compliance with the same.  Upon information and belief, H.I.G. and its Affiliates failed to timely destroy all Proprietary Information received from TPG, and/or materials created derivatively therefrom.

214.    The Clean Room Agreement requires H.I.G. to restrict access to certain highly sensitive Proprietary Information on an "Attorneys Eyes Only" basis.  H.I.G. breached this provision by circumventing these AEO restrictions and directly accessing "Clean Room" documents during the auction process.

215.    These breaches have caused TPG actual and consequential damages in an amount to be determined at trial.

COUNT X
Fraud

216.    TPG repeats and realleges the allegations contained in Paragraphs 1 – 215 above as if fully set forth herein.

217.    H.I.G. made misrepresentations and omissions of material facts to TPG by continuing to present bids into, and past, the second phase of the bidding process.  The Custodian's invitation to participate in the second round of bidding, dated August 21, 2017, informed potential buyers that the transaction would not be conditioned on the existence of any non-competition obligations of the stockholders.  Accordingly, by August 21, 2017, H.I.G. knew that a non-compete would not be imposed on Shawe as part of the sale of TPG, and that therefore H.I.G. would not be able to purchase TPG because the Company's value to third parties without a non-compete was hundreds of millions of dollars lower than if the Company was in Shawe's control.

218.    Instead of submitting a realistic bid in an amount that would have disqualified it from advancing, H.I.G. inflated its bid numbers to keep itself in the running.  H.I.G. qualified these bids with unrealistic conditions that were difficult to valuate, enabling H.I.G. to present a competitive "sticker price," while leaving it with room to retreat from its inflated dollar values when its conditions were inevitably removed.  Upon information and belief, the representations made in H.I.G.'s "revised" bid submitted on September 7, 2017, its second "revised" bid, its final

53

bid submitted on November 8, 2017, its final revised bid submitted on November 15, 2017, and its execution of the Clean Room Amendment, including but not limited to the dollar amounts of the bids themselves, were materially false in fact and by omission.  These misrepresentations were intended to, and did, deceive TPG, acting by and through Pincus, and induced it to provide H.I.G. with access to confidential Proprietary Information and Trade Secrets to which H.I.G. was not otherwise entitled.

219.    Upon information and belief, Pincus reasonably relied on these misrepresentations by Defendants in allowing them access to TPG's Trade Secrets and Proprietary Information.

220.    Had TPG known H.I.G.'s true intentions, it would have immediately taken appropriate measures to prevent H.I.G. from continuing its participation in the bidding process under false pretenses, and from thereby obtaining ongoing access to TPG's continually supplemented Trade Secrets and Proprietary Information.

221.    H.I.G.'s representations to TPG regarding its intent to purchase TPG, after learning that a non-compete would not be imposed on Shawe, were false, and intended to induce TPG to allow H.I.G. to access TPG's Proprietary Information and Trade Secrets.  H.I.G. knew its representations were false when it made them, and H.I.G. intended that TPG rely on its misrepresentations.  These representations of H.I.G. were therefore fraudulent.

222.    Upon information and belief, at the time they were made, TPG, acting by and through Pincus, had no knowledge of the falsity of H.I.G.'s representations and omissions of relevant facts.  TPG, acting by and through Pincus, reasonably and justifiably relied upon H.I.G.'s representations and omissions of relevant facts in allowing H.I.G. to continue in the bidding process, to continue accessing TPG's Proprietary Information and Trade Secrets in the data room, and for H.I.G.'s representatives to continue accessing the Clean Room.

223.    While H.I.G. made misrepresentations to Pincus to advance its pretextual participation in the auction process, Lionbridge employees deliberately misrepresented to TPG's clients that Lionbridge would be acquiring TPG, and that future business inquiries should be directed to Lionbridge.  Upon information and belief, these statements caused actual confusion among TPG's clients, some of whom have decreased or reduced their business with TPG.

224.    TPG has been injured as a direct and proximate result of the foregoing fraud in an amount to be proven at trial.  Defendants committed these acts of material misrepresentation and omission of relevant facts willfully and wantonly, and TPG therefore is entitled to recover punitive damages in an amount to be determined by a trier of fact.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, TPG respectfully demands that judgment be made and entered in its favor jointly and severally against the Defendants as follows:

a.    Require H.I.G. and Lionbridge to make restitution to TPG, and award TPG judgment against H.I.G. and Lionbridge in an amount to be determined at trial but now believed to be in excess of $100,000,000, plus all interest and costs as allowed by law;

b.    Require H.I.G. and Lionbridge to account to TPG for all revenues and profits derived from their misappropriation of TPG's Trade Secrets and Proprietary Information;

c.    Award TPG actual compensatory and consequential damages in an amount to be determined at trial but now believed to be in excess of $100,000,000 against H.IG. and Lionbridge for their misappropriation of TPG's Trade Secrets and Proprietary Information;

d.    Award TPG exemplary and/or punitive damages of $200,000,000 pursuant to (i) the DTSA and (ii) the New York state common law due to H.I.G. and Lionbridge's willful and malicious misappropriation of TPG's Trade Secrets and Proprietary Information;

e.      Require H.I.G. and Lionbridge to account for and to return to TPG any documents obtained from TPG in their possession;

f.      Enter a permanent injunction enjoining Defendants, or either of them, their agents, employees, directors, officers, assignees and/or transferees, from soliciting TPG's clients who were listed in the data room and/or the Protected Computer;

g.      Enter a permanent injunction enjoining Defendants, or either of them, their agents, employees, directors, officers, assignees and/or transferees, from soliciting TPG's sales people and managers;

h.      Award TPG punitive damages in an amount to be determined at trial but now believed to be in excess of $300,000,000 against H.I.G. and Lionbridge;

i.      Award TPG prejudgment interest against Defendants for the claims asserted against them herein;

j.      Award TPG all costs and reasonable attorneys' fees it incurs in the prosecution of this lawsuit; and

k.      Award TPG such other and further relief as this Court deems just and proper.

<u>JURY TRIAL DEMANDED</u>

TPG hereby demands a jury trial.


Dated:  New York, New York
        July 19, 2019

Respectfully submitted

KRUZHKOV RUSSO PLLC

By: /s/  Martin P. Russo
       Martin P. Russo
       Sarah Y. Khurana

350 Fifth Avenue,
Suite 7230
New York, New York 10118
Tel: (212) 363-2000
Fax: (347) 507-2378


GARVEY SCHUBERT BARER, P.C.

By: /s/ Andrew J. Goodman
       Andrew J. Goodman, Esq.
       Malcolm Seymour, Esq.
       Jeanne Barenholtz, Esq.

100 Wall Street, 20th Floor
New York, New York 10005
Tel:  (212) 965-4534
Fax: (212) 334-1278

*Attorneys for Plaintiff TransPerfect Global, Inc.*