UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
TRANSPERFECT GLOBAL, INC.,             :
                                       :
                      Plaintiff,       :        19cv3283 (DLC)
          -v-                          :
                                       :        OPINION AND ORDER
LIONBRIDGE TECHNOLOGIES, INC. and      :
H.I.G. MIDDLE MARKET, LLC,             :
                                       :
                      Defendants.      :
                                       :
-------------------------------------- X

APPEARANCES

For the plaintiff:
Kruzhkov Russo PLLC
Martin P. Russo
Robert Sidorsky
Sarah Y. Khurana
350 Fifth Avenue, Suite 7230
New York, New York 10118

Foster Garvey, P.C.
Andrew J. Goodman
Malcolm Seymour
Jeanne C. Barenholtz
100 Wall Street, 20th Floor
New York, New York 10005

For the defendants:
Kirkland & Ellis LLP
Aaron Marks
Michael Murray
601 Lexington Avenue
New York, New York 10022

Akerman LLP
Scott M. Kessler
666 Fifth Avenue, 20th Floor
New York, New York 10130

Jason S. Oletsky
Las Olas Centre II - Suite 1600

350 East Las Olas Boulevard
Fort Lauderdale, Florida 33301


DENISE COTE, District Judge:

On August 12, 2019, defendants Lionbridge Technologies, Inc. ("Lionbridge") and H.I.G. Middle Market, LLC ("H.I.G.") moved to dismiss the plaintiff's Amended Complaint for failure to state a claim. Defendants' motion, brought pursuant to Rule 12(b)(6), Fed. R. Civ. P., is denied, except as to plaintiff's Computer Fraud and Abuse Act claims.

## **Background**

The following facts are drawn from the Amended Complaint, unless otherwise noted, and are assumed to be true for the purpose of addressing this motion.

### The Delaware Sale Order

Philip Shawe and Elizabeth Elting co-founded plaintiff TransPerfect Global, Inc. ("TransPerfect") in 1992. The company provides translation, website localization, and litigation support services. TransPerfect has about 5,000 full-time employees and maintains a network of more than 25,000 translators, editors, and proofreaders, who work in approximately 170 different languages.

In April 2014, Elting filed a petition in Delaware Chancery Court seeking the dissolution and forced sale of TransPerfect. In August 2015, the Chancery Court granted Elting's petition and appointed Robert Pincus as a custodian to oversee the sale.  In re Shawe & Elting LLC, No. 10449-CB, 2015 WL 4874733, at *1, 32 (Del. Ch. Aug. 13, 2015), aff'd sub nom. Shawe v. Elting, 157 A.3d 152 (Del. 2017).  In July 2016, the Chancery Court ordered Pincus to use a "Modified Auction" to sell TransPerfect, in which Shawe, Elting, and outside bidders would have the opportunity to purchase the company (the "Auction").  In re TransPerfect Global, Inc., No. 10449-CB, 2016 WL 3949840, at *1-2 (Del. Ch. July 18, 2016).

Defendants' Participation in the Auction

In late July 2016, H.I.G., an investment firm, submitted a bid to purchase Lionbridge, TransPerfect's largest competitor. In November 2016, Pincus hired Credit Suisse to act as his financial advisor for the sale of TransPerfect.[1]  H.I.G.'s acquisition of Lionbridge was completed in February 2017.

---

[1] Plaintiff alleges that Credit Suisse had a conflict of interest while it advised Pincus concerning the sale of TransPerfect because it had also provided financing for H.I.G.'s acquisition of Lionbridge -- and if H.I.G. could combine Lionbridge with TransPerfect, then the risk of default on the debt that Credit Suisse had issued would decrease.

Credit Suisse and Pincus structured the Auction to include three rounds of bidding. In Phase I, Credit Suisse invited potential bidders to participate and distributed an informational package about TransPerfect to those potential bidders who executed a confidentiality agreement. Those who wished to advance to the next round were required to submit an "indication of interest." In Phase II, Credit Suisse chose a small group from those who had submitted indications of interest. This group was given access to an online data room[2] (the "Data Room") and invited to meet with certain TransPerfect management. At the end of Phase II, the bidders were required to submit a revised offer. Phase III included another formal round of bidding. The remaining participants were then permitted to submit a further informal "final" bid.

---

[2] See generally Will Kenton, Virtual Data Room (VDR), Investopedia (May 1, 2019), https://www.investopedia.com/terms/ v/virtual-data-room-vdr.asp ("A virtual data room (VDR), also known as a deal room, is a secure online repository for document storage and distribution. It is typically utilized during the due diligence process preceding a merger or acquisition to review, share, and disclose company documentation."); Intralinks, Frequently Asked Questions (last visited Mar. 5, 2020), https://www.intralinks.com/faqs ("Traditional data rooms are physical locations where paper copies of documents are compiled, stored and managed until a deal is finalized. . . . A virtual data room (VDR) is an online space designed for the same purpose as a traditional data room -- secure storage, organization and exchange of documents among parties to a transaction.").

During each phase of the Auction, additional information
was loaded into the Data Room.  In each round, the disclosed
information became increasingly detailed and sensitive.  The
Amended Complaint alleges that defendants used the Auction to
access confidential information, including TransPerfect's client
contracts, pricing methodology, and translator pay rates.

During Phase I, Shawe and Elting declared themselves as
potential buyers and were permitted to seek assistance from
third parties in making a bid for TransPerfect.  Credit Suisse
also identified ninety-two third parties for potential
participation in the Auction, including H.I.G.  On June 2, 2017,
H.I.G. signed a confidentiality agreement related to its
participation in the Auction (the "Confidentiality Agreement").

Under the Confidentiality Agreement, H.I.G. was required to
keep confidential any information received from TransPerfect and
was prohibited from using it "either directly or indirectly, for
any purpose other than in connection with evaluating a potential
Transaction," i.e. a potential purchase of the company.  The
Confidentiality Agreement contained an entire-agreement clause
and a Delaware choice-of-law clause.

H.I.G. submitted an initial Phase I bid of $750 million.
Credit Suisse selected ten bidders to participate in Phase II of
the Auction, and on August 7, 2017 added more detailed

information about TransPerfect to the Data Room.  On August 21,
2017, Pincus invited the ten bidders to submit their Phase II
bids.  The invitation letter instructed that bids could not be
conditioned on the existence of a restrictive covenant on
competition or on the resolution of any litigation involving
TransPerfect or Pincus.

According to the Amended Complaint, H.I.G. believed that
the unavailability of a noncompete clause decreased the value of
TransPerfect by hundreds of millions of dollars because if Shawe
lost the Auction, he could become a competitor of TransPerfect.
TransPerfect alleges that from this point forward, H.I.G.
"understood that it would not be prudently able to outbid Shawe
in the Modified Auction" and therefore "shifted [its] goal from
acquiring [TransPerfect] to obtaining a competitive advantage
for Lionbridge in bad faith."  During Phase II, H.I.G. and
Lionbridge employees had access to competitively sensitive
TransPerfect information in the Data Room, and TransPerfect
alleges that the defendants used the Data Room to access
thousands of competitively sensitive documents.

On September 7, 2017, H.I.G. submitted a revised Phase II
bid, again for $750 million.  According to the Amended
Complaint, H.I.G. knew it would not in fact make a $750 million
offer unless a noncompete were imposed on Shawe, but

deliberately failed to disclose that limitation, which would
have prevented H.I.G. from advancing to Phase III of the
Auction.  On September 21, Credit Suisse and Pincus invited four
bidders, including H.I.G., to participate in Phase III.  The
four participants were asked to provide a markup of a Form Sale
Agreement by October 30 and to submit a final bid by November 8.

On October 26, 2017, Pincus and H.I.G. entered into a
"Clean Room Agreement."  The Clean Room Agreement provided for
creation of a separate folder (the "Clean Room") within the Data
Room that would contain "particularly competitively sensitive
information," including "detailed pricing, cost, and other
competitively sensitive information."  The Clean Room would be
accessible only to members of a "Clean Team" composed of
H.I.G.'s outside counsel.  The Clean Team was not permitted to
disclose any information from the Clean Room to H.I.G.'s other
representatives without advance written approval from Pincus's
counsel.  The Clean Team could provide a summary of the
information from the Clean Room -- without identifying pricing,
cost, or other sensitive information -- to other H.I.G.
representatives, if the summary was approved in advance by
H.I.G.'s antitrust counsel.  As with all information subject to
the Confidentiality Agreement, any summary of the Clean Room

7

information was to be used solely for the purpose of participating in the Auction.

Plaintiff alleges that creation of the Clean Room was unnecessary because the Data Room contained versions of all ninety documents that were placed in the Clean Room. Plaintiff further alleges that the defendants accessed, through the Data Room, unredacted versions of more than half of the Clean Room documents.

After two more rounds of bidding, Shawe's bid was accepted. On December 1, 2017, Pincus issued a report and recommended to the Chancery Court that Shawe's purchase of TransPerfect be approved.

Defendants' Alleged Use of TransPerfect's Trade Secrets

The Amended Complaint lists sixteen items that TransPerfect contends constitute trade secrets, including (1) a list of TransPerfect's clients, the annual revenue attributable to each client, and the per-word translation rates charged to each client, (2) a January 2016 memorandum detailing TransPerfect's pricing methodology for each of its services, and (3) rates that TransPerfect paid to its translators.

According to the Amended Complaint, the defendants obtained the above-described information through the Auction, and Lionbridge has now used that information to restructure its

business model to mirror TransPerfect's.  In particular,
Lionbridge is alleged to have focused its sales efforts on
industries and clients that were the largest revenue sources for
TransPerfect and then used TransPerfect's confidential
information to undercut its pricing and obtain business that
would have otherwise gone to TransPerfect.  Lionbridge has
allegedly created a "Deal Desk" that reviews project bids and
uses information acquired in the Auction to determine whether to
raise or lower its pricing to be more competitive with
TransPerfect.

Procedural History

TransPerfect commenced this action against H.I.G. and
Lionbridge on April 11, 2019.  On June 26, the defendants moved
to dismiss the complaint.  On July 19, TransPerfect filed the
Amended Complaint, thereby mooting the June 26 motion to
dismiss.  The Amended Complaint contains claims for
misappropriation of trade secrets under the Defend Trade Secrets
Act ("DTSA"), 18 U.S.C. § 1836, and for exceeding authorized
access under the Computer Fraud and Abuse Act ("CFAA"), 18
U.S.C. § 1030(g).  The Amended Complaint also contains state law
claims for misappropriation of trade secrets, unfair
competition, unjust enrichment, breach of contract, and fraud.

The defendants moved to dismiss the Amended Complaint on August 12. That motion became fully submitted on October 15.

## Discussion

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Sierra Club v. Con-Strux, LLC, 911 F.3d 85, 88 (2d Cir. 2018) (citation omitted). A claim to relief is plausible when the factual allegations in a complaint "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Progressive Credit Union v. City of New York, 889 F.3d 40, 48 (2d Cir. 2018) (citation omitted). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Carlin v. Davidson Fink LLP, 852 F.3d 207, 212 (2d Cir. 2017) (citation omitted). The plaintiff must plead enough facts to "nudge[] [its] claims across the line from conceivable to plausible." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

When a party moves to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), Fed. R. Civ. P., a court must "constru[e] the complaint liberally, accept[] all factual allegations as true, and draw[] all reasonable inferences in the plaintiff's favor." Coal. for

Competitive Elec. v. Zibelman, 906 F.3d 41, 48-49 (2d Cir. 2018)
(citation omitted).  A court may also consider any documents
that are "'integral' to the complaint."  Sierra Club, 911 F.3d
at 88.  A document is "deemed 'integral' to the complaint when
the complaint relies heavily upon its terms and effect."  Palin
v. New York Times Co., 940 F.3d 804, 811 (2d Cir. 2019)
(citation omitted).

## I.   DTSA Claims

TransPerfect has adequately pleaded its DTSA claims.  The
defendants argue that the Amended Complaint does not identify
material that constitutes trade secrets and that it does not
sufficiently plead misappropriation of such trade secrets.
Neither argument is persuasive.

### A.   Trade Secrets

The Economic Espionage Act, which creates criminal
liability for trade secret theft, was amended by the DTSA to
create a federal civil cause of action for owners of
misappropriated trade secrets.  See Defend Trade Secrets Act of
2016, Pub. L. No. 114-153, secs. 2, 5, 130 Stat. 376, 376-84.[3]

---

[3] The DTSA was intended to "create a uniform federal civil cause
of action, without preempting state law, to provide clear rules
and predictability for trade secret cases."  162 Cong. Rec.
S1631, S1635 (daily ed. Apr. 4, 2016) (statement of Sen.
Grassley).  It "draws heavily from the Uniform Trade Secrets
Act" in order to "harmonize[] U.S. law."  161 Cong. Rec. S7251
(daily ed. Oct. 8, 2015) (statement of Sen. Coons).

The statute provides that business information constitutes a
"trade secret" if

> (A) the owner thereof has taken reasonable measures to
> keep such information secret; and

> (B) the information derives independent economic
> value, actual or potential, from not being generally
> known to, and not being readily ascertainable through
> proper means by, another person who can obtain
> economic value from the disclosure or use of the
> information[.]

18 U.S.C. § 1839(3).

The Amended Complaint plausibly alleges that the detailed
revenue, pricing, and pay information identified in that
pleading constitute trade secrets.  The defendants argue that
the Amended Complaint (1) is insufficiently specific in its
description of the alleged trade secrets, (2) fails to
adequately allege that TransPerfect took reasonable measures to
keep the information secret, and (3) fails to adequately allege
that the information derives economic value from its secrecy.
These arguments are unavailing.  In fact, the Amended Complaint
makes clear what information is claimed as a trade secret,
listing sixteen types of information to which the defendants had
access through the Auction.  Likewise, the Amended Complaint
sufficiently pleads the measures that TransPerfect took to
maintain the confidentiality of its trade secrets, such as
keeping the information on a password-protected network,

authorizing only senior managers to access the information, and enforcing confidentiality agreements with TransPerfect's employees, clients, and vendors.  And the Amended Complaint sufficiently alleges that the secrecy of revenue, pricing, and pay information produces economic value:  It protects TransPerfect from strategic underbidding by its competitors.

B.    Misappropriation

The DTSA defines "misappropriation" as

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who--

> (i) used improper means to acquire knowledge of the trade secret;
>
> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was--
>
> > (I) derived from or through a person who had used improper means to acquire the trade secret;
> >
> > (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
> >
> > (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>
> (iii) before a material change of the position of the person, knew or had reason to know that--

(I) the trade secret was a trade secret; and

(II) knowledge of the trade secret had been acquired by accident or mistake[.]

18 U.S.C. § 1839(5) (emphasis added).  The term "improper means"

(A) includes theft, bribery, misrepresentation, <u>breach or inducement of a breach of a duty to maintain secrecy</u>, or espionage through electronic or other means; and

(B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition[.]

<u>Id.</u> § 1839(6) (emphasis added).

The Amended Complaint adequately alleges misappropriation. Under the Confidentiality Agreement, H.I.G. was prohibited from using information that it received from TransPerfect "for any purpose other than in connection with evaluating" a potential purchase of the company.  The Amended Complaint alleges that H.I.G. disclosed trade secrets to members of the Lionbridge sales team and "Deal Desk."  H.I.G. would have therefore disclosed trade secrets with the knowledge that they were acquired under circumstances giving rise to a duty to maintain the secrecy of the information.  <u>See</u> 18 U.S.C. § 1839(5)(B)(ii)(II).  Lionbridge would likewise have acquired the trade secrets through breach of a duty to maintain secrecy.  <u>See</u> 18 U.S.C. § 1839(5)(A).

II.  CFAA Claims

The CFAA creates a cause of action against a person who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains" information from a computer that is used in interstate commerce.  18 U.S.C. § 1030(a)(2), (e)(2), (g).  "[T]he term 'exceeds authorized access' means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter."  Id. § 1030(e)(6).

The Second Circuit has held that a police officer who accesses a law-enforcement database to search for a personal acquaintance, with no valid law-enforcement purpose for the search, cannot be convicted under the CFAA.  United States v. Valle, 807 F.3d 508, 512-13, 528 (2d Cir. 2015).  In so holding, the Court of Appeals reasoned that

> because "without authorization" most naturally refers
> to a scenario where a user lacks permission to access
> the computer at all, one sensible reading of the
> statute is that "exceeds authorized access" is
> complementary, referring to a scenario where a user
> has permission to access the computer but proceeds to
> "exceed" the parameters of authorized access by
> entering an area of the computer to which his
> authorization does not extend.

Id. at 524.  In short, a defendant exceeds authorized access "only when he obtains or alters information that he does not

15

have authorization to access for any purpose which is located on a computer that he is otherwise authorized to access." Id. at 511.

The Amended Complaint does not plausibly plead that the defendants exceeded authorized access. There is, for example, no allegation that the defendants hacked into TransPerfect's confidential files. Instead, TransPerfect alleges that the defendants "took advantage of Credit Suisse's apparent incompetence in setting security protocols" for the Data Room, which allowed even strategic buyers like H.I.G. to access competitively sensitive information. This is an allegation (1) that Credit Suisse gave the defendants access and (2) that the defendants misused that access. But it is not an allegation that the defendants exceeded authorized access.

TransPerfect alleges on information and belief that H.I.G. and Pincus had agreed, even prior to the execution of the Confidentiality Agreement, that H.I.G. would not directly access trade secret information that was placed in the Data Room.[4]  But,

_____

[4] Allegations may be made "'upon information and belief' where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (citation omitted).  The Amended Complaint provides the following informational bases for the belief that Pincus and H.I.G. had an extra-contractual understanding that H.I.G.'s access would be limited:  (1) A report recommending the Modified

16

H.I.G. entered into a Confidentiality Agreement, which contained an integration clause.[5]  Even crediting the information-and-belief allegation that Pincus and H.I.G. had a prior extra-contractual understanding concerning access limitations, that understanding would have been superseded by the Confidentiality Agreement.  The Amended Complaint makes no allegation that the defendants exceeded the access permitted by the Confidentiality Agreement.[6]  Accordingly, the defendants' motion to dismiss the CFAA claims is granted.

III. DUTSA Preemption

The defendants contend that Delaware law governs TransPerfect's state law claims for unfair competition, unjust

---

Auction had warned that special precautions should accompany any disclosure of competitively sensitive information to strategic buyers; (2) Pincus had assured the Chancery Court that he could regulate the level of access provided to diligence materials based on the stage of the bidding process and the identity of the bidder; (3) Credit Suisse asserted in its report supporting the sale that it had taken precautions concerning the disclosure of information; and (4) H.I.G. acknowledged in its objection to the sale that it knew it would have limited access to certain information due to its ownership of Lionbridge.

[5] The relevant language reads, "This Agreement shall constitute the entire agreement between the parties hereto with regard to the subject matter hereof."

[6] The Amended Complaint also alleges that H.I.G. used the general Data Room to access documents that should have been placed only in the Clean Room.  But this is again an allegation that Credit Suisse carelessly gave the defendants too much access; it is not an allegation that the defendants exceeded their authorized access, as required for CFAA liability.

enrichment, and fraud, and that these claims are preempted by
the Delaware Uniform Trade Secrets Act (the "DUTSA"), Del. Code
Ann. tit. 6, §§ 2001-09. Since New York law applies to these
claims and New York has not adopted the Uniform Trade Secrets
Act, there is no statute to preempt TransPerfect's common-law
claims.[7]

A.   Legal Standard

A federal court sitting in New York should, when addressing
diversity-jurisdiction claims, apply New York law to determine
the scope of a choice-of-law clause.  AEI Life LLC v. Lincoln
Benefit Life Co., 892 F.3d 126, 132 (2d Cir. 2018).
"Contractual choice of law provisions are generally enforceable
under both New York law and federal common law."  Arnone v.
Aetna Life Ins. Co., 860 F.3d 97, 108 (2d Cir. 2017).  But "the
effect of a choice of law clause depends on its scope, and New
York courts are reluctant to read choice-of-law clauses
broadly."  Id. (citation omitted).

---

[7] The defendants also argue that Delaware law governs
TransPerfect's state law claim for misappropriation of trade
secrets, and that the Amended Complaint fails to state a claim
under Delaware law for the same reasons that the defendants
raised concerning the DTSA claims.  Having rejected the
defendants' arguments under the DTSA, they are rejected
concerning the state law trade secret misappropriation claim as
well.

Where a choice-of-law clause specifies only that the
contract will be "governed by and construed in accordance with"
the law of a certain state, New York courts hold that the clause
does not control the law that applies to tort claims.  Fin. One
Pub. Co. v. Lehman Bros. Special Fin., 414 F.3d 325, 332, 335
(2d Cir. 2005); see also Krock v. Lipsay, 97 F.3d 640, 645 (2d
Cir. 1996) ("Under New York law, in order for a choice-of-law
provision to apply to claims for tort arising incident to the
contract, the express language of the provision must be
sufficiently broad as to encompass the entire relationship
between the contracting parties." (citation omitted)).  That
result stands "even when the contract also includes a broader
forum-selection clause" -- for example, one that reaches any
proceedings "relating to" the contract.  Fin. One Pub. Co., 414
F.3d at 335 (citation omitted).

In the absence of a choice-of-law clause governing the
claims at issue, the court must first "determine whether there
is an actual conflict between the laws of the jurisdictions
involved."  Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New
York, 822 F.3d 620, 641 (2d Cir. 2016) (citation omitted).  If
there is such a conflict, New York determines the applicable law
for tort causes of action using an "interest analysis."  In re
Thelen LLP, 736 F.3d 213, 219 (2d Cir. 2013).

Under this approach, "the law of the jurisdiction having the greatest interest in the litigation will be applied and the only facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." Id. (citation omitted). "Interest analysis is a flexible approach intended to give controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." Fin. One Pub. Co., 414 F.3d at 337 (citation omitted).

If the legal principle under examination is a "conduct-regulating rule" -- as opposed to a "loss-allocating rule" -- then "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." In re Thelen LLP, 736 F.3d at 220 (citation omitted). "Where the parties are domiciled in different states, the locus of the tort will almost always be determinative in cases involving conduct-regulating laws, whereas those cases concerning loss allocation will turn in significant part on the domiciles of the parties." Krock, 97 F.3d at 646 (citation omitted); see also Schultz v. Boy Scouts of Am., Inc., 480 N.E.2d 679, 683 (N.Y. 1985)

20

(stating that, when damages are a necessary prerequisite to liability, the locus of the tort is "determined by where the plaintiffs' injuries occurred"); In re Thelen LLP, 736 F.3d at 220 ("[F]or claims based on fraud, the locus of the tort is generally deemed to be the place where the injury was inflicted, rather than where the fraudulent act originated.").

B.  Application

As a threshold matter, the defendants have identified a genuine conflict of law.  The DUTSA specifies that it "displaces conflicting tort, restitutionary and other law of this State providing civil remedies for misappropriation of a trade secret."  Del. Code Ann. tit. 6, § 2007(a).[8]  The plaintiff agrees that this provision creates a true conflict with New York law, which contains no such preemption provision.

The defendants assert that Delaware law applies due to the choice-of-law provision in the Confidentiality Agreement.  The

---

[8] See also Alarm.com Holdings, Inc. v. ABS Capital Partners Inc., No. CV 2017-0583-JTL, 2018 WL 3006118, at *11 (Del. Ch. June 15, 2018) (noting with approval that other states "have interpreted their versions of the Uniform Act to abolish all common law theories for misappropriation of confidential information"), aff'd, 204 A.3d 113 (Del. 2019) (declining to reach the preemption question); Truinject Corp. v. Nestlé Skin Health, S.A., No. CV 19-592-LPS-JLH, 2020 WL 70981, at *7 (D. Del. Jan. 7, 2020) ("Section 2007 was intended to preserve a single tort cause of action under state law for misappropriation . . . and thus to eliminate other tort causes of action founded on allegations of trade secret misappropriation." (citation omitted)).

relevant language states that the "Agreement shall be governed
by, and construed in accordance with, the laws of the State of
Delaware, without regard to the principles of the conflicts of
laws thereof."  Such a clause does not reach tort claims like
those at issue here.  See Fin. One Pub. Co., 414 F.3d at 335.

Nor have the defendants shown that Delaware law should
apply under New York's interest analysis.  TransPerfect is
domiciled in New York; Lionbridge is domiciled in Massachusetts;
and H.I.G. is domiciled in Florida.[9]  Since the parties are
domiciled in different states and prohibitions on trade secret
misappropriation are conduct-regulating rules, the locus of the
tort determines which law should apply.  See Krock, 97 F.3d at
646; Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc., 118 F.3d
955, 968 (2d Cir. 1997) (holding that New York law applied to a
common-law trade secrets claim, where both parties maintained
offices in New York and "the misappropriation, if any,
apparently took place in New York").

Although the Court need not conclusively determine which
state's law applies at this stage, on the current record it

---

[9] Although all three entities were organized under Delaware law
during the relevant time period, it is an entity's principal
place of business that determines its domicile for the purpose
of New York's choice-of-law analysis.  Travelers Cas. & Sur. Co.
v. Honeywell Int'l, Inc., 880 N.Y.S.2d 66, 67 (N.Y. App. Div.
2009); see also In re Thelen LLP, 736 F.3d at 220.

appears that New York's law applies to the common law claims.
The tortious conduct occurred in New York.  In particular, the
Amended Complaint alleges that TransPerfect has its principal
place of business in New York; that Lionbridge had senior
management in New York during the relevant period; that Credit
Suisse managed the Data Room through its New York City office;
and that H.I.G. and Lionbridge employees conducted interviews at
TransPerfect's New York offices.

The defendants argue that Delaware has the greater interest
in this litigation because the alleged torts are related to the
Auction, which was overseen by the Delaware Chancery Court.  But
they have cited no authority for the proposition that such
oversight is relevant for the purposes of New York's interest
analysis, such that it would outweigh the locus of
misappropriation.

IV.  Unjust Enrichment Claim

The defendants argue that TransPerfect's unjust enrichment
claim fails because the Confidentiality Agreement governs the
subject matter of the dispute and thus displaces any claim for
unjust enrichment.  Importantly, TransPerfect asserts an unjust
enrichment claim only against Lionbridge, a non-signatory to the
Confidentiality Agreement.

New York law, which it appears applies here, allows an unjust enrichment claim to proceed even in the presence of a related contract, if the claim is brought against a non-signatory to that contract. See Lee v. Kylin Mgmt. LLC, No. 17cv7249 (JMF), 2019 WL 917097, at *2 (S.D.N.Y. Feb. 25, 2019) (predicting that the New York Court of Appeals would hold that "the mere existence of a written contract governing the same subject matter does not preclude recovery in quasi-contract from non parties so long as the other requirements for quasi contracts are met" (citation omitted)). Defendants' motion to dismiss the unjust enrichment claim against Lionbridge is therefore denied.

V.    Breach of Contract Claim

Defendants argue that the breach of contract claim against H.I.G. should be dismissed because TransPerfect has failed to allege any breach of the Confidentiality Agreement or Clean Room Agreement. The Confidentiality Agreement prohibits H.I.G. from using confidential information received from TransPerfect "either directly or indirectly, for any purpose" other than evaluating a potential purchase of TransPerfect. The Amended Complaint alleges that H.I.G. has in fact disclosed such information to Lionbridge for the purpose of enabling it to unfairly compete with TransPerfect. The Clean Room Agreement

required H.I.G. to keep the "detailed pricing, cost, and other
competitively sensitive information" that was placed in the
Clean Room confidential from other H.I.G. representatives who
were not members of the Clean Team.  The Amended Complaint
alleges that the defendants circumvented the Clean Room
Agreement by downloading documents containing such sensitive
information that was available through the regular Data Room.
These allegations are sufficient to withstand a motion to
dismiss.[10]

VI.  Fraud Claim

        The defendants argue that the Amended Complaint (1) has not
alleged any fraudulent statement with particularity and (2) has
not plausibly alleged fraudulent intent.  Neither argument is
persuasive.

        A party alleging fraud must "state with particularity the
circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  To
adequately plead fraud, the complaint must: (1) detail the
events giving rise to the fraud, such as the statement or
omission that is alleged to be fraudulent, the identity of the

---

[10] The Amended Complaint also alleges that TransPerfect served an
October 30, 2018 letter demanding that the defendants return or
destroy all documents obtained from TransPerfect during the
Auction, and that the defendants' failure to comply with that
demand constitutes a further breach of the Confidentiality
Agreement.

speaker, the location of the fraud, and the reason the statement
is fraudulent; and (2) allege facts "that give rise to a strong
inference of fraudulent intent." <u>Loreley Fin. (Jersey) No. 3
Ltd. v. Wells Fargo Sec., LLC</u>, 797 F.3d 160, 171 (2d Cir. 2015)
(citation omitted); <u>see also</u> <u>Cohen v. S.A.C. Trading Corp.</u>, 711
F.3d 353, 359 (2d Cir. 2013).

The Amended Complaint alleges that H.I.G.'s bids during the
Auction were fraudulent, because H.I.G. was in fact unwilling to
pay its quoted bid amounts unless a noncompete was imposed on
Shawe.  Plaintiff's theory is that H.I.G. submitted inflated
bids in order to gain access to TransPerfect trade secrets.  The
allegations in the Amended Complaint identify the statements and
omissions alleged to be fraudulent, the identity of the speaker,
the location of the fraud, and the reason the statement is
fraudulent.  Accordingly, plaintiff has alleged its fraud claim
with sufficient particularity.

The defendants further argue that TransPerfect has not
plausibly alleged that H.I.G. acted with fraudulent intent.
Relying on certain allegations in the Amended Complaint, they
argue it is implausible that H.I.G. was only a pretextual
participant in the Auction.  At best, these facts raise a
question of fact to be resolved at a later stage of the

proceedings.  Accordingly, TransPerfect has adequately pleaded
its fraud claim.

## Conclusion

The defendants' August 12, 2019 motion to dismiss is
granted as to plaintiff's CFAA claims, and otherwise denied.


Dated:     New York, New York
           March 20, 2020

                              _____
                                       DENISE COTE
                              United States District Judge