UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
 TRANSPERFECT GLOBAL, INC.,            :
                                       :
                          Plaintiff,   :        19cv3283 (DLC)
              -v-                      :
                                       :        OPINION AND ORDER
 LIONBRIDGE TECHNOLOGIES, INC. and     :
 H.I.G. MIDDLE MARKET, LLC,            :
                                       :
                          Defendants.  :
                                       :
-------------------------------------- X

APPEARANCES:

For the plaintiff:
Russo PLLC
Martin P. Russo
Robert Sidorsky
Sarah Y. Khurana
350 Fifth Avenue, Suite 7230
New York, New York 10118

Foster Garvey, P.C.
Andrew J. Goodman
Malcolm Seymour
100 Wall Street, 20th Floor
New York, New York 10005

For the defendants:
Kirkland & Ellis LLP
Aaron Marks
Kara Cheever
Farryal Siddiqui
601 Lexington Avenue
New York, New York 10022

Kirkland & Ellis LLP
Kristin Rose
333 South Hope Street
Los Angeles, CA 90071

DENISE COTE, District Judge:

The defendants have moved for summary judgment against plaintiff TransPerfect Global, Inc. ("TransPerfect"). TransPerfect asserts that the defendants breached a confidentiality agreement and used improperly accessed information about TransPerfect's operations to compete unfairly with it.  TransPerfect has presented insufficient evidence to support that accusation or the other theories of misconduct it has pursued in this litigation.  It has also failed to show that it has been damaged by any of the alleged misconduct.  As a result, the defendants' motion for summary judgment is granted.

## Background

The following facts are undisputed or taken in the light most favorable to TransPerfect, unless otherwise stated.  Phil Shawe ("Shawe") and Elizabeth Elting ("Elting") founded TransPerfect in 1992.  TransPerfect provides translation, website localization, and litigation support services. TransPerfect and defendant Lionbridge Technologies, Inc. ("Lionbridge") are the two largest companies in the language services industry.  Despite their size, they were responsible during the relevant period for less than 5% of worldwide language services market revenue.

In May 2014, Elting petitioned the Delaware Court of Chancery, seeking a dissolution and forced sale of TransPerfect.

In August 2015, the court ordered TransPerfect's shares to be sold at an auction (the "Auction").  The court appointed Robert Pincus to serve as Custodian of TransPerfect.  On May 22, 2017, Credit Suisse, acting on behalf of the Custodian, invited defendant H.I.G. Middle Market, LLC ("H.I.G.") to participate in the Auction.  H.I.G. had acquired Lionbridge in February 2017 (together with Lionbridge, the "Defendants").

On June 2, 2017, H.I.G. entered into a confidentiality agreement (the "Agreement") with TransPerfect.  Pursuant to the Agreement, H.I.G. and its "representatives" were given access to information about TransPerfect for the purpose of conducting due diligence to evaluate a potential acquisition of TransPerfect ("Evaluation Material").  The "Transaction" at issue is defined as "a potential negotiated transaction with [TransPerfect] or its stockholders related to the sale of [TransPerfect]".  As an affiliate of H.I.G., Lionbridge was a representative of H.I.G by the terms of the Agreement, although the Agreement did not permit H.I.G. to share Evaluation Material with the whole of Lionbridge.  The Agreement only permitted H.I.G. to share Evaluation Material with individuals at Lionbridge "who need access to such information for the sole purpose of assisting in [H.I.G.'s] evaluation of a potential Transaction."

The Agreement provided that H.I.G. and its representatives would not use or disclose Evaluation Material

3

either directly or indirectly, for any purpose other
than in connection with evaluating a potential
Transaction; <u>provided</u>, <u>however</u>, that any of the
Evaluation Material may be disclosed (i) . . . to the
extent required by applicable law or legal process;
and (ii) to your Representatives who need access to
such information for the sole purpose of assisting in
[H.I.G.'s] evaluation of a potential Transaction (it
being understood that any such Representative shall be
provided with a copy of this Agreement and you shall
direct such Representative to comply with the terms of
this Agreement applicable to Representatives).

The Agreement obligated H.I.G. and its representatives to

return or destroy Evaluation Material upon receipt of a written

request to do so.  It provides:

> <u>Upon</u> [TransPerfect]'s <u>written request</u>, all Evaluation
> Material supplied by [TransPerfect] or its
> Representatives (and all copies, extracts or other
> reproductions in whole or in part thereof) shall be
> returned to [TransPerfect] (or, at [H.I.G.'s] option,
> destroyed with written confirmation thereof provided
> to [TransPerfect] within five (5) businesses days) and
> not retained by [H.I.G.] or [H.I.G.'s] Representatives
> in any form or for any reason except for such copies
> required to be retained by applicable law or
> regulation.

(Emphasis supplied.)

In August 2017, Credit Suisse opened a virtual data room

(the "Room") to which it posted TransPerfect documents for

potential bidders.  H.I.G. and its advisors were given access to

some of the documents in the Room, or to redacted copies of some

of the documents.  H.I.G also interviewed members of

TransPerfect's management in meetings attended by the

Custodian's advisors.

Credit Suisse was to make appropriate redactions to documents placed in the Room in consultation with members of TransPerfect's management.  Credit Suisse mistakenly allowed H.I.G. access to more information than it should have.  For instance, Credit Suisse failed to redact TransPerfect customer names and revenue information by customer from certain documents that it placed in the Room.  Later, Credit Suisse corrected its error and substituted redacted versions of the documents.

H.I.G. and its advisors used certain information in their evaluation of TransPerfect to which they had been mistakenly given access.  For instance, H.I.G.'s financial advisor for the Auction, Houlihan Lokey, used customer revenue information to produce an analysis of TransPerfect's pricing trends over time. H.I.G.'s advisor for commercial due diligence, McKinsey & Company, used the customer-specific information to create a list of TransPerfect's top customers by revenue and to perform an analysis of customer overlap between Lionbridge and TransPerfect to evaluate revenue dissynergies.  These analyses were shared with H.I.G.

There is no evidence that the TransPerfect pricing information or customer-specific information was shared with those at Lionbridge who are responsible for Lionbridge's pricing processes.  For example, the Houlihan Lokey analysis was shared with H.I.G. and not with Lionbridge.

On October 26, 2017, H.I.G. and TransPerfect amended the
Agreement (the "Clean Room Agreement").  Pursuant to the Clean
Room Agreement, a separate folder was set up in the Room (the
"Clean Room") to which documents were posted that were to be
viewed only by certain attorneys for H.I.G. from Kirkland &
Ellis (the "K&E Clean Team").  The K&E Clean Team was permitted
to provide H.I.G. with a summary of information on the condition
that the summary did "not identify customer names or pricing,
cost or other similar competitively sensitive information . . .
[and would be used] solely for decision-making purposes in
connection with the Transaction."  The K&E Clean Team produced a
short summary of certain information that did not include
customer names or other sensitive information.  There is no
evidence that the K&E Clean Team violated the Clean Room
Agreement.

On November 19, 2017, the Custodian selected Shawe as the
winning bidder in the Auction.  On February 15, 2018, the court
approved the sale of Elting's shares to Shawe.  The sale closed
in May 2018.

On April 11, 2019, TransPerfect filed this action.  The
complaint included the allegation that H.I.G. did not return or
destroy Evaluation Material following receipt of a written

request to do so.[1]  TransPerfect no longer contends that H.I.G.

violated the Agreement in this way.

During discovery, TransPerfect identified 92 documents that

it contends contain trade secrets misappropriated by the

Defendants.  Following the conclusion of discovery, the

Defendants moved for summary judgment.  TransPerfect contends in

opposition to this motion for summary judgment that the

Defendants used misappropriated Evaluation Material to compete

unfairly with TransPerfect by trying to win business from two of

its largest clients, IQVIA[2] and Merck.

## Discussion

The complaint, which was amended on July 19, 2019, contains

claims for misappropriation of trade secrets under the Defend

Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, and state law

claims for misappropriation of trade secrets, unfair

competition, unjust enrichment, breach of contract, and fraud.[3]

---

[1] TransPerfect no longer contends that it sent the Defendants a
written request to return Evaluation Material.  It never
produced evidence of such a written request.

[2] In October 2016, Quintiles merged with IMS Health and changed
its name to IQVIA in November 2017.

[3] An Opinion of March 20, 2020 granted the motion to dismiss the
claim brought under the Computer Fraud and Abuse Act.
TransPerfect Glob., Inc. v. Lionbridge Techs., Inc., No.
19CV3283 (DLC), 2020 WL 1322872 (S.D.N.Y. Mar. 20, 2020).

The Defendants seek summary judgment on each of these claims. The DTSA and misappropriation claims will be addressed first.

Summary judgment may only be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "To present a genuine issue of material fact sufficient to defeat a motion for summary judgment, the record must contain contradictory evidence such that a reasonable jury could return a verdict for the nonmoving party."  Horror Inc. v. Miller, 15 F.4th 232, 241 (2d Cir. 2021) (citation omitted). Material facts are facts that "might affect the outcome of the suit under the governing law."  Choi v. Tower Rsch. Cap. LLC, 2 F.4th 10, 16 (2d Cir. 2021) (citation omitted).  In considering a motion for summary judgment, a court "construe[s] the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  Kee v. City of New York, 12 F.4th 150, 158 (2d Cir. 2021) (citation omitted).

"Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  Robinson v. Concentra Health Servs., Inc., 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). The nonmoving party may rely neither "on conclusory statements

or on contentions that the affidavits supporting the motion are not credible," CIT Bank N.A. v. Schiffman, 948 F.3d 529, 532 (2d Cir. 2020) (citation omitted), nor on "mere speculation or conjecture as to the true nature of the facts," Fed. Trade Comm'n v. Moses, 913 F.3d 297, 305 (2d Cir. 2019) (citation omitted).

I.   Trade Secret Misappropriation

The DTSA provides a private cause of action to the "owner of a trade secret that is misappropriated". 18 U.S.C. § 1836(b)(1). There are, therefore, two components to a violation: the existence of a trade secret and its misappropriation. The DTSA and New York's cause of action for misappropriation contain largely overlapping elements. The parties have not identified a distinction between these causes of action that is material to the decision here.

The DTSA provides that business information constitutes a "trade secret" if

> (A) the owner thereof has taken reasonable measures to keep such information secret; and

> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3).

Similarly, to determine whether information constitutes a trade secret under New York law, courts consider:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

<u>Faiveley Transp. Malmo AB v. Wabtec Corp.</u>, 559 F.3d 110, 117 (2d Cir. 2009).

The DTSA defines "misappropriation" as

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was <u>acquired by improper means</u>; or

(B) <u>disclosure or use</u> of a trade secret of another without express or implied consent by a person who--

> (i) used improper means to acquire knowledge of the trade secret;

> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was--

> > (I) derived from or through a person who had used improper means to acquire the trade secret;

> > (II) <u>acquired under circumstances giving rise to a duty to maintain the secrecy</u> of the trade secret or limit the use of the trade secret; or

> > (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(iii) before a material change of the position of the person, knew or had reason to know that--

(I) the trade secret was a trade secret; and

(II) <u>knowledge of the trade secret had been acquired by accident or mistake</u>.

18 U.S.C. § 1839(5) (emphasis added).

Under the DTSA, the term "improper means"

(A) <u>includes</u> theft, bribery, misrepresentation, <u>breach or inducement of a breach of a duty to maintain secrecy</u>, or espionage through electronic or other means; and

(B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition[.]

<u>Id.</u> § 1839(6) (emphasis added).

To succeed on a claim for the "misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the Defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means."  <u>Faiveley Transp. Malmo AB</u>, 559 F.3d at 117.

There is no dispute that at least two of the documents to which H.I.G. was given access pursuant to the Agreement contain information that constitutes trade secrets.  The Defendants contend that TransPerfect has not offered evidence that they acquired the trade secrets through improper means or that they used or improperly disclosed its trade secrets.  The Defendants assert that their only use was as permitted by the Agreement: to evaluate a potential acquisition.  Moreover, the Defendants assert that TransPerfect has not identified any damages that it

11

suffered due to an alleged misappropriation of its trade secrets.

A.  The Existence of Trade Secrets

TransPerfect has identified two categories of trade secrets to which H.I.G. was given access.  It contends that its average payment to its freelance linguists in terms of cents per word and its revenues per customer for the years 2014 and 2015 were trade secrets.  According to TransPerfect, the Defendants used this information to identify and compete for the business of two of its largest clients: IQVIA and Merck.

TransPerfect has carried its burden to show that each of these items constitutes a trade secret.  It is undisputed that two of the documents within the Evaluation Material, the 2014 and 2015 Revenue by Task Code files, contained these trade secrets.  The documents indicated the revenue generated by each TransPerfect subsidiary, organized by specific task code, with line items reflecting payments received by TransPerfect, the rate, unit of measurement, and other key payment metrics. H.I.G. received unredacted versions of these files which contained TransPerfect customer names.

TransPerfect has not shown that any other documents provided to H.I.G. as part of the Evaluation Material contained other trade secrets relevant to the claims it brings in this lawsuit.  During this litigation, TransPerfect identified 92

documents containing purported trade secrets.  TransPerfect has offered no evidence that the Defendants ever accessed 35 of these 92 documents.  The Defendants contend that 55 of the remaining 57 documents do not contain trade secrets since the information within the documents does not derive economic value from being kept secret.  TransPerfect has failed to provide evidence that any of the remaining documents contained other trade secrets.

In an Appendix to their motion papers, the parties address each document.  TransPerfect identifies the subject matter of the document and its purported trade secret.  The Defendants explain why there was no misappropriation, including their lack of access to the document, or no trade secret.  In challenging the claim that the document contained trade secrets, the Defendants refer to evidence that the information was available through other sources and was outdated.  The Defendants point out as well that TransPerfect has failed to offer evidence that the information was unique to TransPerfect's operations, among other things.  At the end of the day, it is unnecessary to wade into each of these disputes because TransPerfect's opposition to this motion relies almost exclusively on its contention that it was damaged because Lionbridge had access to its average payment rate for its linguists and its revenues per customer.  This Opinion turns therefore to the analysis of that claim.

13

B. Acquisition by Improper Means

TransPerfect has failed to show that the Defendants acquired trade secrets through improper means in violation of § 1839(5)(A) of the DTSA.  TransPerfect notes that the definition of improper means in § 1839(6) of the DTSA is not exhaustive and argues that it should be read to include use of customer-specific information when provided by accident.  In support of this, TransPerfect highlights that the Custodian did not wish H.I.G. to have access to information about specific TransPerfect customers.

The Agreement explicitly permitted H.I.G. and its representatives to access Evaluation Material.  The Custodian's error in uploading unredacted documents that included the trade secrets at issue here did not create a breach by the Defendants of § (5)(A).  It is noteworthy that TransPerfect never requested the return or destruction of the information; it has not produced sufficient evidence to show that the Defendants acquired the documents by improper means.

C. Disclosure or Use of a Trade Secret

Even if its trade secrets were not improperly acquired in violation of § (5)(A), TransPerfect contends that the Defendants disclosed and used them in violation of § 1839(5)(B).  TransPerfect has also failed to show that the Defendants

14

disclosed or used its trade secrets in a manner that violated §
(5)(B) or otherwise violated the state law of misappropriation.

TransPerfect argues that the Defendants "disclosed" or
"used" trade secrets that they "knew or had reason to know" had
been acquired either under circumstances giving rise to a duty
to maintain secrecy or by "accident or mistake."  §§
1839(5)(B)(ii)(II) and 1839(5)(B)(iii)(II).[4]  To prevail under
any of the provisions of § (5)(B), however, TransPerfect must
provide evidence to raise a question of fact that the trade
secrets were used "without" consent.  The Agreement permitted
the Defendants to use the Evaluation Material in connection with
the Auction.  As explained below, TransPerfect has failed to
identify evidence that its trade secrets were used for any other
purpose.

    1. Disclosure to McKinsey

TransPerfect argues that H.I.G. improperly disclosed its
trade secrets to McKinsey.  While the evidence shows that
McKinsey was given access to Evaluation Material, the Agreement
allowed for that sharing of information.  McKinsey was hired to
conduct commercial due diligence for H.I.G. and was H.I.G.'s
representative in connection with the Auction.  There is no

---

[4] These two sections appear to be the sections of the DTSA to
which the plaintiff intended to refer at page 23 of its
Opposition brief.

evidence that McKinsey improperly provided that information to anyone at Lionbridge.

    2. Disclosure to Unauthorized Individuals at Lionbridge

    TransPerfect argues that H.I.G improperly disclosed trade secrets to the Lionbridge Sales Team.  TransPerfect contends that the Lionbridge Sales Team used customer pricing data to poach TransPerfect clients, Merck and IQVIA.  This speculation rests on evidence that the trade secret information was located among the files of TransPerfect employee Mark Pelissier.

    During the period for discovery, TransPerfect made a request for a specific folder from the network drive of Lionbridge Director of Financial Planning and Analytics Mark Pelissier ("Pelissier").  In response, a comma-separated value ("CSV") file was identified as among the contents of the folder (the "CSV File").[5]  The CSV File contains TransPerfect pricing and revenue information.

    The CSV File was created on August 29, 2017, and last saved on August 31, 2017.  At that time, Pelissier was performing discrete analyses of excel files to support H.I.G.'s due diligence efforts during the Auction.  Those analyses included developing an analysis of TransPerfect customers ranked by revenue.

---

[5] A CSV file is a raw text file that lacks the functionality and readability of Excel files.

The evidence shows, however, that Pelissier's work was performed solely in furtherance of H.I.G.'s due diligence for the Auction and was provided to H.I.G. for that purpose. Pelissier is not a member of the Lionbridge deal desk and has no responsibility for or input into Lionbridge pricing decisions. There is no documentary or testimonial evidence to support TransPerfect's speculation.  Thus, TransPerfect has failed to offer evidence that anyone on the Lionbridge Sales Team was given access to the Evaluation Material.

　　3. TransPerfect's Cost Per Word

Next, TransPerfect speculates that Lionbridge must have received access to its average cost per word and improperly used that trade secret to improve its business.  TransPerfect's argument here relies entirely on the personal notes created by TransPerfect board member Arjun Mohan.[6]

During a Lionbridge board meeting held on August 29, 2017, which was towards the end of the first phase of Data Room diligence, H.I.G. Principal Arjun Mohan made notes.  The notes contain a figure for Lionbridge's cost per word and a lower figure for TransPerfect's cost per word.  The Board was composed of Mohan, two H.I.G. Managing Directors, and a former Lionbridge CEO.

---

[6] Mohan forwarded these notes to himself.

TransPerfect argues that Mohan's notes of TransPerfect's average cost per word must mean that H.I.G.'s due diligence advisor McKinsey not only had access to that figure but also used it to refine its analysis of what Lionbridge could save if it achieved TransPerfect's "lower per-word costs."  There are many problems with this argument.

First, these notes do not reference McKinsey and do not indicate that the board discussed ways to reduce Lionbridge's per-word costs.  There is no evidence to show that Lionbridge relied on this information in such an effort.  Second, Lionbridge has captured and maintained information regarding the rates of freelance linguists and translators for years and did not begin to do so only after it joined the Auction.  Finally, the price per word referenced in Mohan's notes is also contained in an Ernst and Young Quality of Earnings Report, which was provided to H.I.G. during the Auction.  TransPerfect has not designated this report as a document containing trade secret information.  TransPerfect has thus failed to show that the Mohan notes are evidence that the Defendants misappropriated TransPerfect's trade secrets.

D. Damages

The Defendants are also entitled to summary judgment since TransPerfect has not offered evidence that it was damaged by any misappropriation.  Under the DTSA,

> a court may award damages for <u>actual loss</u> caused by
> the misappropriation of the trade secret; and damages
> for any <u>unjust enrichment caused by</u> the
> misappropriation of the trade secret that is not
> addressed in computing damages for actual loss; or in
> lieu of damages measured by any other methods, the
> damages caused by the misappropriation measured by
> imposition of liability for a reasonable royalty for
> the misappropriator's unauthorized disclosure or use
> of the trade secret.

18 USC § 1836(b)(3)(B) (emphasis added).  Under New York law,

"damages in trade secret actions must be measured by the losses

incurred by the plaintiff."  <u>E.J. Brooks Co. v. Cambridge Sec.</u>

<u>Seals</u>, 31 N.Y.3d 441, 454 (2018).

TansPerfect has not offered evidence that its damages may

be measured as a reasonable royalty.  TransPerfect's evidence of

damages rests entirely on the expert report prepared by

Creighton Hoffman and his estimate of damages under two other

theories of damages:  unjust enrichment and lost profits.

1. Unjust Enrichment

Hoffman first calculates that the Defendants' use of

TransPerfect's trade secrets unjustly enriched the Defendants by

at least $66.2 to $77 million.  There is no admissible evidence

to support this theory of damages.  Among the deficiencies in

his proposed measurement of damages, Hoffman fails to connect

any misappropriation of one or more trade secrets to his

calculation and even fails to connect this calculation to any

changes that were actually made to Lionbridge's operations.

Hoffman's calculation is derived from a single document prepared by an H.I.G. consultant.  It is an October 2017 report that H.I.G.'s advisor McKinsey prepared in connection with the Auction.  The McKinsey report purports to analyze the additional profit that might be generated from a combination of Lionbridge and TransPerfect into a merged entity, which the report names NewCo.  It seeks to answer what might be the "expected cost synergies" and the "expected revenue synergies" from such a merger.  To answer those questions, McKinsey evaluated information taken from a wide variety of sources.  Those sources included nonpublic information from both TransPerfect and Lionbridge, information about relevant peers taken from a global database, information in McKinsey's proprietary databases, information from many public sources, and knowledge gleaned from over a score of interviews with McKinsey experts, TransPerfect competitors, and TransPerfect customers.  McKinsey identified eight areas in which cost savings could be achieved from a merger and two areas in which revenues could be enhanced.  The overall "cost synergies" were estimated as between $51 and $71 million, while the revenue synergies were estimated as between $14 and $41 million.

Hoffman relies on three components of the McKinsey report to create his unjust enrichment calculation.  They are its discussion of sales force compensation and organization;

20

outsourcing practices and costs; and production workflow and management processes.  Hoffman's discussion of the first two of these components is drawn fairly directly from the McKinsey report.  Hoffman massages some of the McKinsey data and its estimates to calculate the cost savings that would accrue to NewCo from improvements to the production workflow and management processes of the merged entity.

TransPerfect's theory of unjust enrichment appears to be that any benefits that McKinsey determined might accrue to NewCo from a merger are due to TransPerfect's superiority in its operations and that Lionbridge learned about aspects of that superiority in the Auction process and has been unjustly enriched by that knowledge.  TransPerfect contends that Hoffman can calculate the amount of unjust enrichment from the McKinsey report.

Among the problems with this theory of damages are the following.  Neither the McKinsey report nor Hoffman's report identify the trade secrets from which Lionbridge has been unjustly enriched.  The McKinsey report only generally identifies its sources of information and they are wide-ranging. There has been no showing that TransPerfect's trade secrets are responsible for any particular part of the McKinsey analysis. Similarly, Hoffman does not identify any particular TransPerfect trade secret as a component of his calculation.  Indeed, the

21

section of his report in which he calculates unjust enrichment damages only explains generally that it has valued TransPerfect's "trade secrets and/or confidential information." There is no way to determine, therefore, what trade secrets are at issue in this calculation of damages.

Just as critically, TransPerfect has failed to connect the McKinsey or Hoffman analysis to any misappropriation.  Even if TransPerfect's trade secrets were used in preparing the McKinsey report, that would not constitute a misappropriation.  The Agreement permitted McKinsey to have access to Evaluation Material to assist H.I.G. in the Auction process.  Hoffman does not calculate unjust enrichment damages from an analysis of changes that Lionbridge made to its operations based on access to any TransPerfect trade secrets.  He doesn't analyze Lionbridge's operations at all.  Hoffman relies entirely on the McKinsey report, which concerns a hypothetical merger that never took place and the synergies that might accrue should there be a merger.

2. Lost Profits

Alternatively, TransPerfect claims as damages its lost profits with respect to two clients:  Merck and IQVIA.  Hoffman estimates that TransPerfect's lost profits damages amount to at least $8.4 million.

TransPerfect contends that Lionbridge misused its pricing data from 2014 and 2015, which was obtained by H.I.G. during the Auction, to compete unfairly with it in 2017 and 2018 in connection with its bids to obtain business from Merck and IQVIA.  According to TransPerfect, it was compelled to lower its prices for these two clients or increase its rebates to compete with Lionbridge.  The Defendants have shown that they are entitled to summary judgment on these two claims for damages.

There is no direct evidence that the Lionbridge Sales Team or any other Lionbridge employee involved in bidding for business from Merck or IQVIA had access to the Evaluation Material providing to H.I.G. during the Auction.  There is also no circumstantial evidence that possession of the TransPerfect pricing or revenue information for either Merck or IQVIA for the years 2014/2015 played any role in the 2017 and 2018 bidding process.

Merck

TransPerfect contends that Lionbridge used its trade secrets, in particular its pricing data, in November 2017 to compete unfairly for business from Merck.  Merck is one of TransPerfect's most significant customers, although its annual revenues from its Merck business fluctuated considerably from year to year.

23

In 2017, Merck commenced a global RFP process. TransPerfect and Lionbridge (with its partner organization CQ Fluency) competed in that process for Merck's business.[7]  There were three rounds of submissions.  The first and second rounds were in June and September of 2017.  The third round was a best-and-final offer or BAFO round in November 2017.  It appears that pursuant to this process Merck awarded business to both TransPerfect and Lionbridge.[8]

The overall contract prices for the three proposals made by TransPerfect and Lionbridge/CQ Fluency are set forth below.  At each round, TransPerfect's price was lower than the price proposed by the Lionbridge team.

|  | Round 1 | Round 2 | Round 3 (BAFO) |
|---|---|---|---|
| TransPerfect | 37.8 | 32.2 | 29.7 |
| Lionbridge/CG Fluency | 40.2 | 40.0 | 34.1 |

Among other notable features of this bidding war are that at each round, both bidders reduced their prices; the Lionbridge team decreased its price by the widest margin in the BAFO round; and even with that reduction, the Lionbridge BAFO price was higher than TransPerfect's price in not just the BAFO round but also in round two.

---

[7] CQ Fluency had performed work for Merck for twelve years.

[8] TransPerfect became one of Merck's two global vendors.

TransPerfect does not assert that Merck gave Lionbridge access to its Merck bids or that Lionbridge learned what they were.  Instead, it alleges that Lionbridge had misappropriated TransPerfect's 2014 and 2015 Merck pricing data, data to which H.I.G. had mistakenly been given access during the Auction, and used that pricing data to prepare its BAFO, which Lionbridge submitted on November 22, 2017.  This was two days after H.I.G. learned it had lost the Auction.

TransPerfect explains how it was damaged from that unauthorized use of its confidential pricing information as follows.  TransPerfect contends that Merck informed it that it was "in the lead" after round 2.  But on November 29, Merck notified TransPerfect that it would need to submit its own BAFO to remain competitive with a global competitor.  As a result, TransPerfect submitted a BAFO that reduced its round 2 proposal by 8%.  TransPerfect does not contend, however, that Merck advised it of the terms of Lionbridge's bid at any round or that it knew of them through any other source.  Indeed, as noted above, TransPerfect's round 2 bid was below Lionbridge's round 2 and BAFO bids.

TransPerfect has no direct evidence of misappropriation by Lionbridge to support this claim.  Those at Lionbridge who were involved in preparing the BAFO have denied knowledge of the TransPerfect pricing information from 2014 and 2015, and there

is no evidence that they ever had such access.  Nor does
TransPerfect adequately explain why access to pricing data from
2014/2015 would have been of much assistance to anyone in
formulating a bid in late 2017.  Instead, TransPerfect relies on
inferences to be drawn from its analysis of the Lionbridge BAFO
pricing and speculation that the Lionbridge employees who
prepared the BAFO may have had access to the 2014/2015 pricing
data.

TransPerfect first contends that Lionbridge's BAFO pricing
looks suspicious.  It points out that, for the three highest
volume language groups, the Lionbridge price was one cent less
than the 2014/2015 TransPerfect rates.  In the fourth language
group, it was two cents less.  In the fifth language group it
was equal.  TransPerfect offers evidence that Lionbridge had not
altered its prices in these categories in its second bid, but
made late night adjustments to lower word rates in four out of
five language categories for its BAFO.

Next, it argues that the CSV File found in a folder of
TransPerfect employee Pelissier is sufficient to suggest access
and use by TransPerfect.  As explained above, the 2017 CSV File
contains TransPerfect pricing and revenue information from
2014/2015.  In 2017, Pelissier performed certain discrete
analyses of excel files to support H.I.G.'s due diligence
efforts during the Auction.  Those analyses included developing

an analysis of TransPerfect customers ranked by revenue.  There is no evidence that the File was ever accessed again.  Pelissier did not perform an analysis of TransPerfect's pricing and there is no evidence that Pelisser could have performed a pricing analysis if asked.

The existence of the CSV File in a folder maintained by Pelissier is insufficient to create a question of fact to support TransPerfect's assertion of misappropriation.  There is no evidence that the Lionbridge employees who prepared the BAFO bid for Merck in 2017 had access to or relied on TransPerfect's 2014/2015 pricing data.  Again, those employees deny knowing that information and there is no record anywhere of their access to that information.  Pelissier was not involved in preparing the BAFO bid in November 2017, and in the ordinary course of Lionbridge's business would have had no involvement.  The CSV File is unusable without conversion and there is no evidence of any such conversion to convey pricing information to anyone.

IQVIA

IQVIA and its predecessor have been TransPerfect customers since at least 2014 and TransPerfect's gross revenue from this customer has increased each year since 2014, including in 2020. On March 9, 2018, TransPerfect executed an amendment to its agreement with IQVIA.  This amendment increased the rebates that

TransPerfect offered to IQVIA.  This amendment serves as the first basis for TP's damages calculation.

Lionbridge also provides services to IQVIA, but by many orders of magnitude earns less revenue from this customer.  In April 2018, Lionbridge submitted a proposal for translation services to IQVIA.  TransPerfect does not contend that the Defendants had access to TransPerfect's March 9, 2018 amendment at the time Lionbridge submitted the April 2018 proposal. TransPerfect contends instead that the Lionbridge proposal benefited from Lionbridge having access to Transperfect's 2014 and 2015 pricing information, which was contained in the Pelissier CSV file, and that the proposal reflects selective underpricing of TransPerfect on eight of ten "key language pairs" when compared to the 2014 and 2015 pricing information.

In September 2018, IQVIA shared a summary of TransPerfect's pricing (by language and hourly charge) with Lionbridge. Lionbridge used the information disclosed by IQVIA in a proposal it submitted to IQVIA in September 2018.  This is the second element in the TransPerfect damages calculation.

TransPerfect contends that it has suffered lost profits from its business with IQVIA because it had to increase rebates in March 2018 to maintain its business with IQVIA.  TransPerfect argues that Lionbridge had the motive, means and opportunity to

use its 2014 and 2015 pricing data to unfairly compete with it in proposals Lionbridge made in April and September 2018.

TransPerfect has failed to offer evidence that the Defendants misappropriated any information relating to its business with IQVIA, or that it was damaged in any way from wrongful behavior by the Defendants in connection with IQVIA. For the reasons explained above, there is no evidence that the 2014 and 2015 pricing information in the CSV file possessed by Pelissier was shared with anyone other than the due diligence team or that it ever reached anyone involved in the Lionbridge sales operation or anyone involved in creating the proposals submitted to IQVIA.

Moreover, the first use of the information by Lionbridge to which TransPerfect points is the April 2018 Lionbridge proposal to IQVIA.  That proposal, however, was submitted to IQVIA a month after TransPerfect had agreed to provide increased rebates to IQVIA.  And, even if TransPerfect were able to offer evidence that Lionbridge had knowledge of the 2014 and 2015 TransPerfect prices in formulating its April 2018 proposal, the passage of time alone would have undercut the utility of that information.

As for the September 2018 bid by Lionbridge, that bid was informed by the TransPerfect data that IQVIA itself shared with Lionbridge.  There is, therefore, no evidence from which a jury could find either an improper use the TransPerfect 2014 and 2015

pricing information or any damage to TransPerfect from a
misappropriation of that information.

TransPerfect argues that the willingness of Lionbridge to
use the confidential information that IQVIA provided to it in
September demonstrates that Lionbridge would have had no
scruples in violating the Agreement.  Whether it was appropriate
or not of Lionbridge to accept from its client a competitor's
pricing data, the decision to accept and use the information
stands on separate footing from a breach of the Agreement, which
was executed in a court-supervised Auction.  In any event,
TransPerfect has the burden of providing sufficient admissible
evidence to raise a question of fact that, among other things,
the Defendants used the information and that it was damaged by
that use.  It has failed to do so.

## II.  Unfair Competition

TransPerfect brings a claim for unfair competition under
New York law.  To succeed on an unfair competition claim,
"plaintiffs must establish some wrongful appropriation or use of
the plaintiffs' intellectual property." Dow Jones & Co., Inc.
v. Int'l Sec. Exch., Inc., 451 F.3d 295, 302 (2d Cir. 2006).
"Whatever the breadth and flexibility of such a claim, it
depends upon the allegation of facts that, if true, would
constitute misuse of plaintiffs' property." Id. at n.8.  Here,
as the plaintiff recognizes in opposing this motion for summary

judgment, the state law unfair competition claim rises and falls with the trade secret misappropriation claim.  As the trade secret claims fail, the unfair competition claim does as well.

III. Fraud

TransPerfect has also pleaded a claim of fraud.  It has not, however, opposed the Defendants' motion for summary judgment on the fraud claim.  The fraud claim is deemed abandoned.  Kovaco v. Rockbestos-Surprenant Cable Corp., 834 F.3d 128, 143 (2d Cir. 2016).

IV.  Unjust Enrichment

Plaintiff brings an unjust enrichment claim against Lionbridge.  To establish unjust enrichment, TransPerfect must show that "(1) defendant was enriched (2) at plaintiff's expense, and (3) that it is against equity and good conscience to permit defendant to retain what is sought to be recovered." Kaplan v. Reed Smith LLP, 919 F.3d 154, 160 (2d Cir. 2019) (citation omitted).

TransPerfect's unjust enrichment claim fails.  TransPerfect argues that its unjust enrichment claim "mirrors" its breach of contract claim.  "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim."  Corsello v. Verizon New York, Inc., 18 N.Y.3d 777, 790 (2012).  Thus, TransPerfect's unjust enrichment claim is dismissed as duplicative of the breach of contract claim.

31

V.   Breach of Contract

Finally, TransPerfect has brought a breach of contract claim.  In its First Amended Complaint, TransPerfect pleaded that the breach of contract occurred from the misappropriation of trade secrets in violation of the Agreement.  As already explained, TransPerfect has failed to offer evidence to raise a question of fact that there was any breach of the Agreement.

TransPerfect argues in its opposition to this motion for summary judgment that the Defendants' motion does not address TransPerfect's "actual theories" of contractual breach. TransPerfect contends its actual theory is set forth in its contention interrogatory responses ("Responses"), which were filed one week before defendants' summary judgment motion was filed.  TransPerfect may not introduce new arguments into its Responses and then argue that the Responses, and not the operative complaint, constitute its "actual" legal claims.  At a conference held the record on January 7, 2021, this Court denied TransPerfect's motion to amend its First Amended Complaint.  As TransPerfect does not otherwise address the breach of contract claim in its opposition to the motion for summary judgment, TransPerfect has abandoned this claim as pleaded in the First Amended Complaint.

## Conclusion

Defendants' July 16, 2021 motion for summary judgment is granted.  The Clerk of Court shall enter judgment for Lionbridge Technologies, Inc., and H.I.G. Middle Market, LLC, and close this case.

Dated:      New York, New York
            January 21, 2022

                              _____
                                    DENISE COTE
                         United States District Judge